IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FORT DEFIANCE INDIAN HOSPITAL
BOARD, INC.,

       Plaintiff,

vs.                                No. CIV 22-0098 JB/CG

XAVIER BECERRA; ROSELYN TSO;
ELIZABETH FOWLER; MARQUIS YAZZIE;
NAVAJO AREA INDIAN HEALTH SERVICE
and THE UNITED STATES OF AMERICA,

       Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on Plaintiff Fort Defiance Indian Hospital Board,

Inc.'s Motion for Immediate Injunctive Relief or in the Alternative a Preliminary Injunction with

Supporting Memorandum, filed April 1, 2022 (Doc. 29)("PI Motion").  The Court held a hearing

on April 26, 2022.  See Clerk's Minutes, filed April 26, 2022 (Doc. 47).  The primary issues are:

(i) whether the Court should award immediate injunctive relief to Plaintiff Fort Defiance Indian

Hospital Board, Inc. under 25 U.S.C. § 5331(a) and require Defendants Xavier Becerra, Roselyn

Tso, Elizabeth Fowler, Marquis Yazzie, Navajo Area Indian Health Service ("IHS"), and the

United States of America to fund fully Fort Defiance in compliance with the parties' renewal

contract; (ii) whether the Court should award a preliminary injunction ("PI") to Fort Defiance and

require the Defendants to fund fully Fort Defiance in compliance with the parties' renewal

contract; and (iii) whether the Court should impose a bond on Fort Defiance.  The Court concludes

that: (i) Fort Defiance is not currently entitled to a permanent injunction under 25 U.S.C. § 5331;

(ii) Fort Defiance is entitled to a PI requiring the United States to fund fully Fort Defiance in

compliance with the parties' renewal contract; and (iii) Fort Defiance does not need to secure a bond. Accordingly, the Court will grant the Motion in part and deny the Motion in part.

## FINDINGS OF FACT

The Court must make findings of fact to order a PI. See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.). "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1179 (quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only). See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union   No. 1505, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.). The United States Court of Appeals for the Tenth Circuit notes that "when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits." Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003). Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." Heideman v. S. Salt Lake City, 348 F.3d at 1188. Accordingly, the Court makes these findings from the existing, limited record. These facts bind neither the Court nor the parties at trial.

1.      This case arises from a dispute between Fort Defiance and the IHS over IHS' partial declination of a renewal contract that Fort Defiance has with IHS under the Indian Self-Determination and Educational Assistance Act, 25 U.S.C. §§ 5301-5423 ("ISDEAA"). First

Amended Complaint ¶¶ 1-2, at 1-2, filed March 31, 2022 (Doc. 27)("Complaint").[1]

1.    **The Parties.**

2.    Fort Defiance is a "tribally chartered, 501(c)(3) nonprofit healthcare organization that owns and operates a hospital campus in Fort Defiance, Arizona, on the Arizona/New Mexico border, and a health clinic in Sanders, Arizona." Complaint ¶ 6, at 2, filed February 11, 2022 (Doc. 1)("Original Complaint").

3.    Fort Defiance serves approximately 47,000 people, "most of whom are members of the Navajo Nation and reside within the 16 Navajo communities in the Fort Defiance service area," which is formerly known as the Fort Defiance Service Unit. Original Complaint ¶ 6, at 3.

4.    The Navajo Nation is a federally recognized Indian Tribe and has designated Fort Defiance as a "tribal organization," under 25 U.S.C. § 5304(l) for purposes of contracting with IHS under the ISDEAA. Original Complaint ¶ 6, at 3.

5.    "Since 2010, FDIHB has provided healthcare services to members of the Navajo Nation pursuant to a contract with IHS under Title I" of the ISDEAA. Original Complaint ¶ 6, at 3.

6.    Becerra is the Secretary of the United States Department of Health and Human Services ("HHS"). Original Complaint ¶ 7, at 3.

7.    Fowler is the Acting Deputy Secretary of the IHS. See Original Complaint ¶ 8 at

---

[1]Neither the Original Complaint nor the Complaint is a verified complaint. Although the Court would be more confident relying on the Complaint to make its Findings of Fact if the Complaint were verified or were otherwise supported by sworn testimony, the Court has no basis other than the Complaint on which to make many of its factual findings. The Court relies on affidavits and declarations when possible, but, given that the United States does not dispute, in the extant record, many of the Complaint's factual allegations, the Court relies on the Complaint to make many of its factual findings.

3.

8.      Tso is the Area Director of the Navajo Area Indian Health Service ("NAIHS"), and

lives in Albuquerque, New Mexico.  Original Complaint ¶ 9, at 4.

9.      Yazzie is the Agency Lead Negotiator and Director of the Office of Indian Self-

Determination within the NAIHS, and lives in Gallup, New Mexico.  See Original Complaint ¶ 10,

at 4.

### 2.      **Background on the Contract**.

10.     On August 3, 2009, the Intergovernmental Relationship Committee of the Navajo

Nation Council "sanctioned and approved FDIHB as a tribal organization, empowered by"

ISDEAA, and "recognized by the Internal Revenue Service as a 501(c)(3) non-profit

organization."  Complaint ¶ 24, at 9.

11.     The Navajo Nation Council continues to support and approve Fort Defiance as a

tribal organization "at all times since" Fort Defiance entered its first ISDEAA contract.  Complaint

¶ 24, at 9.

12.     Pursuant to its authority under the Navajo Nation Council and the ISDEAA, Fort

Defiance entered a three-year contract with IHS to "manage and operate health services to eligible

beneficiaries within the former IHS Fort Defiance Unit," to begin in 2010.  Complaint ¶ 26, at 7.

13.     Under the FY 2010 contract, IHS awarded Fort Defiance $6.8 million in indirect

contract support costs and $1.2 million in direct contract support costs.[2]  See Transcript of Hearing

---

[2]The ISDEAA distinguishes between two contract supports costs: (i) "direct program expenses"; and (ii) "any additional administrative or other expense incurred by the governing body of the Indian Tribe or Tribal organization and any overhead expense incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract."  25 U.S.C. § 5325(a)(3)(A).

at 8:6-13, taken April 26, 2022 ("Tr.")(Miller).[3]

14.    For the FY 2010 contract, the parties "looked carefully at every item of indirect costs sought by the Fort Defiance Indian Health Board, and made a judgment about what was duplicated or not duplicated." Tr. at 8:15-18 (Miller).

15.    Since 2010, Fort Defiance has continued to manage and operate health services for eligible beneficiaries under "successive three-year" ISDEAA contracts with IHS. Complaint ¶ 26, at 7.

16.    For each successive ISDEAA contract, Fort Defiance "periodically submits contract renewal proposals to IHS," in accordance with IHS regulations "and standard practice," along with an Annual Funding Agreement ("AFA"), which specifies both parties' funding obligations for the first year of the proposed contract term. Complaint ¶ 27, at 8.

17.    "Ideally, the funding agreement and the contracts are in place before each fiscal year begins." Tr. at 9:7-9 (Miller).

18.    IHS' funding determination is "driven by a formula," but applying the formula from year to year "may lead to a slightly different amount," because, "[u]sually, the magnitude is unchanged, but the amounts change slightly." Tr. at 11:7-11 (Miller).

19.    Each funding agreement is "done in a collaborative way," Tr. at 12:1 (Miller), because it "starts with what the tribal contractor believes is going to be its indirect costs, and what the agency believes," Tr. at 11:23-25 (Miller).

20.    To determine the exact funding amount, the parties "look at the funding tables that are issued with the original funding agreement for the preceding years," including modifications

---

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

that occur "from time to time."  Tr. at 7:3-7 (Miller).

21.     Not all of the funding fits into this model, because IHS adds money to the contract over the course of a year, although "some of these dollars . . . cannot be awarded on day one of the next year" and "the tribal contractor must wait to get that money till later in the year."  Tr. at 11:1-3 (Miller).

22.     If the contract negotiations do not work out, one of two things can happen: (i) the parties extend the existing contract or funding agreement; or (ii) the negotiation happens later, "but the parties agree that the new agreement will be for a full 12 months."  Tr. at 9:20-22 (Miller).

23.     "The funding provided via the AFA includes both direct and indirect contract support costs."  Declaration of Dr. Sandra Adkins ¶ 6, at 2, filed April 1, 2022 (Doc. 30)("Adkins Decl.").

24.     After Fort Defiance submits a contract renewal proposal, IHS determines whether to approve or decline the contract renewal proposal.  See Complaint ¶ 27, at 8.

25.     "In addition to submitting an AFA with each contract renewal proposal, FDIHB and IHS jointly propose and develop AFAs annually during the term of an" ISDEAA contract.  Complaint ¶ 28, at 8.

26.     Once IHS and Fort Defiance finalize an AFA, "the AFA is signed by HIS" and IHS transmits to Fort Defiance.  Complaint ¶ 28, at 8.

27.     ISDEAA requires Tribal organizations that submit contract renewal proposals to estimate the "indirect contract support costs" that are associated with each proposal.  Complaint ¶ 29, at 8.

28.     IHS provides Tribal organizations two options to estimate indirect contract support costs: (i) the Tribal organization can start with the most recent indirect contract support cost ("IDC

rate") agreement that the Tribal organization and its "cognizant agency" had negotiated separately, and "apply the rate to the direct cost base"; or (ii) "in addition to applying the rate," the Tribal organization can "negotiate a lump sum for indirect contract support costs." Complaint ¶ 29, at 8. See Adkins Decl. ¶ 8, at 2-3.

29.     Since FY 2017, Fort Defiance's indirect cost rate has been calculated by the Division of Cost Allocations, or DCA, "an office within the Department of Health and Human Services." Tr. at 15:9-12 (Miller).

30.     Fort Defiance negotiates with DCA by submitting "its audit," which is "an elaborate array of information concerning all the programs it's operating, and all the personnel in its indirect cost pool." Tr. at 15:14-16 (Miller).

31.     After DCA and Fort Defiance make "various adjustments," the indirect cost pool "is divided by the base of all the programs," and DCA "comes up with a ratio." Tr. at 15:17-19 (Miller).

32.     Fort Defiance "switched from negotiating its indirect costs with IHS from 2010 to 2016" to having "an indirect cost rate, which is a lot easier for everybody." Tr. at 15:21-23 (Miller).

33.     The indirect cost rate applies to "everything Fort Defiance does, every program, every grant, no matter who the payor is" and "no matter from whom that money comes." Tr. at 15:24-16:2 (Miller).

34.     Both the direct cost base and the IDC rate that the Tribal organization and its relevant agency negotiate vary each year. See Complaint ¶ 30, at 8.

35.     Because the direct cost base and the IDC rate vary each year, for organizations that choose to estimate indirect contract support costs by applying the IDC rate, the indirect contract

support costs' amount also varies each year.  <u>See</u> Complaint ¶ 30, at 8.

36.     Fort Defiance's annual budget has grown over time.  <u>See</u> Tr. at 6:11-16 (Miller).

37.     In pre-COVID-19 years, IHS is responsible for approximately forty-five percent of Fort Defiance's budget.  <u>See</u> Tr. at 6:11-16 (Miller).

**3.      <u>The Contract</u>.**

38.     On August 14, 2018, Fort Defiance submitted to IHS a contract renewal proposal and an AFA for fiscal year 2019.  <u>See</u> Complaint ¶ 31, at 8.

39.     In the August 14, 2018, proposal, Fort Defiance estimates indirect contract support costs by applying its "negotiated IDC rate to the IHS direct cost base."  Complaint ¶ 31, at 8-9.

40.     IHS "accepted this proposed calculation and negotiated a three-year renewal contract with FDIHB for February 1, 2019 through September 30, 2021."  Complaint ¶ 31, at 9.

41.     During the 2019-2021 contract's term, Fort Defiance and IHS "jointly developed annual AFAs."  Complaint ¶ 32, at 9.

42.     In 2020, Fort Defiance and IHS developed jointly a proposed AFA for the 2021 fiscal year.  <u>See</u> Complaint ¶ 32, at 9.

43.     While developing the FY 2021 proposed AFA, Fort Defiance and IHS staff "proposed that $18,279,615 of indirect contract support costs be included in the AFA."  Complaint ¶ 33, at 9.

44.     The FY 2021 proposed AFA includes the $18,279,615.00.  <u>See</u> Complaint ¶ 33, at 9.

45.     The indirect cost rate in place when the parties executed the FY 2021 AFA was 34.3, although this was considered a "provisional" rate not made "final" until an auditing process was undertaken.  Tr. at 16:10-17 (Miller).

46.     The provisional rate "may go up or down slightly," but typically does not change significantly before it is finalized.  Tr. at 16:24-25 (Miller).

47.     In March, 2021, a new indirect cost rate was issued, changing the old rate of 34.3 to 34.5.  See Tr. at 17:8-18 (Miller).

48.     Fort Defiance calculated that, applying this rate, indirect contract costs would increase to "roughly . . . 18.4 [million dollars]."  Tr. at 20:12 (Miller).

49.     IHS does not "modify additional indirect costs into the funding agreement on an as-occurring basis," because IHS waits until the fiscal year closes.  Tr. at 18:4-10 (Miller).

50.     On October 16, 2020, Yazzie sent an email about the FY 2021 AFA, in which Yazzie "stated that the 'only issue raised by the IHS concerned a reference in the AFA to a policy considered by IHS to be obsolete."  Complaint ¶ 34, at 9 (no citation for quotation).

51.     IHS "did not identify any issue with the indirect contract support costs proposed in the" FY 2021 AFA.  Complaint ¶ 34, at 9.

52.     On December 16, 2020, IHS signed and transmitted the final FY 2021 AFA to Fort Defiance.  See Complaint ¶ 35, at 9.

53.     The "fully executed" FY 2021 AFA includes $18,279,615.00 in indirect contract support costs and is "consistent with the proposal of $18,279,615 previously calculated by agency staff."  Complaint ¶ 35, at 9.

**4.      The 2022 Renewal Proposal and 2022 AFA.**

54.     On August 2, 2021, the Navajo Nation's Health, Education and Human Service Committee ("HEHSC") passed a resolution "approving and recommending" that Fort Defiance be designated as a Tribal organization for "'a period of fifteen (15) years, beginning December 29, 2021, and ending December 28, 2036,'" for the purposes of ISDEAA contracts with IHS.

Complaint ¶ 36, at 9 (no citation for quotation).

55.    "The Naabik'íyáti' Committee, which acts as the executive committee of the Navajo Nation Council, passed a resolution on August 31, 2021 granting" Fort Defiance "authority to contract with IHS for a 15-year term."  Complaint ¶ 36, at 9.

56.    Fort Defiance submitted a contract renewal proposal and a FY 2022 AFA to IHS on August 3, 2021.  See Complaint ¶ 37, at 10.

57.    Fort Defiance's contract renewal proposal "proposed a contract term that matched the term of authority that would be included in the Navajo Nation's authorizing resolution," meaning that Fort Defiance proposed a fifteen-year contract term.  Complaint ¶ 37, at 10.

58.    The proposed FY 2022 renewal contract "related to the same programs" as prior Fort Defiance self-determination contracts and their related AFAs.  Complaint ¶ 38, at 10.

59.    The proposed FY 2022 renewal contract "did not add programs, services, functions, and activities, or include any new types of costs not already included in prior year contracts." Complaint ¶ 38, at 10.

60.    The proposed FY 2022 renewal contract did not add "staff associated with a joint venture."  Declaration of Oscencio Tom ¶ 8, at 3, filed April 1, 2022 (Doc. 1)("Tom Decl.").

61.    The proposed FY 2022 renewal contract "did not include any new types of costs not included in the [indirect contract costs] pool associated with IHS programs that were not already included in prior year contracts."  Tom Decl. ¶ 9, at 3.

62.    In the proposed FY 2022 renewal contract, Fort Defiance "proposed to estimate indirect contract support costs associated with its contract renewal proposal" by using "the same methodology used for previous contract renewal proposals and related AFAs," meaning that Fort Defiance applied "its negotiated IDC rate to the IHS direct cost base amount."  Complaint ¶ 41, at

10.

63.     IHS staff used this same methodology to develop and then propose indirect contract support costs of $18,405,910.00, which is a $126,295.00, or 0.7%, increase "over the amount previously proposed and approved by IHS staff for the" FY 2021 AFA.  Complaint ¶ 42, at 11.

**5.     IHS Approval.**

64.     On August 3, 2021, IHS received and acknowledged Fort Defiance's FY 2021 contract renewal proposal and accompanying AFA documents.  See Complaint ¶ 44, at 11.

65.     On August 18, 2021, Yazzie sent a letter to Fort Defiance requesting more information about Fort Defiance's indirect contract support costs, but "did not indicate that there were any concerns with the methodology" that Fort Defiance "had proposed for estimating indirect contract support costs," -- same methodology that IHS used to calculate Fort Defiance's 2022 contract support costs.  Complaint ¶ 45 at 11.

66.     On September 3, 2021, IHS sent Fort Defiance its initial review documents, which "acknowledged that the correct indirect cost rate" for Fort Defiance should be 34.5% and "indicated that 'Current-Year Indirect CSC Need' was $18,515,007 -- greater than the $18,405,910 amount IHS earlier proposed for the" FY 2022 AFA.  Complaint ¶ 46, at 11 (no citation for quotation).

67.     "An initial negotiation meeting" between Fort Defiance and IHS "was scheduled for October 6, 2021."  Complaint ¶ 47, at 11.

68.     On October 5, 2021, IHS sent Fort Defiance "updated contract and AFA documents" for "discussion in the October 6, 2021 negotiation"; in the documents, IHS "again calculated the indirect contract support costs for the 2022 AFA as $18,515,007," and "did not indicate that there were any issues with the contract support cost amount and raised no issues"

regarding cost duplication.  Complaint ¶ 48, at 11-12.

69.     At the October 6, 2021, negotiations, IHS asserted that the indirect contract support cost amounts that IHS had calculated and proposed, and which Fort Defiance updated, "included duplicative costs," but IHS "did not say how much they believed was duplicated and continued using the $18,515,007 number during this negotiation."  Complaint ¶ 49, at 12.

70.      On October 14, 2021, IHS asserted that $11,132,625.00 of the funding amount that IHS had proposed previously "constituted duplicative funding."  Complaint ¶ 49, at 12.

71.     On October 21, 2021, Fort Defiance informed IHS that IHS' analysis of the alleged duplicative funding "violated the restriction of 25 C.F.R. § 900.33." Complaint ¶ 51, at 12.

72.     Fort Defiance reiterated this position to IHS on November 19, 2021.  See Complaint ¶ 49, at 12.

**6.     IHS' Partial Declination.**

73.     On December 1, 2021, IHS sent Fort Defiance a partial declination of Fort Defiance's contract renewal proposal.  See Complaint ¶ 52, at 12.

74.     IHS' December 1, 2021, correspondence conveying IHS' partial declination indicates that IHS "was 'awarding the portion of the contract and [FY] 2022 [AFA] that, pursuant to'" the ISDEAA, "'the IHS considers severable.'"  Complaint ¶ 52, at 12 (no citation for quotation)(alterations in Complaint).

75.     IHS declined to award Fort Defiance its proposed fifteen-year term, "notwithstanding that the proposed 15-year term accorded with the grant of authority provided by the Navajo Nation's governing body."  Complaint ¶ 52 n.1, at 12.

76.     IHS decided to fund only $1,887,739.00 of Fort Defiance's proposed indirect contract support costs, declining the remaining $16,627,268.00 -- an "almost 90% reduction" from

the $18,515,007.00 in indirect contract support costs that IHS proposed in September, 2021. Complaint ¶ 52, at 12.

77.     In its declination letter, IHS stated that the funding that Fort Defiance received in prior years "included duplicative funding amounts" and asserted that "the indirect contract support cost funding amounts it had calculated earlier in the review period had also included duplicative amounts."  Tom Decl. ¶ 20, at 5.  See Letter from Chris Buchanan to Oscencio Tom, Re: Partial Declination of Fort Defiance Indian Hospital Board, Inc.'s Fiscal Year 2022 Indian Self-Determination and Education Assistance Act Proposal at 267-68 (dated December 1, 2021), filed April 20, 2022 (Doc. 39-1)("Declination Letter"),

78.     Although Fort Defiance's proposed contract support cost amount "was calculated using an approved methodology" that Fort Defiance had used previously, IHS indicates that the method that Fort Defiance uses to determine its indirect contract support costs is "flawed, and the amounts previously awarded to" Fort Defiance "were overstated."  Complaint ¶ 53, at 13.

79.     As of January 27, 2022, IHS has provided $1,887,739.00 in "reimbursable indirect costs for FY 2022," $16,627,268.00 less than Fort Defiance proposed.[4]  Complaint ¶ 54, at 13.

**7.     The Partial Declination's Impact.**

80.     IHS' partial declination impacts Fort Defiance's ability to "provide essential health services to its patients and community members, especially in the midst of the COVID-19

---

[4]Fort Defiance's calculations are not correct.  Fort Defiance states that IHS agreed to fund $1,887,739.00 in contract support costs, see Complaint ¶ 52, at 12, but provided Fort Defiance $1,887,339.00, see Complaint ¶ 54, at 13, a $400.00 difference.  Fort Defiance does not indicate whether IHS has not provided Fort Defiance $400.00 or whether there is a typographical error in its Complaint.  Because Fort Defiance states that "IHS's partial declination has already reduced funds available to" Fort Defiance "by $16,627,268," the Court concludes that the $400.00 is a typographical error.  Complaint ¶ 54, at 13.

pandemic."  Complaint ¶ 55, at 13.

81.     As of September 30, 2020, Fort Defiance has $227,781,909.00 in assets and a net position of $199,665,784.00.  See Declaration of Marquis E. Yazzie ¶ 3, at 2, filed April 15, 2022 (Doc. 35-1)("Yazzie Aff.").

82.     The annual funding that IHS gives to Fort Defiance under the ISDEAA contract "directly applies to cover the salaries of permanent staff members."  Complaint ¶ 56, at 13.

83.     As a result of IHS' partial declination of Fort Defiance's indirect contract support costs, Fort Defiance "will need to re-allocate funds to the employment of full time, permanent administrative staff in order to make up the shortfall," which will require Fort Defiance to reduce the number of "locums tenens (contract) nurses and providers it utilizes to fill vacant positions." Complaint ¶ 56, at 13.

84.     "Contract staff costs approximately 40% more overall than permanent employees, and the cost to employ contract staff has increased over 300% from pre-pandemic costs." Complaint ¶ 56, at 13.

85.     "The cost of hiring contract staff during the pandemic has imposed severe financial difficulties" on Fort Defiance.  Complaint ¶ 56, at 13.

86.     Fort Defiance hires "[n]ursing and physician contractors" to help "manage the extremely high number of COVID-19 patients seeking care at" Fort Defiance's facilities, and hires "contract nurses to assist with COVID-19 screening and testing as well as providing COVID-19 vaccinations at large scale community vaccination events."  Complaint ¶ 57, at 14.

87.     Fort Defiance's contract nurses and physicians "have been critical" to Fort Defiance's care delivery, and "have backfilled for staff members who are out due to illness and in departments that have unfavorable nurse to patient ratios during the pandemic."  Complaint ¶ 57,

at 14.

88.     Reducing Fort Defiance's ability to hire these contract nurses and physicians, including through IHS' partial declination, "will make it impossible to provide the necessary level of care to the Navajo Nation community and to the sickest patients throughout the COVID-19 pandemic."  Complaint ¶ 58, at 14.

89.     Prospective patients who are not able to get healthcare at Fort Defiance due to Fort Defiance's staffing shortages "will need to be transferred to hospitals in other areas of the western United States where an open bed may be found," which will "add to the already overwhelming challenges that members of the Navajo Nation face in receiving medical care in an underserved area."  Complaint ¶ 59, at 14.

90.     The "significant funding reduction" will impact Fort Defiance's ability to hire "needed additional Contract Tracers, Public Health Nurses, and Infection Control and Occupational Health staff," who are "critical" to Fort Defiance's efforts to address COVID-19's impacts.  Complaint ¶ 60, at 14.

91.     Fort Defiance's contract tracing team is "struggling to stay on top of the current positive COVID-19 patient case load due to the sheer number of cases."  Complaint ¶ 60, at 14.

92.     Fort Defiance "has had to reduce the amount of information gathered from patients and the number of times patients are contacted in order to reach all patients being tracked."  Complaint ¶ 60, at 14.

93.     Fort Defiance instituted a hiring freeze because of IHS' partial declination.  See Tr. at 38:25-39:1 (Miller).

94.     Being able to hire "additional contract personnel" would allow Fort Defiance to "mitigate these issues."  Complaint ¶ 60, at 14-15.

- 15 -

95.     "[C]ontract personnel are critical" to Fort Defiance's ability to comply with "the CMS conditions of participation[5], which indicate that" Fort Defiance "must have a robust Infection Control and Occupational Health program with staff positions filled in order to keep its employees safe and free from exposure to the COVID-19 virus."  Complaint ¶ 60, at 15.

96.     The funding decrease from IHS' partial declination will require Fort Defiance to reevaluate and "eliminate patient services that result in low patient revenue," including Fort Defiance's "Denture Program for elders, the Hearing Aid Program, Durable Medical Equipment Program, the HEAL Fellowship Program that hires physicians who are specially trained to manage health cases," Fort Defiance's "Mobile Unit Program that provides vaccines and basic care in remote communities, and Wellness Program initiatives that serve patients in the community by providing exercise programs and education to combat hypertension, diabetes and obesity." Complaint ¶ 61, at 15.

97.     In 2020 and in 2021, Fort Defiance received one-time federal grants "that were designed to help offset the increased operational costs of fighting the COVID-19 pandemic," but "these monies will do nothing to address" the shortfall that IHS' partial declination caused.  Adkins Decl. ¶ 18, at 6.

98.     The one-time federal grants "were essential to cover unforeseen costs that have arisen with the onset of the COVID-19 pandemic."  Adkins Decl. ¶ 19, at 6.

99.     "The costs for Personal Protective Equipment, as well as contract nurses and providers, have risen astronomically since the onset of the pandemic due to extremely high demand

---

[5]The CMS conditions of participation are the Centers for Medicare and Medicaid Services Conditions and Conditions of Participation.  See Conditions for Coverage (CfCs) & Conditions of Participation (CoPs), CMS.gov, https://www.cms.gov/Regulations-and-Guidance/Legislation/CFCsAndCoPs/Hospitals?msclkid=ede01aafcfb411ecb81a8decae2ae6f7 (last visited May 9, 2022).

throughout the country."  Adkins Decl. ¶ 19, at 6-7.

100.    In 2020, Fort Defiance received Provider Relief Funds through the CARES Act that helped to cover the FY 2020 drop in third-party revenue from the discontinuation of elective surgeries because of COVID-19.  See Adkins Decl. ¶ 20, at 7.

101.    The Provider Relief Funds were a temporary solution and "will have no bearing on" Fort Defiance's ability to cover the shortfall resulting from IHS' partial declination.  Adkins Decl. ¶ 20, at 7.

102.    During FY 2021, Fort Defiance received funds through the America Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4, that were used "to cover only COVID-19 related expenses," Adkins Decl. ¶ 21, at 7, and "cannot be applied to general patient care," Adkins Decl. ¶ 22, at 7.

103.    The America Rescue Plan Act funds cannot be applied to any future expenses.  See Adkins Decl. ¶ 22, at 7.

104.    The America Rescue Plan Act funds do not affect Fort Defiance's ability to cover the shortfall resulting from IHS' partial declination.  See Adkins Decl. ¶¶ 22-23, at 7-8.

105.    On March 13, 2022, Fort Defiance filed its Motion for Immediate Injunctive Relief or in the Alternative a Temporary Restraining Order & Preliminary Injunction With Supporting Memorandum at 1, filed March 13, 2022 (Doc. 13)("Initial TRO Motion"), and withdrew it later the same day, see Notice of Withdrawal of Document, filed March 28, 2022 (Doc. 22).

106.    Fort Defiance filed its Motion seeking an injunction on April 1, 2022.  See Motion at 1.

## PROCEDURAL BACKGROUND

Fort Defiance alleges three claims.  See Complaint ¶¶ 63-75, at 15-18.  First, Fort Defiance alleges that it is entitled to "immediate injunctive relief" under 25 U.S.C. § 5331(a), because "IHS

declined to fully award" Fort Defiance's renewal contract, thus violating the ISDEAA and its implementing regulations.   Complaint ¶ 66, at 16.   In particular, Fort Defiance asserts that ISDEAA requires IHS to award Fort Defiance's proposed renewal contract, because Fort Defiance "did not propose a 'material and substantial change' from the preceding contract, concerning either the scope or funding of the agency program, functions, services, or activities covered by the contract."   Complaint ¶ 64, at 15 (quoting 25 C.F.R. §§ 900.33).

Second, Fort Defiance contends that IHS' partial declination violates the ISDEAA, which "prohibits the Secretary from reducing the amount of funds provided for the contract 'in subsequent years.'"   Complaint ¶ 68, at 16 (quoting 25 U.S.C. § 5325(b)).   In particular, Fort Defiance argues that, for FY 2021, it received $15,250,622.00 in indirect contract support costs over a ten-month period, which is equivalent to $18,279,615.00 over a full fiscal year, but IHS "impermissibly reduced that amount to $1,887,339 in FY 2022," which violates 25 U.S.C. § 5325. Complaint ¶ 70, at 16.   For this alleged violation, Fort Defiance asks the Court to award immediate injunctive relief under 25 U.S.C. § 5331(a) "to compel the Secretary to award and fund in full the renewal contract" that Fort Defiance submitted on August 3, 2021.   Complaint ¶ 70, at 16.

Third, Fort Defiance argues that IHS' partial declination of Fort Defiance's proposal renewal contract and its accompanying AFA violates the ISDEAA, because: (i) IHS' declination letter "fails to clearly demonstrate the validity of its assertion that it has included $12,666,506 in Secretarial amount dollars being paid to" Fort Defiance "for activities also identified" in Fort Defiance's "indirect pool cost," Complaint ¶ 74(a), at 17, and; (ii) IHS' declination letter "fails to clearly demonstrate the validity of its assertion that amounts IHS claims it transferred in FY 2010 are properly adjusted to some high numbers in FY 2022" and "fails to analyze any actual amounts included in the overall FY 2022 Secretarial amount that are alleged to be duplicative of costs" in

Fort Defiance's indirect pool cost, Complaint ¶ 74(b), at 18. Fort Defiance argues that IHS did not make a finding that "clearly demonstrates" the validity of its determination that Fort Defiance's FY 2022 contract proposal and AFA duplicate $16,627,268.00 in funding in Fort Defiance's indirect cost pool. Complaint ¶ 75, at 18. For its third claim, Fort Defiance asks the Court to award immediate injunctive relief under 25 U.S.C § 5331(a) to compel Becerra to award and fund fully Fort Defiance's renewal contract. Complaint ¶ 75, at 18.

On March 13, 2022, Fort Defiance filed a motion asking for immediate injunctive relief under the ISDEAA or, in the alternative, a temporary restraining order and PI. See Initial TRO Motion. The Court held a hearing on the Initial TRO Motion on March 28, 2022. See Clerk's Minutes, filed March 28, 2022 (Doc. 28). After the hearing, that same day, Fort Defiance withdrew its Initial TRO Motion. See Notice of Withdrawal of Document, filed March 28, 2022 (Doc. 22). Fort Defiance filed its Motion asking for an injunction under ISDEAA and a PI on April 1, 2022. See Motion at 1.

### 1.    **The Motion.**

Fort Defiance asserts two bases for injunctive relief. See Motion at 1-20. Fort Defiance argues that it proposed a renewal contract and an incorporated AFA for FY 2022 that was "materially identical to proceeding contracts (but for the new contract term)," but that IHS partially declined the proposed contract's indirect contract support cost funding, which is "contrary to [IHS'] obligations under law." Motion at 2. Fort Defiance, therefore, asks for immediate injunctive relief under the ISDEAA's injunction provision, 25 U.S.C § 5331(a), and, in the alternative, for a PI requiring IHS to fund fully the renewal contract "on a recurring monthly basis pending the disposition of this case on summary judgment." Motion at 2.

First, Fort Defiance argues that 25 U.S.C. § 5331(a) permits the Court to award a statutory injunction to compel IHS to award and fund Fort Defiance's ISDEAA contract. <u>See</u> Motion at 6. Fort Defiance asserts that, when IHS violates ISDEAA or its regulations, "a court 'may award immediate injunctive relief without proceeding to summary judgment or to trial.'" Motion at 6 (quoting <u>Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell</u>, 100 F. Supp. 3d 1122, 1166 (D.N.M. 2015)(Browning, J.)). According to Fort Defiance, IHS violates the ISDEAA in three ways, one of which is "factually complex and is not suited to consideration at this stage of the proceeding." Motion at 9. Fort Defiance alleges that the two other alleged violations entitle it to immediate injunctive relief under the ISDEAA. <u>See</u> Motion at 9. First, Fort Defiance contends that IHS acted unlawfully by declining to fund fully Fort Defiance's contract renewal proposal, because there are no "'material and substantial changes'" in the proposed renewal contract when compared with its predecessor contract. Motion at 9 (quoting 25 C.F.R. § 900.33). According to Fort Defiance, if there are no material and substantial changes to an ISDEAA contract, then IHS "may not review the renewal proposal for declination issues." Motion at 9 (citing 25 C.F.R. § 900.33). Fort Defiance argues that the proposed FY 2022 renewal contract does "not contain any substantial and material changes to the preceding contract" and proposes only "minor amendments to update the renewal contract for the proposed term and to clarify language used in the previous iterations of the contract (and of course proposing a new term)." Motion at 9-10. Moreover, Fort Defiance alleges that the proposed incorporated AFA uses the "same HIS-approved methodology the parties employed for previous contract and funding agreements." Motion at 10. According to Fort Defiance, the proposed fifteen-year term for the renewal contract is not a material and substantial change. <u>See</u> Motion at 10. Fort Defiance argues that IHS declined in part its renewal contract, because IHS believes that Fort Defiance "had received excessive

funding in previous years." Motion at 11. Fort Defiance argues that this reason involves considerations beyond the contract's four corners, which IHS is not permitted to consider when making a renewal determination. See Motion at 11-12.

Second, Fort Defiance argues that it is entitled to a statutory injunction under ISDEAA, because IHS reduced impermissibly the amount of funds for Fort Defiance's ISDEAA contract, in violation of 25 U.S.C. § 5325(b). See Motion at 12. Fort Defiance contends that the ISDEAA requires IHS to fund "a tribally contracted Federal Program at levels prescribed by statute." Motion at 12 (citing 25 U.S.C. § 5325). Fort Defiance states that ISDEAA's funding requirements include a base funding amount that is equal to what IHS would have spent on the program in the absence of the contract -- the "Secretarial" amount -- and an additional amount to cover the Tribe's "fixed overhead costs necessary to carry out the program" -- the "contract support costs." Motion at 12 (citing 25 U.S.C. § 5325(a)(1)-(3)). Fort Defiance states that 25 U.S.C. § 5325 permits IHS to reduce contract support costs only if at least one of the following are present: (i) a reduction in appropriations from the previous fiscal year for the program or function to be contracted; (ii) a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution; (iii) a Tribal authorization; (iv) a change in the amount of pass-through funds needed under a contract; or (v) completion of a contracted project, activity, or program. See Motion at 12 (citing 25 U.S.C. § 5325(b)(2)). Fort Defiance argues that IHS partially declines the renewal contract on a "different basis," namely "the alleged duplication of funds provided to" Fort Defiance under the contract. Motion at 12. According to Fort Defiance, IHS' partial declination is not one of ISDEAA's enumerated criteria, and, therefore, the partial declination violates ISDEAA. See Motion at 12. Fort Defiance contends that IHS' "newfound

duplication concerns are not a valid basis for reducing the funds available" under the proposed renewal contract.  Motion at 12.

Alternatively, Fort Defiance asks for a PI.  See Motion at 7.  Fort Defiance asserts that it is entitled to injunctive relief even if it must demonstrate the "traditional equitable grounds for obtaining injunctive relief."  Motion at 13.  First, according to Fort Defiance, a PI would "maintain the decade-long status quo that IHS disrupted on December 1, 2021."  Motion at 13.  Fort Defiance alleges that the status quo is "a contractual relationship in which IHS provides Fort Defiance a specific amount of funding -- calculating using an IHS-approved methodology -- to provide specific healthcare services to the Navajo people."  Motion at 13.  In addition, Fort Defiance asserts that the requested PI does not require the Court to supervise constantly the injunction.  See Motion at 14.  Second, Fort Defiance argues that failing to award the proposed FY 2022 renewal contract would cause irreparable harm, because Fort Defiance and the Navajo Nation tribal members who depend on it would face -- and already are facing -- an "interruption in continuity of care and decreased access to vital health care services" as a result of IHS' partial declination.  Motion at 15. Moreover, Fort Defiance argues that the "failure of IHS to perform its duties under" the ISDEAA is "statutorily defined to be the kind of irreparable harm for which an injunction is to issue." Motion at 14-15 (citing 25 U.S.C. § 5331(a)).  Third, Fort Defiance argues that it is likely to succeed on the merits, because IHS's partial declination violates the ISDEAA, given that there are no material and substantial changes to the scope or funding of Fort Defiance's programs, and given that the AFA is substantially the same as the prior AFA.  See Motion at 16.  Fourth, Fort Defiance asserts that the balance of equities weighs in a PI's favor, because an injunction will not harm IHS, because a PI would merely require IHS to continue its relationship with Fort Defiance until trial, and because IHS "always has the right to file claims under the Contract Disputes Act if the amounts

paid under the injunction were improper." Motion at 16 (citing 41 U.S.C. §§ 7101-7109). Fifth, Fort Defiance contends that a PI is in the public interest, because "'there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.'" Motion at 17 (quoting League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016)). In addition, according to Fort Defiance, a PI is in the public interest, because Fort Defiance provides high-quality healthcare to the Navajo Nation's members, and because IHS' partial declination limits Fort Defiance's ability to provide patient care. See Motion at 17. Finally, Fort Defiance asserts that, if the Court awards a statutory injunction under 25 U.S.C. § 5331(a), the Court should not require it to post a bond, because the ISDEAA "expressly" provides the relief, and that, if the Court awards a PI, the Court should not impose a bond, because there is no harm to IHS and because IHS can recoup any funds later in the litigation. Motion at 18.

### 2. **The Response.**

The United States responds, asserting that Fort Defiance does not demonstrate that it will suffer irreparable harm if the Court does not award a PI. See Defendants' Opposition to Plaintiff's Motion for Immediate Injunction Relief or in the Alternative a Preliminary Injunction at 1, filed April 15, 2022 (Doc. 35)("Response"). In addition, the United States argues that the Court should not award an injunction under 25 U.S.C. § 5331(a), because Fort Defiance is not likely to succeed on the merits of its claims. Response at 1. In the Response, the United States makes three arguments. See Response at 3-16.

First, the United States contends that Fort Defiance will not suffer irreparable harm if the Court does not award a PI. See Response at 3. The United States alleges that Fort Defiance "has submitted no evidence of its current financial position to support its motion," and that, as of September 30, 2020, Fort Defiance had $227,781,909.00 in assets and a "net position of

$199,665,784." Response at 4. According to the United States, Fort Defiance "faces no irreparable injury," because it possesses "substantial assets and can recover damages, if warranted, at the conclusion of this action." Response at 4. Moreover, the United States suggests that Fort Defiance does not explain its "delay" in seeking a PI, noting that IHS "issued its partial declination decision on December 1, 2021," but Fort Defiance "did not file the present motion until four months later." Response at 4.

Second, the United States asserts that, for two reasons, Fort Defiance is not likely to succeed on the merits. See Response at 4-8. First, the United States argues that 25 U.S.C. § 5325(b) applies only to funds that § 5325(a)(2) requires. See Response at 5. The United States notes that the § 5325(a)(1) amount is known as the "Secretarial" amount, because "this is the amount the Secretary, through IHS, would have otherwise provided for its continued operation of the program." Response at 5. The United States suggests that ISDEAA requires IHS to add to the Secretarial amount funds to reimburse a Tribe for its contract support costs. See Response at 5 (citing 25 U.S.C. §§ 5325(a)(2) and (a)(3)). According to the United States, § 5325(a)(2) authorizes contract support costs only for "unique activities for which funding is not already transferred in the Secretarial amount," and § 5325(b) "limits the circumstances in which IHS can reduce the 'amount of funds *required* by subsection (a).'" Response at 5 (no citation for quotation)(emphasis in Response). The United States argues that the funding in dispute here is "not required by subsection (a), nor was it [an] authorized [contract support cost] under subsection (a)(2)-(3)." Response at 6. The United States alleges that § 5325(a)(3), "which Congress later added to clarify that [contract support costs] can be for both direct and indirect types of costs, emphasizes that requirement." Response at 6 (citing Cook Inlet Tribal Council, Inc. v. Dotomain, 10 F.4th 892, 894-96 (D.C. Cir. 2021)). The United States argues that IHS declines funding "that

did not satisfy" ISDEAA's contract support provision, namely funds designated as contract support costs to cover activities "for activities that IHS also carried out when it directly operated the now-contracted health care programs, and transferred to Plaintiff in the Secretarial amount, as required by § 5325(a)(1), such as laundry and linen service, patient registration services, and facility maintenance."  Response at 6.  Moreover, the United States argues that § 5325(b) does not require IHS to fund "unauthorized" contract support costs merely because of an "inadvertent overpayment or oversight in prior years," because doing so would "create internal inconsistencies in the statute" and would "nullify Congress's specific instructions about the types of costs that are authorized" as contract support costs.  Response at 6.

Next, the United States argues that Fort Defiance is not likely to succeed on the merits, because 25 C.F.R. § 900.33 does not prohibit IHS' partial declination.  See Response at 7. According to the United States, Fort Defiance proposed a material and substantial change to its funding amount, namely: (i) an increase in contract support costs of $15,250,622.00 -- a ten-month proration from an annual amount of $18,279,615.00 -- in FY 2021 to $19,486,709 in FY 2022, "equivalent to a 6.6% increase"; and (ii) an increase in the term of the contract from three to fifteen years.  Response at 7.  The United States argues that, even if 25 C.F.R. § 900.33 prohibits IHS' partial declination, IHS "must follow" the ISDEAA and that "the regulation cannot conflict with those requirements."  Response at 8.  The United States contends that 25 C.F.R. § 900.33 "cannot be read to override Congress' restrictions defining the types of costs authorized to be paid by 25 U.S.C. § 5325(a)(2)-(3)."  Response at 8.

Third, the United States argues that both the balance of equities and the public interest tilt in its favor and that the Court should not award a preliminary injunction.  See Response at 8.  The United States argues that the balance of equities and public interest factors "merge when a plaintiff

seeks an injunction against the federal government." Response at 8 (citing <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009)). According to the United States, "it would contravene the public interest to require IHS to award funding that Congress specifically prohibited in 25 U.S.C. § 5325(a)(2)-(3)." Response at 8. Accordingly, the United States contends that Fort Defiance is not entitled either to immediate injunctive relief under 25 U.S.C. § 5331(a) or to a PI. <u>See</u> Response at 8.

### 3.      The Reply.

Fort Defiance replies to the United States, maintaining that it is entitled to injunctive relief under 25 U.S.C. § 5331(a) or to a PI. <u>See</u> Reply in Support of a Motion for Immediate Injunctive Relief or in the Alternative a Preliminary Injunction, filed April 22, 2022 (Doc. 41)("Reply"). According to Fort Defiance, the United States' arguments are unavailing. <u>See</u> Reply at 1-12. In the Reply, Fort Defiance makes three arguments. <u>See</u> Reply at 1-12.

First, Fort Defiance contends that IHS does not meet its burden to show that it lawfully declined Fort Defiance's proposed renewal contract. <u>See</u> Reply at 1. Fort Defiance alleges that the proposed FY 2022 renewal contract proposes indirect contract support costs that are "virtually the same," and does not propose a material and substantial change to the contract under 25 C.F.R. § 900.33. Reply at 1. Fort Defiance asserts that the United States' numbers are wrong -- that the FY 2022 renewal contract proposes $18,515,007.00, not $19,486,709.00, in indirect contract supports costs, and that this increase over FY 2021's indirect contract support costs is not a material and substantial change. <u>See</u> Reply at 2. Moreover, Fort Defiance contends that IHS calculated $18,515,007.00 on August 30, 2022, before later reducing that amount in its declination letter. <u>See</u> Reply at 2. Next, Fort Defiance argues that IHS states incorrectly that the FY 2021 indirect contract support costs are $18,279,615.00, because IHS does not include either "any indirect contract support costs that would become due as a result of program increases eventually

paid to" Fort Defiance as a result of the "subsequently-enacted Consolidated Appropriations Act of 2021 [Pub. L. No. 116-260, 134 Stat. 1182]," or any indirect contract support costs that IHS later added to Fort Defiance's indirect contract support costs.  Reply at 3.  According to Fort Defiance, IHS reimbursed Fort Defiance for an additional $2,945,128.00 in indirect contract support costs, meaning that IHS "seriously understates the total indirect contract support costs" that Fort Defiance "was entitled to in FY 2021."  Reply at 3.  Next, Fort Defiance argues that IHS and Fort Defiance used the same methodology to calculate indirect contract support costs both in the FY 2022 proposed renewal contract and in the FY 2021 contract, which further suggests that there was no material and substantial change in the FY 2022 proposed renewal contract.  See Reply at 3.  Moreover, according to Fort Defiance, the fifteen-year proposed renewal term is not a material and substantial change to the FY 2022 proposed renewal contract, because 25 C.F.R. § 900.33 covers only changes in "'funding.'"  Reply at 5 (quoting 25 C.F.R. § 900.33).  In addition, Fort Defiance argues that "the mandatory rule of interpretation" that the IHS "must demonstrate that its broader reading of the regulation is 'clearly required' by the regulatory language" supports this reading of 25 C.F.R. § 900.33, Reply at 5 (quoting 25 C.F.R. § 900.33(b)(11)), and the United States' preferred interpretation "would permit a variation in the term of a contract to serve as a pretext for a do-over of IHS' initial" contract that is more than ten years old, Reply at 5.  Finally, Fort Defiance argues that IHS must fund the FY 2022 proposed renewal contract, because IHS does not have the authority to decline it.  See Reply at 6 (citing Navajo Nation v. U.S. Dep't of Interior, 852 F.3d 1124, 1126, 1130 (D.C. Cir. 2017); Seneca Nation of Indians v. U.S. Dep't of Health & Hum. Servs., 945 F. Supp. 2d 135, 152 (D.D.C. 2013)(Collyer, J.)).

Second, Fort Defiance asserts that 25 U.S.C. § 5325(b) does not permit IHS to "reduce contract amounts in later years whenever IHS decides that its original determination may have

been flawed."  Reply at 6-7.  Fort Defiance states that the ISDEAA does not "suggest[] that Congress authorized the Secretary to reduce contract amounts years later whenever IHS decides that its original calculations and agreements with a tribe or tribal organization were mistaken or ill-conceived."  Reply at 7.  According to Fort Defiance, the United States' argument that the disputed funding was not "required by" § 5325(a) is incorrect, because it would open a "new basis for contract reductions" in the ISDEAA.  Reply at 6.

Third, Fort Defiance argues that the United States does not address "any aspect" of § 5331(a), and that Fort Defiance, therefore, is entitled to an ISDEAA injunction under § 5331(a).  Reply at 7.  In addition, Fort Defiance contends that, in the alternative, it is entitled to a PI, because the United States' assertion that Fort Defiance can recover any funds at the case's end relies on an "eighteen-month-old excerpt" of Fort Defiance's FY 2020 audit, which "both overstates and misconstrues" Fort Defiance's assets, because it includes "non-liquid assets such as capital assets, long-term investments, and assets limited as to use."  Reply at 8.  Moreover, Fort Defiance states that IHS' partial declination caused Fort Defiance to project a net loss of $22 million for FY 2022 and caused Fort Defiance to delay planned maintenance on its buildings.  See Reply at 8.  Fort Defiance argues that it is "not required to prove 'imminent bankruptcy or the imminent complete demise of [its] business' to show an 'injury acute enough to justify injunctive relief.'"  Reply at 8 (quoting Kan. Health Care Ass'n, Inc. v Kan. Dep't of Soc. & Rehab. Servs, 31 F.3d 1536, 1544 (10th Cir. 1994)(alteration in Reply)).  According to Fort Defiance, that it exercised "prudent financial management in planning for an developing a reserve fund" does not preclude it from showing that it suffers imminent or irreparable injury from IHS' partial declination.  Reply at 9.  Moreover, Fort Defiance asserts that the United States does not explain why it thinks that Fort Defiance's three-month delay in filing its Motion is "'unreasonable.'"  Reply at 9 (no citation for

quotation).  Fort Defiance maintains that it is likely to succeed on the merits, because IHS violates the ISDEAA and its regulations by applying "the declination process to a contract renewal proposal that did not propose a material and substantial change to the scope or funding of the contract programs" and reducing Fort Defiance's "funding from one year to the next contrary to the narrow and limited reductions authorized in 25 U.S.C. § 5325(5)."  Reply at 10.  Finally, Fort Defiance states that a PI serves the public interest, because "the public interest is not served by reducing [Fort Defiance's] indirect contract support cost funding by nearly 90% in the middle of a pandemic, nor is it served by permitting the agency's conduct to go unaddressed."  Reply at 10 (citing League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016)).  Fort Defiance, therefore, asserts that it is entitled to an injunction under the ISDEAA or a PI.

### 4.    **The Hearing.**

The Court held a hearing on the Motion on April 26, 2022.  See Clerk's Minutes, filed April 26, 2022 (Doc. 47).  The Hearing began with Fort Defiance introducing several Fort Defiance officials who attended the hearing.  See Tr. at 4:5-12 (Miller).  Fort Defiance began its argument by stating that "this is another tragic case . . . of the Indian Health Service abusing its twin responsibilities to support tribal self-determination and maximize health care for Indian people."  Tr. at 4:20-23 (Miller).  Fort Defiance noted that this "is happening in the face of the [Navajo Health Foundation-- Sage Memorial Hospital Inc. v. Burwell, 100 F. Supp. 3d at 1166] litigation, which was largely identical, as a legal matter, to circumstances here."  Tr. at 4:23-5:1 (Miller).  According to Fort Defiance, this case is "happening in a context where the Government invented a declination it had no authority to do, in order to have the pretext to renegotiate the contract and the duplication issues in the contract."  Tr. at 5:1-5 (Miller).

Fort Defiance explained the case's background, including its ISDEAA contract, the population it serves, and its affiliation with the Navajo Nation.  See Tr. at 6:3-10 (Miller).  Fort Defiance stated that its annual budget has grown over time, and that, in non-COVID-19 years, IHS is responsible for approximately forty-five percent of Fort Defiance's budget.  See Tr. at 6:11-16 (Miller).  According to Fort Defiance, Medicaid and Medicare revenues cover the majority of the budget's remainder.   See Tr. at 6:17-19 (Miller).  Fort Defiance noted the history of the contract that it has with IHS, explaining that the contract began with FY 2010.  See Tr. at 7:10-15 (Miller).  Fort Defiance contended that, for FY 2010, IHS awarded Fort Defiance $6.8 million in indirect contract support costs and $1.2 million in direct contract support costs.  See Tr. at 8:6-13 (Miller).  Fort Defiance argued that, for FY 2010, the parties "looked carefully at every item of indirect costs sought by the Fort Defiance Indian Health Board, and made a judgment about what was duplicated or not duplicated."  Tr. at 8:15-18 (Miller).

Fort Defiance then summarized the contract negotiation process and stated that, "[i]deally, the funding agreement and the contracts are in place before each fiscal year begins."  Tr. at 9:7-9 (Miller).  Fort Defiance stated that, if the contract negotiations do not end in agreement, one of two things can happen: (i) the parties extend the existing contract or funding agreement; or (ii) the negotiation happens later, "but the parties agree that the new agreement will be for a full 12 months, which is what happened in 2022."  Tr. at 9:20-22 (Miller).  Fort Defiance contended that, to determine the exact funding amount, the parties "look at the funding tables that are issued with the original funding agreement for the preceding years, and you look at all of the modifications, because the funding agreement is modified from time to time."  Tr. at 7:3-7 (Miller).  Fort Defiance asserted that some of the funding does not fit into this model, because IHS adds money to the contract over the course of a year, although "some of these dollars . . . cannot be awarded on day

one of the next year" and "the tribal contractor must wait to get that money till later in the year."
Tr. at 11:1-3 (Miller).  Fort Defiance alleged that IHS' funding determination "is driven by a
formula," and that IHS "needs to apply the formula each year, and it may lead to a slightly different
amount," because, "[u]sually, the magnitude is unchanged, but the amounts change slightly."  Tr.
at 11:7-11 (Miller).

Fort Defiance then turned to the indirect contract support costs.  See Tr. at 11:20-23
(Miller).  Fort Defiance argued that each funding agreement "starts with what the tribal contractor
believes is going to be its indirect costs, and what the agency believes" are going to be its indirect
costs, Tr. at 11:23-25 (Miller), noting that is it "always done in a collaborative way," Tr. at 12:1
(Miller).  Fort Defiance contended that, for the FY 2022 contract negotiations at issue here,
deciding the indirect contract support costs "was done in a collaborative way here for"
approximately seventy days.  Tr. at 12:2-3 (Miller).  According to Fort Defiance, the parties "arrive
at an agreement on the numbers; they apply the latest indirect cost rate, and you're good to go."
Tr. at 12:10-11 (Miller).  Fort Defiance stated that, when this process happens on the first day of
the fiscal year, "you know there are going to be changes."  Tr. at 12:13-14 (Miller).

Fort Defiance then discussed the FY 2021 proposed funding agreement, observing that it
has four sections "that are interesting and important to consider," namely "Sections 4(b)(1), 4(e),
20(c), and 20(d)."  Tr. at 12:20-23 (Miller).  According to Fort Defiance, section 4(b)(1) means
that new data makes the parties recalculate their indirect contract costs, and 4(e) "tells us there will
be adjustments and increases," or "[s]tay tuned, there are going to be amendments called
modifications to this agreement."  Tr. at 13:11-12 (Miller).  Fort Defiance contended that § 20(c)
of the FY 2021 contract provides that "Fort Defiance shall be eligible for any increases in funding,
for funding for maintenance and improvement funds," also called "M&I funds."  Tr. at 13:19-24

- 31 -

(Miller). Finally, according to Fort Defiance, § 20(d) "says that no consent is required of Fort Defiance for the Indian Health Service to add more money to the contract." Tr. at 14:6-8 (Miller). Fort Defiance argued that "these provisions turn out to be pretty important, because the section -- the fiscal year 2021 contract, when it says there is going to be paid 15 million and change for ten months, which annualized -- and the parties agree -- annualized to just shy of $18.3 million," is "actually not the number." Tr. at 14:19-25 (Miller). Fort Defiance alleged that the total contract support cost amount will change "if the rate changes, and it's going to change if there is more money coming into the contract." Tr. at 15:1-3 (Miller).

Next, Fort Defiance turned to its indirect cost rates, noting that, since FY 2017, Fort Defiance "has had an indirect cost rate issued by the Division of Cost Allocations," or DCA, which "is an office within the Department of Health and Human Services." Tr. at 15:9-12 (Miller). Fort Defiance stated that it negotiates with DCA by submitting "its audit," which is "an elaborate array of information concerning all the programs it's operating, and all the personnel in its indirect cost pool." Tr. at 15:14-16 (Miller). Fort Defiance argued that, after DCA and Fort Defiance make "various adjustments," the indirect cost pool "is divided by the base of all the programs," and DCA "comes up with a ratio." Tr. at 15:17-19 (Miller). Fort Defiance stated that it "switched from negotiating its indirect costs with IHS from 2010 to 2016" to having "an indirect cost rate, which is a lot easier for everybody." Tr. at 15:21-23 (Miller). Fort Defiance argued that the indirect cost rate applies to "everything Fort Defiance does, every program, every grant, no matter who the payor is," and "no matter from whom that money comes." Tr. at 15:24-16:2 (Miller).

Fort Defiance contended that the indirect cost rate in place when the parties executed the FY 2021 AFA is 34.3%, and explained that this is the "provisional" rate until "you get your audits done that year and you square up all the numbers and you come up with a new rate for that year,

which will be final." Tr. at 16:10-17 (Miller).  Fort Defiance noted, however, that the provision

rate "may go up or down slightly," but typically does not change significantly.  Tr. at 16:24-25

(Miller).  According to Fort Defiance, there was a new indirect cost rate issued in March, 2021,

that changed the old rate to 34.5%, meaning that the indirect contract costs is "going to go up to

roughly 18.4 [million dollars] and change."  Tr. at 17:23-24 (Miller).  The Court interjected to

clarify whether IHS calculated indirect contract support costs to be higher than the prior year.  See

Tr. at 18:1-3 (Miller).  Fort Defiance stated that "IHS calculated it," but noted that "the way IHS

and the Tribes . . . do business is they know that the rate went up, everybody knows it," and that

"IHS is given a copy of the rate," but IHS does not "modify additional indirect costs into the

funding agreement on an as-occurring basis," because IHS waits until the fiscal year closes.  Tr.

at 18:4-10 (Miller).  Fort Defiance stated that, if the rate changes, the parties multiply the rate by

the additional program dollars, and that there is a reconciliation process afterwards.  See Tr. at

18:18-25 (Miller).  According to Fort Defiance, the reconciliation process began in FY 2021 and

has not been completed.  See Tr. at 19:1-4 (Miller).

Next, Fort Defiance noted that it received "additional dollars" in FY 2021, including

$1,760,000.00 in "M&I, maintenance and improvement funds," $400,000.00 in equipment

funding, $45,000.00 in "Office of Environmental Health and Engineering" "support dollars," and

two "Navajo area-wide reserves," including $381,000.00 for a "so-called hospital and clinics line

item in the budget," and $65,000.00 for "the purchase and referred case, PRC, line item of the

budget."  Tr. at 19:16-25 (Miller).  Fort Defiance alleged that these five amounts "add up to $2.65

million that were added into the" FY 2021 contract.  Tr. at 20:103 (Miller).  Fort Defiance noted

that there are "other funds" that relate to "COVID, and prior years," but that they do not affect the

relevant calculation.  Tr. at 20:6-7 (Miller).  Fort Defiance argued that, when the Court multiplies

$2,650,000.00 by the 34.5% rate, "you get to over $900,000 to be added," meaning that "we went from 18.4 roughly, to 18.5" million dollars, and "now we're at 19.3 [million] round dollars" for FY 2021, which is "what you would expect to occur in the ultimate reconciliation that happens in March." Tr. at 20:11-15 (Miller).

Fort Defiance then turned to the FY 2022 contract renewal proposal and 25 C.F.R. § 900.33. See Tr. at 20:19-21:3 (Miller). Fort Defiance stated that, in its briefing, the United States misstates the amount of FY 2022 proposed contract supports costs as $19,500,000.00, because the actual amount that Fort Defiance proposed is $18,515,008.00. See Tr. at 21:4-22:11 (Miller). Fort Defiance argued that $18,515,008.00 is not "materially and substantially higher than what IHS agreed to in 2021." Tr. at 22:13-14 (Miller). According to Fort Defiance, of the five categories of funding added to the AFA in FY 2021, IHS "was persuaded to put three of those five" in the FY 2022 AFA: "everything but maintenance and improvement monies . . . and equipment monies." Tr. at 23:8-11 (Miller). Fort Defiance alleged that "not only wasn't there a material and substantial increase; once you sort that out and you're comparing apples to apples, it was the same. It was the same amount." Tr. at 23:20-23 (Miller). Fort Defiance asserted that this comparison "explains a fundamental problem with the Government's case," because "IHS never premised its declination on an increase in indirect contract support costs requested by Fort Defiance." Tr. at 23:23-24:3 (Miller).

According to Fort Defiance, 25 C.F.R § 900.33 "doesn't say any change in the program or funding of contract support costs," but instead discusses a change "in a program or funding of a PFSA [program, service, function, or activity]." Tr. at 24:9-11 (Miller). Fort Defiance asserted that, because 25 C.F.R § 900.33 does not discuss specifically contract support costs, it is "not at all clear that 900.33 even applies" when there is an increase in contract support costs; nevertheless,

Fort Defiance maintained that there "was no proposed increase in contract support costs in this case." Tr. at 24:16-20 (Miller). Fort Defiance then turned to the fifteen-year contract extension term, arguing that the extension is not a "program, service, function, or activity" under 25 C.F.R § 900.33, because it is "a term change." Tr. at 26:8-10 (Miller).

Turning to IHS' declination letter, see Declination Letter at 262-72, Fort Defiance contended that the Declination Letter is "nothing if it isn't clear," because "[w]e know exactly why IHS did the declination": "IHS did the declination because it undertook a new analysis inspired by" Cook Inlet Tribal Council, Inc. v. Dotomain, 10 F.4th at 892, and "decided there is a new way to look at things," Tr. at 26:12-22 (Miller). Fort Defiance argued that the Court, in Navajo Health Found. -- Sage Mem'l Hosp. , Inc. v. Burwell, 256 F. Supp. 3d 1186 (D.N.M. 2015)(Browning, J.), said "that's forbidden," because IHS is "confined to the [f]our [c]orners of the renewal proposal." Tr. at 27:5-8 (Miller). Fort Defiance asserted that IHS came "very close to the end of that 90-day [negotiation] period," and concluded that it is overpaying Fort Defiance by $11,000,000.00, which later "changed to $12 million, and they came out with a declination letter claiming $12 million in duplicated costs." Tr. at 28:12-16 (Miller). According to Fort Defiance, that number changed to "over $16.6 million" "when you apply indirect cost rates and the offsets." Tr. at 28:17-19 (Miller). Fort Defiance asserted that IHS "cannot do that under" 25 C.F.R § 900.33. Tr. at 28:19 (Miller). Fort Defiance stated that it has a "severe problem" with the United States' "conduct in light of" 25 U.S.C. § 5321(f), which requires IHS to negotiate in good faith, because "[w]hat IHS did, under the rubric of 900.33, was not good faith behavior." Tr. at 30:2-9 (Miller). Fort Defiance noted that IHS has a "backup argument" that IHS "can reduce the contract anyway," that is, when "they think the contract value is too high." Tr. at 30:10-16 (Miller). Fort Defiance asserted, however, that 25 U.S.C. § 5325(b) "addresses reductions in contract amounts"

and forbids IHS from reducing contracts except for one of five enumerated reasons, none of which applies here.  Tr. at 30:18 (Miller).

Fort Defiance then addressed <u>Navajo Nation v. United States Dep't of Interior</u>, No. CIV 16-0011-TSC, 2022 WL 834143, at *9 n.6 (D.D.C. March 21, 2022)(Chutkan, J.), asserting that it is "a bit off the point," because "all [the Honorable Tanya S. Chutkan, United States District Judge for the United States District Court for the District of Columbia,] says about this topic, about 900.33," is that it "doesn't apply to a successor funding agreement."  Tr. at 31:16-32:18 (Miller). Fort Defiance argued, however, that Judge Chutkan is mistaken, because "900.33 does involve funding agreements," given that it "talks about funding for programs, services, functions, or activities," meaning that it "embraces both the contract and the funding agreement incorporated into the contract." Tr. at 32:20-33:1 (Miller).   Fort Defiance noted that "the case has been appealed."  Tr. at 33:2-3 (Miller).  Next, Fort Defiance addressed <u>Cook Inlet Tribal Council, Inc. v. Dotomain</u>, 10 F.4th at 892, alleging that it is "wrong" and is "diametrically opposed to [the Court's] opinion in the Sage litigation, and there is no way to square the two."  Tr. at 33:6-12 (Miller).  Fort Defiance contended that, in <u>Cook Inlet Tribal Council, Inc. v. Dotomain</u>, 10 F.4th at 892, the D.C. Circuit concluded that "anything the Government would normally spend money on -- never mind whether they did or they didn't, never mind whether they transferred it to the tribe or didn't -- is disqualified as a contract support cost item."  Tr. at 34:5-9 (Miller).   Fort Defiance contrasted in <u>Cook Inlet Tribal Council, Inc. v. Dotomain</u>, 10 F.4th at 892, with <u>Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell</u>, 263 F. Supp. 3d 1083, 1178 (D.N.M. 2016)(Browning, J.), arguing that the Court concludes that IHS "can only claim duplication for individuated amounts that it actually pays the tribe."  Tr. at 33:24-25 (Miller).

Fort Defiance then addressed the remedy that it requests, arguing that it does not request permanent injunctive relief under 25 U.S.C. § 5331(a), noting that the Court "is free to fashion injunctive relief any way Your Honor thinks is best," and stating that it hopes that the Court award a month-to-month amount to cover the declined contract support costs, which will allow the contract to continue to be funded "if this litigation goes into the next fiscal year."  Tr. at 35:19-23 (Miller).  Next, Fort Defiance argued that this case is different from Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 100 F. Supp. 3d at 1166, because, here, the United States briefed the 25 C.F.R § 900.33 issue.  See Tr. at 36:11-18 (Miller).  Fort Defiance asserted that "there aren't any factual issues here" and that this case raises only questions of law.  Tr. at 36:20-21 (Miller). Moreover, Fort Defiance states that 25 U.S.C. § 5331(e) "requires the Government to justify its declination by clearly demonstrating the validity of its declination."  Tr. at 37:21-23 (Miller). According to Fort Defiance, a PI does not harm the United States, because "Congress has made an unlimited annual appropriation for contract support costs."  Tr. at 38:7-9 (Miller).  Fort Defiance stressed that "losing over $16.6 million has caused severe problems at Fort Defiance," including a hiring freeze.  Tr. at 38:25-39:1 (Miller).  Finally, Fort Defiance argued that "requiring the agency to abide by the rigors of the Indian Self-determination Act and its implementing regulations" serves the public interest.  Tr. at 40:7-9 (Miller).

The United States then began its argument, asserting that Fort Defiance does not show that they will suffer irreparable harm without a PI.  See Tr. at 40:24-41:5 (Bell).  The United States alleged that "what is missing is any sort of meaningful evidence or census number or true budgetary information that shows that this, meaningfully is how Fort Defiance is harmed."  Tr. at 41:6-10 (Bell Miller).  According to the United States, Fort Defiance does not show that it will suffer irreparable harm that cannot be remedied with later funding.  See Tr. at 41:17-25 (Bell).

Moreover, the United States argued that contract support costs are "authorized to cover costs for unique activities in which the funding is not already covered in the secretarial amount," which is "where the duplication was discovered, and that duplication is what is at issue." Tr. at 42:2-7 (Bell). According to the United States the "large amount of reserve funding that Fort Defiance has available to it" supports this conclusion. Tr. at 42:10-16 (Bell).

The United States argued that IHS did not abuse its discretion in issuing the partial declination, because it "has a responsibility to responsibly manage these funds," and "if Fort Defiance's position is that once the Government discovers duplication, it's stuck with it, because it was discovered after the fact," then Fort Defiance's position is "irrational." Tr. at 42:6-11 (Bell). The United States asserted that Fort Defiance requested a material or substantial change to the contract, because a "6 percent increase in funding is arguably quite material, and opens the door for that sort of renegotiation," Tr. at 44:16-19 (Bell), and extending the contract to a fifteen-year term is "absolutely material," Tr. at 45:1 (Bell).

Next, the United States turned to Cook Inlet Tribal Council, Inc. v. Dotomain, 10 F.4th at 892, and Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 263 F. Supp. 3d at 1083, asserting that the two opinions are in conflict, so "there needs to be an opportunity in this case to try to rectify the differences there, to let the litigation . . . play out so that these two positions can be squared." Tr. at 45:12-18 (Bell). The United States asserted that IHS does not have "buyer's remorse or some sort of position that IHS is taking that it got out-negotiated some years ago and it's trying to rectify that." Tr. at 46:16-20 (Bell). The United States reiterated its contention that "the evidence that is before the Court today shows basically that there is a concern by Fort Defiance that potentially there could be some sort of harm if the injunction doesn't issue today, but no evidence to meaningfully support that." Tr. at 47:7-11 (Bell). Moreover, the United States

asserted, Fort Defiance's financial reserves are sufficient to make up the budgetary shortfall.  <u>See</u> Tr. at 47:18-48:2 (Bell).  The United States argued that the Court should "let this play out," so the Court can have "meaningful time to review this," rather than reach a decision "based on a presentation made in haste."  Tr. at 48:8-11 (Bell).

The Court asked the United States about <u>Cook Inlet Tribal Council, Inc. v. Dotomain</u>, 10 F.4th at 892, and <u>Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell</u>, 263 F. Supp. 3d at 1083, and inquired whether, "[i]f I stay with my conclusions in <u>Sage</u>, on the merits . . . would the Government agree that it loses here?"  Tr. at 48:23-49:1 (Court).  The United States responded that it does not necessarily lose, because "[t]here is a lot of evidence for the Court to consider here," Tr. at 49:5-6 (Bell), but conceded that it " may not succeed here," but that "the Government needs to have the opportunity to . . . make its arguments," Tr. at 49:19-21 (Bell).

Fort Defiance then stated that it has a sworn declaration stating that it will "suffer a net operating loss this year of $22 million projected," and "the $16.6 million . . . would almost eliminate that."  Tr. at 50:15-19 (Miller).  According to Fort Defiance, there is "substantial harm in the way by permitting the Government to keep that money instead of honoring the contractual commitment it made and has made to Fort Defiance for several years."  Tr. at 50:20-24 (Miller).  Next, Fort Defiance alleged that the "long-term impact is clear when it comes to the purposes for which those reserves were set aside," and explained that many of the funds that Fort Defiance has are already slated to be spent on other projects.  Tr. at 50:25-51:1 (Miller).  Fort Defiance argued that the "question is who holds onto that money during the pendency of the case?"  Tr. at 51:7-8 (Miller).  Fort Defiance contended that Congress made a policy that "once a contract is negotiated, good, bad, or indifferent, it sticks, and no reductions can occur in subsequent years" and "there is good reason for that."  Tr. at 52:23-53:1 (Miller).  The parties then discussed the deadline for the

Court to issue its opinion; the parties settled on May 26, 2022.  See Tr. at 54:9-55:12 (Court, Miller, Bell).  After the parties discussed scheduling matters, the hearing concluded.  See Tr. at 55:13-60:4 (Court, Miller, Bell).

## LAW REGARDING THE ISDEAA

The ISDEAA authorizes Native American Tribes and Tribal organizations to contract either with the United States Department of the Interior ("DOI") or with the HHS Secretary[6] to provide their members federally funded services that a federal agency otherwise would provide directly.  See 25 U.S.C. § 5302; S. Rep. No. 100-274, at 1 (1987), reprinted in 1988 U.S.C.C.A.N. at 2620 ("1987 Senate Report"); Seneca Nation of Indians v. HHS, 945 F. Supp. 2d 135, 143 (D.D.C. May 23, 2013)(Collyer, J.)("[S]elf-determination contracts essentially allow Indian tribes to step into the shoes of certain United States government agencies in providing certain services to their members.").  When Congress passed the ISDEAA in 1975, it recognized that "the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities," and has "denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians."  25 U.S.C. § 5301(a)(1).  Congress thus enacted the ISDEAA to "permit an orderly transition of federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services."  25 U.S.C. § 5302(b).

---

[6]The ISDEA defines "the Secretary" throughout 25 U.S.C. § 3501, without specifying the specific department that the Secretary supervises.  25 U.S.C. § 3501.  In the ISDEA's "definition" provision, it defines "the Secretary" as "either the Secretary of Health and Human Services or the Secretary of the Interior or both."  25 U.S.C. § 5304(i).  Accordingly, in this Law Regarding the ISDEA section, when the Court refers to "the Secretary" it means "either the DOI or the HHS Secretary."  25 U.S.C. § 5304(i).

An ISDEAA contract proposal typically consists of two parts: (i) a multi-year agreement that satisfies 25 U.S.C. § 5329(c); and (ii) an AFA.  See 25 U.S.C. § 5324.  The AFA must contain: (i) "terms that identify the programs, services, functions, and activities to be performed or administered, the general budget category assigned, the funds to be provided, and the time and method of payment"; and (ii) "such other provisions, including a brief description of the programs, services, functions, and activities to be performed (including those supported by financial resources other than those provided by the Secretary), to which the parties agree."  25 U.S.C. § 5329(c).

There are two types of funding in an ISDEAA contract: (i) 25 U.S.C. § 5325(a)(1) funding, also known as the "secretarial" amount; and (ii) contract support costs under 25 U.S.C. §§ 5325(a)(2) and (a)(3).  Cook Inlet Tribal Council, Inc. v. Dotomain, 10 F.4th at 893.  The Secretarial amount is "a negotiated sum" that cannot be less than what IHS "would have spent on the program if it directly provided the health care."  Cook Inlet Tribal Council, Inc. v. Dotomain, 10 F.4th at 893 (citing 25 U.S.C. § 5325(a)(1); Salazar v. Ramah Navajo Chapter, 567 U.S. 182, 186 (2012); and Menominee Indian Tribe of Wisconsin v. United States, 577 U.S. 250, 252 (2016)).  Contract support costs are funds to reimburse Tribes "for contract compliance expenses" that IHS does not "incur (and therefore doesn't pay) when it runs the program."  Cook Inlet Tribal Council, Inc. v. Dotomain, 10 F.4th at 893.  Congress designed contract support costs to cover costs that a Tribe incurs "to ensure compliance with the terms of the contract and prudent management," even if it means that IHS pays the Tribe more under the ISDEAA contract than IHS would pay to run the program itself.  25 U.S.C. § 5325(a)(2).  Expenses that IHS normally pays when it runs a program, however, are "eligible for reimbursement only under the secretarial amount."  Cook Inlet Tribal Council, Inc. v. Dotomain, 10 F.4th at 893.  With the secretarial and

contract support costs combined, "the government is required to fully fund the contracted-for health program" that a Tribe runs.  Cook Inlet Tribal Council, Inc. v. Dotomain, 10 F.4th at 893.

### 1.      **The Declination Process.**

The ISDEAA contracting process begins when a Tribe or Tribal organization submits a contract proposal to the Secretary.  See 25 U.S.C. § 5321(a)(2).  Unless the Tribe or Tribal organization agrees to an extension, the Secretary must approve or decline the proposal within ninety days.  See 25 U.S.C. § 5321(a)(2); 25 C.F.R. §§ 900.16, 900.17.  Otherwise, the proposal is deemed approved.  See 25 U.S.C. 5325(a); 25 C.F.R. § 900.18.

Should the Secretary decide to decline the proposal in part or in its entirety, he or she must do so based on one of these five reasons:

(A)     the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;

(B)     adequate protection of trust resources is not assured;

(C)     the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;

(D)     the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title; or

(E)     the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities, . . . because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 5321(a)(2).  See 25 C.F.R. § 900.22 (setting forth the same declination criteria).

There are a number of limitations on the Secretary's authority to apply § 450f(a)(2)'s declination criteria.  The Secretary cannot decline a contract renewal proposal "where no material and substantial change to the scope or funding of a program, functions, services, or activities has

been proposed by the Indian tribe or tribal organization." 25 C.F.R. § 900.33. Similarly, the Secretary cannot decline a successor AFA proposal that is "substantially the same" as its predecessor. 25 C.F.R. § 900.32. The Secretary also cannot decline any proposal based on any objections "that will be overcome through the contract." 25 C.F.R. § 900.33. The Secretary may not "consider information beyond a contract renewal proposal's four corners in determining whether it is 'substantially the same' as its predecessor." Navajo Health Found. -- Sage Mem'l Hosp. , Inc. v. Burwell, 256 F. Supp. 3d at 1232 (quoting 25 C.F.R. § 900.32). Moreover, if the Secretary can decline only a portion of a contract proposal, he or she must approve all other severable portions of the proposal. See 25 C.F.R. § 900.25.

After the Secretary declines a proposal, he or she must: (i) state any objections in writing to the Tribe or Tribal organization; (ii) provide assistance to the tribe or tribal organization to overcome the stated objections; and (iii) provide the Tribe or Tribal organization with a hearing on the record with the right to engage in full discovery on any issue raised in the matter, and the opportunity to appeal the Secretary's objections. See 25 U.S.C. § 5321(b). The Tribe or Tribal organization may, in lieu of filing an appeal, initiate an action in federal district court. See 25 U.S.C. § 5321(b)(3). In any hearing, appeal, or action in federal court regarding a contract declination, the Secretary bears "the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)." 25 U.S.C. § 5321(e)(1). Courts presented with ISDEAA declination causes of action are split on whether the Secretary must establish "by clear and convincing evidence" the validity of the grounds for his or her declination decision. Compare Fort McDermitt Paiute and Shoshone Tribe v. Becerra, 6 F.4th 6, 9 n.2 (D.C. Cir. 2021)(rejecting the clear and convincing standard, because "'clear and convincing evidence' identifies a burden of persuasion for issues of fact" and "generally has no

application to issues of law")(quoting Clear and Convincing Proof, Black's Law Dictionary (6th ed. 1990)); with S. Ute Indian Tribe v. Leavitt, 497 F. Supp. 2d 1245, 1252 (D.N.M. 2007)(Johnson, J.)("[T]he government bears the burden of establishing by clear and convincing evidence the validity of the grounds for declination.").  See also Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d 1059, 1068 (D.S.D. 2007)(Kornmann, J.).

### 2.   The Reassumption Process.

The Secretary also has the authority to reassume ISDEAA contracts.  See 25 U.S.C. § 5330. Reassumption means "rescission, in whole or in part, of a contract and assuming or resuming control or operation of the contracted program . . . without consent of the Indian tribe or tribal organization."  25 C.F.R. § 900.246.  A federal agency within the HHS or the DOI unilaterally may reassume a contract either on an emergency or on a non-emergency basis.  See 25 C.F.R. § 900.246.  An emergency reassumption is permitted when a Tribe or Tribal organization fails to fulfill the ISDEAA contract's requirements, and that failure poses either: (i) an immediate threat of imminent harm to any person's safety; or (ii) an imminent substantial and irreparable harm to trust funds, trust lands, or interest in such lands.  See 25 C.F.R. § 900.247.  A non-emergency reassumption is permitted when there has been either: (i) a violation of the rights, or endangerment of the health, safety, or welfare of any person; or (ii) gross negligence or mismanagement in the handling or use of contract funds, trust funds, trust lands, or interest in trust lands under the contract.  See 25 C.F.R. § 900.247.

In an emergency reassumption, the Secretary must: (i) rescind immediately, in whole or in part, the contract; (ii) assume control or operation of all or part of the program; and (iii) give written notice of the rescission to the Tribe or Tribal organization, and to the community that the contract serves.  See 25 C.F.R. § 900.252.  The written notice must include: (i) a detailed statement

of the findings that support the Secretary's decision; (ii) a statement explaining the Tribe or Tribal organization's right to a hearing on the record within ten days of the reassumption, or such later date as the Tribe or Tribal organization may approve; (iii) an explanation that the Tribe or Tribal organization may be reimbursed for actual and reasonable "wind up costs" incurred after the effective date of the reassumption; and (iv) a request for the return of property, if any.  25 C.F.R. § 900.253.

In a non-emergency reassumption, the Secretary must: (i) notify the Tribe or Tribal organization in writing of the deficiencies in contract performance; (ii) ask the Tribe or Tribal organization to take specific corrective action within a reasonable period of time, which cannot be less than forty-five days; and (iii) offer and provide, if requested, the necessary technical assistance and advice to help the Tribe or Tribal organization overcome the deficiencies.  See 25 C.F.R. § 900.248.  If the Tribal organization fails to ameliorate the deficiencies, the Secretary shall provide a second written notice to the Tribe or Tribal organization that the Secretary will reassume the contract, in whole or in part.  See 25 C.F.R. § 900.249.  The second written notice shall include: (i) the intended effective date of the reassumption; (ii) the details and facts supporting the intended reassumption; and (iii) an explanation of the Tribe or Tribal organization's right to a formal hearing within thirty days of receiving the notice.  See 25 C.F.R. § 900.250.  The Secretary cannot rescind the contract before the issuance of a final decision in any administrative hearing or appeal.  See 25 C.F.R. § 900.251.

### 3.   Relief Available Under the ISDEAA.

The ISDEAA provides a comprehensive range of remedies for a Tribe or Tribal organization whose contract the Secretary unlawfully terminates.  See 25 U.S.C. § 5331(a).  In any action brought under the ISDEAA, the district court "may order appropriate relief," including

money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this subchapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this subchapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 450f(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

25 U.S.C. § 5331(a).

Applying § 5331(a) to the DOI Secretary's contract declination decision in Crownpoint Inst. of Tech. v. Norton, No. CIV 04-0531 JP/DJS, Findings of Fact and Conclusions of Law, filed Sept. 16, 2005 (D.N.M.)(Parker, Senior J.)(Doc. 86)("Crownpoint"), the Honorable James A. Parker, Senior United States District Judge for the United States District Court for the District of New Mexico, said that "[t]he specific mandamus relief authorized by the [ISDEAA] relieves [the plaintiff] of proving the usual equitable elements including irreparable injury and absence of an adequate remedy at law." Crownpoint at 26 (citations omitted). Other federal district courts similarly have concluded that a Tribe or Tribal organization does not need to demonstrate the traditional grounds for equitable relief to obtain injunctive or mandamus relief under the ISDEAA. See, e.g., Pyramid Lake Paiute Tribe v. Burwell, No. CIV 13-1771 CRC, 2014 WL 5013206, at *7 (D.D.C. Oct. 7, 2014)(Cooper, J.)("Because the [ISDEAA] specifically provides for both injunctive and mandamus relief to remedy violations of the Act, 25 U.S.C. § [5331(a)], however, the Tribe need not demonstrate the traditional equitable grounds for obtaining the relief it seeks."); Red Lake Band of Chippewa Indians v. Dep't of the Interior, 624 F. Supp. 2d 1, 25 (D.D.C. 2009)(Kollar-Kotelly, J.)(granting specific performance on an ISDEAA contract without considering the ordinary grounds for such relief, because the statute provides for injunctive relief); Susanville Indian Rancheria v. Leavitt, No. CIV 07-259 GEB/DAD, 2008 WL 58951, at *10-11 (E.D. Cal. Jan. 3, 2008)(Burrell, Jr., J.)(holding that a plaintiff seeking injunctive relief under the

ISDEAA need not satisfy the traditional equitable requirements); <u>Cheyenne River Sioux Tribe v. Kempthorne</u>, 496 F. Supp. 2d at 1068 (ordering a writ of mandamus where the plaintiffs had not established the traditional equitable requirements, but had established that the DOI Secretary's contract declination decision violated the ISDEAA).

### 4.   <u>The Rules for Interpreting Ambiguous ISDEAA Provisions.</u>

When faced with an ambiguous federal statute, federal courts typically defer to the administering agency's interpretation.   <u>See</u> <u>Chevron U.S.A. v. Natural Res. Def. Council</u>, 467 U.S. 837, 842-45 (1984).   In cases involving Native Americans, however, the Tenth Circuit has "taken a different approach to statutory interpretation," holding that the "normal rules of construction do not apply when Indian treaty rights, or even non-treaty matters involving Indians, are at issue." <u>Ramah Navajo Chapter v. Lujan</u>, 112 F.3d 1455, 1461 (10th Cir. 1997)(quoting <u>EEOC v. Cherokee Nation</u>, 871 F.2d 937, 939 (10th Cir. 1989))(internal quotation marks omitted).   Consequently, the Tenth Circuit has held that federal statutes "'are to be construed liberally in favor of Native Americans, with ambiguous provisions interpreted to their benefit.'"   <u>EEOC v. Cherokee Nation</u>, 871 F.2d at 939 (quoting <u>Montana v. Blackfeet Tribe</u>, 471 U.S. 759, 766 (1985)).

Congress designed the ISDEAA to "circumscribe as tightly as possible the discretion of the Secretary."   <u>Ramah Navajo Sch. Bd. v. Babbitt</u>, 87 F.3d at 1344.   The ISDEAA instructs that "[e]ach provision of [the ISDEAA] and each provision of contracts entered into thereunder shall be liberally construed for the benefit of the tribes or tribal organizations . . . ."   25 C.F.R. § 900.3(a)(5).   The Tenth Circuit has confirmed that the construction canon favoring Native American Tribes -- the Indian canon of construction -- applies to ISDEAA claims, noting that "it would be entirely inconsistent with the purpose of the [ISDEAA], as well as with the federal policy of Native American self-determination in general, to allow the canon favoring Native Americans

to be trumped in this case." Ramah Navajo Chapter v. Lujan, 112 F.3d at 1462. The Tenth Circuit

has explained that the Indian canon of construction "controls over more general rules of deference

to an agency's interpretation of an ambiguous statute." S. Ute Indian Tribe v. Sebelius, 657 F.3d

at 1078. Consequently, in the Tenth Circuit, federal courts must not afford Chevron deference to

the HHS' or the DOI's interpretation of the ISDEAA's ambiguous provisions.

Only a few federal district courts have addressed whether the "arbitrary and capricious

standard" of the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA"), applies to ISDEAA

claims. The majority of district courts have concluded that ISDEAA's text, its legislative history,

and the general presumption favoring Indian Tribes dictates a de novo review of ISDEAA claims.

See, e.g., Rancheria v. Hargan, 296 F. Supp. 3d 256, 265-66 (D.C.C. 2017)(Collyer, J.); Pyramid

Lake Paiute Tribe v. Burwell, 70 F. Supp. 3d at 542; Seneca Nation of Indians v. Dep't of Health

and Human Servs., 945 F. Supp. 2d at 141-42 & n.5; Cheyenne River Sioux Tribe v. Kempthorne,

496 F. Supp. 2d at 1066-67; Cherokee Nation of Okla. v. United States, 190 F. Supp. 2d 1248,

1258 (E.D. Okla. 2001)(Seay, J.), rev'd on other grounds by, 543 U.S. 631 (2005); Shoshone-

Bannock Tribes of the Fort Hall Reservation v. Shalala, 988 F. Supp. at 1318. A minority of

district court opinions -- three of which are unpublished -- use the APA's arbitrary-and-capricious

standard to review ISDEAA claims. See, e.g., Citizen Potawatomi Nation v. Salazar, 624 F. Supp.

2d 103, 108 (D.D.C. 2009)(Kessler, J.); Suquamish Tribe v. Deer, No. CIV 96-5468 (W.D. Wash.

Sept. 2, 1997)(Bryan, J.); Cal. Rural Indian Health Bd., Inc. v. Shalala, No. CIV 96-3526 (N.D.

Cal. April 24, 1997); Yukon-Kuskokwim Health Corp. v. Shalala, No. CIV 96-155 (D. Alaska

April 15, 1997). Those courts have reasoned that, because the ISDEAA does not provide a

standard of review, courts must use the APA's arbitrary-and-capricious standard. See Citizen

Potawatomi Nation v. Salazar, 624 F. Supp. 2d at 108 ("Both the Supreme Court and [the D.C.

Circuit] Court of Appeals have declared that, where a statute does not provide a standard of review, as is true of the ISD[E]A, courts must look to the APA standard.").

## LAW REGARDING PRELMINARY INJUNCTIONS

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal." Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted). To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law." N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984). Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits."[7] Resolution Trust Corp.

---

[7]The requirement that the movant show a mere "substantial likelihood" of prevailing on the merits is the only prong of the preliminary-injunction analysis that is easier to satisfy than its analogous prong in the permanent-injunction analysis; permanent injunctions, obviously, require full success on the merits. 43A C.J.S. Injunctions § 55 ("In general, the standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that, for a preliminary injunction, the plaintiff must show a likelihood of success on the merits rather than actual success."). It is not entirely clear what a preliminary-injunction movant's burden of proof is vis-à-vis the case's merits, as "[t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success -- the most common being that plaintiff must demonstrate a reasonable probability of success." 11A Charles Alan Wright, Arthur R. Miller, et. al., FEDERAL PRACTICE & PROCEDURE § 2948.3 (3d. ed. 2015)(footnotes omitted). The Tenth Circuit, however, has provided more guidance than most Courts of Appeals have, stating on three occasions -- albeit in old cases -- that the movant must make "a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought." Automated Mktg. Sys., Inc. v. Martin, 467

v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992). See Winter v. NRDC, Inc., 555 U.S. 7, 19

(2008)("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

---

F.2d 1181, 1183 (10th Cir. 1972); Crowther v. Seaborg, 415 F.2d 437, 439 (10th Cir. 1969); Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 781 (10th Cir. 1964).

    At a trial on the merits, a plaintiff bears two burdens of proof. The first burden is the burden of production, which is sometimes called the burden of going forward. If the plaintiff fails to carry the burden of production during his or her case-in-chief, then the court will decide the case in the defendant's favor, and the case will not go to the jury. The second burden is the burden of persuasion, which refers to convincing the factfinder -- typically a jury -- that he or she has satisfied the ultimate standard of proof -- usually the preponderance-of-the-evidence standard. There is also a third, even higher quantum of evidence, sometimes called the "third burden of proof," which a plaintiff carries when he or she presents evidence of such great extent and one-sidedness that he or she is entitled to a verdict as a matter of law. Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1236 n.27 (D.N.M. 2014)(Browning, J.). The third burden and the beginning burden of production are also the relevant standards applicable to summary-judgment motions by the plaintiff and by the defendant, respectively.

    Moreover, satisfying the initial burden of production is known as presenting a "prima facie case." Black's Law Dictionary 1310 (9th ed. 2009)(defining "prima facie case" as "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor"). The best way to interpret the Tenth Circuit's dictate that the movant must make "a prima facie case showing a reasonable probability that he will ultimately [prevail]" is by requiring that the movant put forth enough evidence to both: (i) satisfy the burden of production -- meaning that if the same evidence were presented at trial, it would be sufficient for a reasonable factfinder to find in the movant's favor; and (ii) make it reasonably likely -- beyond just being "not unreasonable" -- that the factfinder would in fact find for the movant, i.e., that the movant would satisfy the burden of persuasion. See 11A Wright & Miller, supra § 2948.3 ("All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning." (footnotes omitted)). The movant need not show a greater-than-fifty-percent probability of satisfying the burden of persuasion, as to require such a showing would be to convert the substantial-likelihood-of-success standard into the ultimate trial standard, which the case law makes clear is not the intended result. See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977)("The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay even though its own approach may be contrary to movant's view of the merits.").

    The Court will require preliminary-injunction movants to carry the burden of production at the preliminary-injunction stage in all cases, and it will never require the movant to carry the full burden of persuasion at that stage. As for where in between those two quanta of proof the Court will set the standard, it will vary in different cases, depending upon the strength of the movant's showing on the other three prongs: the irreparability of the movant's harm, the balance of harms as between the movant and the nonmovant, and the public interest. Cf. Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d at 843 ("The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors.").

- 50 -

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (citing Munaf v. Geren, 553 U.S. 674, 688-89 (2008))).  The movant bears the burden of demonstrating all four prongs' satisfaction.  See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972).  "[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."  Diné Citizens Against Ruining our Env't v. Jewell, 839 F.3d 1276, 1282 (10th Cir. 2016).  "A plaintiff suffers irreparable harm 'when the court would be unable to grant an effective remedy after a full trial because such damages would be inadequate and difficult to ascertain.'"  Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.)(quoting Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1156 (10th Cir. 2001)(citing Kikumura v. Hurley, 242 F.3d at 963)).  "Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm."  Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(Browning, J.)(citing Schrier v. Univ. of Colo., 427 F.3d 1253, 1266 (10th Cir. 2005)).

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]'"  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395).  In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the

conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (internal quotation marks omitted)(quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004), aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006)("O Centro")). Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009). Regarding mandatory preliminary injunctions, the Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.)(quoting O Centro [II] . . . , 389 F.3d at 979). The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something.

Salazar v. San Juan Cnty. Det. Ctr., 2016 WL 335447, at *40. When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, the court should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by O Centro, 389 F.3d at 975). "The meaning of this category is self-evident." Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *41. With respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued." Salt Lake Tribune Publ'g Co. v. AT&T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003)(internal quotation marks omitted)(quoting SCFC ILC, Inc. v.

Visa USA, Inc., 936 F.2d at 1098-99).

"[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction[.]" United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)). See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(concluding that a preliminary injunction should not issue where a remedy of money damages was available). Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy. See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

### LAW REGARDING BONDS FOR PRELIMINARY INJUNCTIONS

Under rule 65(c), the Court may issue a PI "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The United States and its officers and agencies are exempt from this requirement. See Fed. R. Civ. P. 65(c). The Court must consider whether a bond is necessary. See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable"). See also Flood v. ClearOne Comm'ns, 618 F.3d 1110, 1126 n.4 (10th Cir. 2010). Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security'" and may, therefore, impose no bond requirement. RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

## THE ISDEAA'S LEGISLATIVE HISTORY

If possible, the Court interprets statutes according to the statutory text's plain meaning and structure.  When the text's meaning and structure leave ambiguities, however, even the ardent textualist "routinely takes purpose into account, but in its concrete manifestations as deduced from close reading of the text." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 20 (2012).  In this spirit, the Court here assembles a legislative history of the ISDEAA and subsequent amendments to help shed light on the disputed sections' meaning.  The Court gives special interpretive weight to committee reports,[8] which congressional staffers consider the most reliable sources of congressional intent.  See Abbe R. Gluck & Lisa Schultz Bressman, Statutory Interpretation from the Inside -- An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 977 fig.8 (2013).  Given the central role that the Executive Branch played in ISDEAA history, the Court also examines related presidential signing statements.[9]  Historical background is woven throughout the discussion as needed to knit a process that transpired over a quarter century into a coherent narrative.

---

[8]Congress defines Committee Reports as follows:

one set of documents among the variety of document types produced by the House and Senate committees that address legislative and other policy issues, investigations, and internal committee matters.  Committee reports usually are one of these types: (1) reports that accompany a legislative measure when it is reported for chamber action; (2) reports resulting from oversight or investigative activities; (3) reports of conference committees; and (4) committee activity reports, published at the conclusions of a Congress.

United States Congress, https://www.congress.gov/congressional-reports/about (last visited Oct. 24, 2016).

[9]The Congressional Research Service defines Presidential signing statements as follows:

1.      <u>**Indian Self-Determination and Education Assistance Act of 1975**</u>.

The ISDEAA became law in 1975.  <u>See</u> Pub. L. No. 93-638 (1975).  It did not emerge out of a vacuum, rather representing in some respects a continuation of and in other respects a break from nearly two centuries of federal policy regarding Native American healthcare.  In this section, the Court first examines the historical background behind the ISDEAA.  It then looks to the House and Senate Committee reports and President Ford's signing statement to uncover legislative intent and help triangulate the proper interpretation of ISDEAA terms and provisions at issue in the present motions for summary judgment.

a.      <u>**Background**</u>.

The United States has provided medical care to Native Americans since at least 1802, when Army physicians began treating Native Americans for smallpox.  <u>See</u> U.S. Public Health Service, Health Services for American Indians 86 (1957)("U.S. Health Service").  Congress appropriated money for more extensive Native American healthcare in 1819, routing the money through missionaries and philanthropic organizations.  <u>See</u> U.S. Health Service at 86.  In 1832, Congress passed the first measure specifically targeted to Native American health, authorizing Native

_____

official pronouncements issued by the President contemporaneously to the signing of a bill into law that, in addition to commenting on the law generally, have been used to forward the President's interpretation of the statutory language; to assert constitutional objections to the provisions contained therein; and, concordantly, to announce that the provisions of the law will be administered in a manner that comports with the administration's conception of the President's constitutional prerogatives.

Todd Garvey, Congressional Research Service, Presidential Signing Statements: Constitutional and Institutional Implications, http://fas.org/sgp/crs/natsec/RL33667.pdf (last visited Oct. 24, 2016).

American agents to purchase smallpox vaccines and to appoint army physicians to administer the vaccines.  See Act of May 5, 1832, 4 Stat. 514.

Starting in the 1830s, the United States entered into numerous treaties with Tribes that included promises of physicians, medical supplies, and hospitals, first for the Cherokees and other Tribes forced westward, see, e.g., Treaty with the Cherokee, art. 8, 7 Stat. 478 (1835), and later for western Tribes in a quid pro quo for land cessions, see, e.g., Treaty with the Yakima, art. 5, 12 Stat. 951 (1855).[10]  Subsequent crowding of Native American onto reservations led to epidemics and unsanitary conditions that outstripped federal healthcare capacity, especially after Congress transferred Indian affairs from the War Department to the Department of the Interior.  See U.S. Health Service at 87.  Even in the few reservations that received promised hospitals, the standard of care usually was very low.  See S. Rep. No. 83-1530 (1954).

In 1910, Congress made the first general appropriation for Indian healthcare.  See Act of Apr. 4, 1920, 36 Stat. 269 (appropriating $40,000.00 to provide for healthcare, and to prevent infectious and contagious disease).  In 1921, some Congress members began to chafe at such appropriations and block Interior Department funding.  See, e.g., H.R. Rep. No. 275, 67th Cong.

_____

[10]John Marshall, the fourth Chief Justice of the United States, put the exchange poetically in Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1 (1831):

> A people once numerous, powerful, and truly independent, found by our ancestors in the quiet and uncontrolled possession of an ample domain, gradually sinking beneath our superior policy, our arts and our arms, have yielded their lands by successive treaties, each of which contains a solemn guarantee of the residue, until they retain no more of their formerly extensive territory than is deemed necessary to their comfortable subsistence . . . .

30 U.S. (5 Pet.) 15 (1831).  In exchange, Marshall waxed, the Native Americans "look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the president as their great father."  30 U.S. (5 Pet.) 17 (1831).

(1921); S. Rep. No.294, 67th Cong. (1921).  A congressional majority, however, wished for the

funding to continue and passed the Snyder Act, 25 U.S.C. § 13, to give the Bureau of Indian Affairs

broad discretion to direct programs that would benefit Native American' health:

> The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior,
> shall direct, supervise, and expend such moneys as Congress may from time to time
> appropriate, for the benefit, care, and assistance of the Indians throughout the
> United States for the following purposes: . . . .  For the relief of distress and
> conservation of health.

25 U.S.C. § 13.

Given the Tribes' difficulties attracting and retaining qualified medical staff in the first half

of the twentieth century, the Bureau of Indian Affairs called in 1953 for the transfer of medical

services among Native American living on reservations to the United States Public Health Service.

See Indian Health Unit Asks Doctor Shift, N.Y. Times, May 30, 1953 at A17.  The following year,

Congress found that this persistent human capital shortage demanded such a shift, see S. Rep. No.

83-1530 at 3-4 (1954), and Congress fully federalized Indian healthcare with the support of the

American Medical Association and state departments of health in every State with a significant

Native American population,  see Transfer Act of 1954, 42 U.S.C. § 2001; S. Rep. No. 83-1530 at

2 (listing these and other medical organizations, departments, and boards supporting the transfer).

The 1960s, a decade that unmoored so many other longstanding federal policies, barely left

a ripple in federal policies related to Native American healthcare.  Shortly after his Senate

confirmation in 1961, Stewart Udall, President John F. Kennedy's Interior Secretary, assembled a

taskforce to study the issue of Native American self-determination.  See Udall Tells of Plan for

Reorganization, N.Y. Times, Jan. 29, 1961 at A32.  Yet the task force accomplished little of

practical value, more replete with grandiloquence than grand strategy.  See Bureau of Indian

Affairs, Report of Task Force on Indian Affairs 2-7 (Feb. 9, 1961)("1961 Report of Task Force").

In a stunning rebuke of the very concept of self-determination even at the ideational stage, Udall paternalistically told task force members that "test[ing] our thinking against the thinking of the wisest Indians and their friends did not mean that we are going to let, as someone put it, the Indian people decide what the policy should be." 1961 Report of Task Force at 2. For the remainder of the Kennedy and Lyndon B. Johnson Administrations, neither the White House nor Congress paid much attention to Native American. See Thomas Francis Clarkin, The New Trail and the Great Society: Federal Indian Policy During the Kennedy-Johnson Administrations (May 1998)(unpublished Ph.D. dissertation, University of Texas at Austin)(on file with ProQuest Dissertations & Theses Global).

Beginning in the 1960s, IHS also faced problems along many fronts, including congressional attempts to control its budget. See Leah Kalm-Freeman, The Community Health Representative Program: Early Voices and Program History 115-18 (June 2009)(unpublished Ph.D. dissertation, Johns Hopkins University)(on file with ProQuest Dissertations & Theses Global)(providing an easily digestible summary of IHS finances and budgetary concerns from the late 1950s until the passage of the ISDEAA). For their part, Tribal leaders nationwide began to agitate for a greater say in healthcare services on their reservations. See, e.g., Indians of North America, Declaration of Indian Purpose: The Voice of the American Indian 9-10 (1961)(coauthored by leaders of sixty-seven Native American Tribes). Tribes also began to undertake small federally funded local projects through Indian Community Action Programs established under President Johnson's War on Poverty, spurring greater self-determination in general. See Sar Levitan & Barbara Hetrick, Big Brother's Indian Programs, With Reservations 90 (1971).

During his presidential campaign in 1968, Richard M. Nixon issued a statement to the National Congress of American Indians in Omaha, Nebraska in which he seconded Tribes' calls for greater self-determination.  See Richard Nixon and the American Indian: The Movement to Self-Determination (Smithsonian National Museum of the American Indian broadcast Nov. 15, 2012) at 20:14-:30, available at https://www.nixonfoundation.org/2012/11 /nixon-and-the-american-indian-the-movement-to-self-determination/ (last visited Oct. 26, 2016)("Smithsonian Video").

Nixon did not forget this support for greater Native American self-determination after the election.[11]  On October 8, 1969, Nixon sent Vice President Spiro Agnew to Albuquerque, New Mexico, to deliver a speech on the topic to lay the groundwork for Native American legislation Nixon's domestic policy advisers were drafting.  See Smithsonian Video at 24:15-25:21.  The legislative proposal was ready by the following summer, and Nixon proposed to Congress what eventually would become the ISDEAA at the start of July 1970.  See Richard Nixon, Special Message to the Congress on Indian Affairs, July 8, 1970, available at https://www.presidency.ucsb.edu/documents/special-message-the-congress-indian-affairs (last visited May 25, 2022)("Nixon's Special Message to Congress").[12]

---

[11]According to a White House domestic policy staffer who oversaw much of the push behind the ISDEA, the issue was extremely important to Nixon, in part because his former football coach, a Native American, had taught the teenage Nixon how to be confident and self-reliant.  See Smithsonian Video at 22:55-:59.  Nixon believed that attitudes prevailing in the 1960s that Native Americans were less able to perform or manage projects than white Americans were benighted and bigoted, and that federal resistance to allowing Native Americans to run IHS projects was "destructive, discriminatory, and debilitating."  Smithsonian Video at 2:05-:14.

[12]Nixon's Special Message to Congress, as available online, is not paginated.  Most of the message, however, is broken into enumerated sections.  To direct readers as precisely as possible to supporting text, citations to Nixon's Special Message to Congress will include the section number wherever applicable.

Decrying the disorientation and excessive dependency that federal hegemony over Native American healthcare had spawned as "morally and legally unacceptable," Nixon challenged Congress (i) to assure Tribes that the federal government would continue to perform its treaty and trusteeship obligations;[13] and (ii) to guarantee that, "whenever Indian groups decided to assume control or responsibility for government service programs, they could do so and still receive adequate Federal financial support." Nixon's Special Message to Congress § 1. The second assurance, according to Nixon, was a very important rejection of suffocating paternalism and bureaucratic inefficiency in favor of Native American self-determination. See Nixon's Special Message to Congress §1.

Nixon told Congress that the assumption prevailing at the time was that Native American programs could not exist without Federal administration. See Nixon's Special Message to Congress § 1. Nixon said that he believed this assumption was incorrect, and that there was no reason that Congress should deprive Native Americans of the privilege of self-determination merely because they receive monetary support from the federal government. See Nixon's Special Message to Congress § 2. In Nixon's opinion, it "should be up to the Indian tribe to determine whether it is willing and able to assume administrative responsibility for a service program which is presently administered by a Federal agency." Nixon's Special Message to Congress § 3. He therefore proposed legislation that would "empower a tribe or a group of tribes or any other Indian community to take over the control or operation of Federally-funded and administered programs

---

[13]The concept of a federal trust responsibility to the Native Americans arose early in Supreme Court of the United States jurisprudence with Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1 (1831). The Supreme Court more recently recognized it in County of Oneida v. Oneida Indian Nation. See County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 247 (1985).

in the Department of the Interior and the Department of Health, Education and Welfare whenever the tribal council or comparable community governing group voted to do so."  Nixon's Special Message to Congress § 3.[14]

Nixon proposed that discretion to take on a program or to not take on a program should lie completely with Native Americans; it would not be necessary for the federal agency administering a program to approve the transfer of responsibility to a Tribe or Tribal organization, nor could a Tribe or Tribal organization be compelled into a transfer it did not want.  See Nixon's Special Message to Congress § 3.  Tribes or Tribal organizations also would, under Nixon's proposal, retain the "right of retrocession," by which he meant that an Native American group could elect to administer a program and then later decide to give it back to the federal government.  Nixon's Special Message to Congress § 3.  Nixon wanted appropriate technical assistance to help local organizations successfully operate programs they took over, and for locally administered programs to be funded on equal terms with services that federal agencies continued to administer.  See Nixon's Special Message to Congress § 3.

Nixon said that his proposed legislation would benefit triply Native Americans.  See Nixon's Special Message to Congress § 3.  First, Nixon wrote, contracting programs out to Tribes or Tribal organizations would directly channel more money into Native American communities, because Native Americans -- not federal bureaucrats -- would be administering the programs and

---

[14]The Department of Education Organization Act, 93 Stat. 695, abolished the United States Department of Health, Education and Welfare ("HEW") on October 17, 1979.  See National Archives, General Records of the Department of Health, Education and Welfare, available at https://www.archives.gov/research/guide-fed-records/groups/235.html (last visited May 25, 2022).  The United States Department of Health and Human Services, of which Becerra is the Secretary, is the successor to HEW for all Indian healthcare programs.  See United States Department of Health and Human Services, HHS Historical Highlights, https://www.hhs.gov/about/historical-highlights/index.html (last visited May 25, 2022).

drawing salaries.  See Nixon's Special Message to Congress § 3.  Second, Nixon contended, contracting programs out to Tribes or Tribal organizations would "help build greater pride and resourcefulness within the Indian community."  Nixon's Special Message to Congress § 3.  Third, Nixon asserted, Native Americans would get better and more efficacious programs if the people whom the programs most directly affected were responsible for creating them.  See Nixon's Special Message to Congress § 9.

Nixon insisted that, "[a]s we move ahead in this important work, it is essential that the Indian people continue to lead the way by participating in policy development to the greatest possible degree."  Nixon's Special Message to Congress § 9.  According to Nixon, the federal government had not always realized that it needed Native American energy and leadership if its assistance were to be effective in improving the conditions of Native American life.  See Nixon's Special Message to Congress § 9.  Nixon concluded that his proposed legislation would turn a new page, however, striking a "new and balanced relationship between the United States government and the first Americans . . . ."  Nixon's Special Message to Congress § 9.

During 1970 and 1971, Nixon Administration officials met with Tribal leaders at ten regional conferences and discussed the President's proposed legislation with them.  See generally Smithsonian Video.  The ISDEAA's first version was introduced in the Senate as 92 S. 3157 on February 9, 1972, and was reported to the Senate on July 27, 1972.  See Indian Self-Determination Act of 1972, S. 3157, 92d Cong. (1972)("1972 ISDEEA").  It was referred to the House Committee on Interior and Insular Affairs on August 3, 1972, see 1972 ISDEAA, but it died there as Washington became embroiled in the Watergate scandal and the related conviction of some of Nixon's White House aides, see Bob Woodward & Carl Bernstein, The Final Days 14-17 (2005)(providing a detailed chronology of the last two years of Nixon's presidency).

Undaunted, Nixon called for greater Native American self-determination in his fourth State of the Union Address in 1973.[15]  In that Address, Nixon indicated that his Administration would continue to advance opportunities for Native American self-determination.  See Richard Nixon, State of the Union Message to the Congress on Human Resources, 61 Public Papers of the Presidents of the United States 143-44 (John Woolley & Gerhard Peters eds. 2005)("1973 Address").  Expounding in more depth on the same issue, Nixon said:

> Just as it is essential to put more decision-making in the hands of the State and local governments, I continue to believe that Indian tribal governments should assume greater responsibility for programs of the Bureau of Indian Affairs and the Department of Health, Education, and Welfare which operate on their reservations. *As I first proposed in 1970, I recommend that the Congress enact the necessary legislation to facilitate this take-over of responsibility.*

1973 Address at 144 (emphasis in the original).  Nixon continued:

> Meanwhile the new statutory provisions for Indian tribal governments under General Revenue Sharing will assist responsible tribal governments in allocating extra resources with greater flexibility.  *I shall also propose new legislation to foster local Indian self-determination by developing an Interior Department program of bloc[k] grants to Federally recognized tribes as a replacement for a number of existing economic and resource development programs.*  The primary purpose of these grants would be to provide tribal governments with funds which they could use at their own discretion to promote development of their reservations.

---

[15]Article II, Section 3 of the United States Constitution requires Presidents of the United States to deliver a "State of the Union Address" to Congress "from time to time."  U.S. Const. art. II, § 3.  Until 1973, every President of the United States except for George Washington had interpreted "from time to time" to mean at most once per calendar year.  See George Washington, First Annual Message to Congress on the State of the Union, January 8, 1790, reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), available at http://www.presidency.ucsb.edu/ws/index.php?pid=29431 (last visited Oct. 27, 2016); George Washington, Second Annual Message, December 8, 1790,  reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.),  available  at  http://www.presidency .ucsb.edu/ws/index.php?pid=29432 (last visited Oct. 27, 2016).  In 1973, in a break from tradition, Nixon gave six State of the Union addresses -- the first an overview and the following five each focused on one specific policy theme.  See State of the Union Addresses and Messages, The American Presidency Project, http://www.presidency.ucsb.edu/sou.php#nixon1973 (explaining that Nixon gave six addresses and linking to each)(last visited Oct. 27, 2016).

1973 Address at 144 (emphasis in the original).   Nixon concluded his remarks on Native Americans with an expression of exasperation with Congress for having failed to pass the version of the ISDEAA that he had proposed in his 1970 Message and said that, "[t]o accelerate organizational reform, I have directed the Secretary of the Interior to transfer day to day operational activities of the Bureau of Indian Affairs out of Washington to its field offices."  1973 Address at 144.

The Senate was increasingly preoccupied with Watergate and declined to pursue the ISDEAA with the urgency that Nixon demanded in the 1973 Address.  The bill languished in committee for nearly a year before Nixon drove home the pressing need for it in his 1974 State of the Union Address.  See Richard Nixon, Annual Message to the Congress on the State of the Union, 26 Public Papers of the Presidents of the United States 56 (2005)("1974 Address").  Perhaps sensing that this would be his final opportunity to advocate for Native American self-determination in a State of the Union Address, Nixon spoke passionately:

> For too many years the American Indians -- the first Americans -- have been the last Americans to receive the rights and opportunities to which they are entitled. This Administration has taken the initiative to change this picture.  For its part, the Federal Government must put behind it the role of autocratic manager of Indian reservations.  We shall continue to encourage Indians and their tribal governments to play an increasing role in determining their own future.

1974 Address at 75.  Nixon noted that "[o]ne measure of our attempt to foster a better, more humane policy is the level of Federal funding benefitting Native Americans -- over twice what it was five years ago or about $1.6 billion."  1974 Address at 76.  Nixon chided Congress for not having acted on his proposals "to permit turning over to Indian tribal governments the management and control of Indian programs" and "to provide greater local control over federally assisted reservation programs through a program of tribal grants."  1974 Address at 76.  Nixon then closed

his discussion of Native American self-determination with a final promise to Native Americans that had first taken embryonic form in his 1968 campaign speech in Omaha: "I shall ask that the Bureau of Indian Affairs make specific plans to accelerate the transfer of significant portions of its programs to Indian tribal management, although I repeat my assurance that, while accelerated, these transfers will not be forced on Indian tribes not willing to accept them." 1974 Address at 76.

Even as the long shadows of possible impeachment over Watergate began to darken the Oval Office in the spring of 1974, Nixon pressed forward with his efforts to pressure the Senate into passing the ISDEAA. Resurrecting his strategy of sending out surrogates with speeches that he first had tried with Vice President Agnew's Albuquerque speech in 1969, Nixon dispatched his special counsel and the executive assistant to his special counsel to Albuquerque in March 1974 to deliver two more speeches advocating for the ISDEAA and Native American self-determination. See Leonard Garment, Speech to Indian Law Students Association, Albuquerque, New Mexico (Mar. 14, 1974)(available for scan or photocopy at the Nixon Presidential Library); Bradley H. Patterson, Albuquerque Speech. After having sat on the bill for nearly a year, the Senate reported it out from the Committee on Interior and Insular Affairs two weeks later, on March 28, 1974. See S. Rep. No. 93-682.

### b.    Senate Report No. 93-682.

The section of the Senate Committee Report dedicated to congressional findings left no doubt that Congress had followed Nixon's lead in advocating for "a definitive break from the past." Smithsonian Video at 19:40. After careful review of the federal government's historical and special legal relationship with Native Americans and of federal responsibilities that result from it, the Senate Committee found that:

(1) the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government, and has denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities; and

(2) the Indian people will never surrender their desire to control their relationships both among themselves and with non-Indian governments, organizations, and persons.

S. Rep. No. 93-682, at 1 (1974).  The Senate Committee further recognized

the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities.

S. Rep. No. 93-682, at 2.  Furthermore, the Senate Committee declared that its

commitment to the maintenance of the Federal Government's unique and continuing relationship with and responsibility to the Indian people through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from Federal domination of programs for and services to Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.

S. Rep. No. 93-682, at 2.  After diving into the bill's text, section by section, see S. Rep. No. 93-682, at 3-11, the Senate Committee wrote at length about the purpose behind and the need for the bill that it had just christened the "Indian Self-Determination and Educational Reform Act."  S. Rep. No. 93-682, at 1, 12-14.

Priming fellow senators for the discussion about the ISDEAA's purpose, the Senate Committee chronicled the history of federal relations with Native Americans.  See S. Rep. No. 93-682, at 12-13.   The Supreme Court of the United States, the Senate Committee said, first recognized Tribal sovereignty in 1832.  See S. Rep. No. 93-682, at 12 (citing Worcester v. Georgia,

31 U.S (6 Pet.) 515, 519 (1832)).  Expanding on this point by quoting from a leading Indian law

treatise's commentary on that case, the Senate Committee remarked that

> From the earliest years of the Republic, the Indian tribes have been recognized as
> distinct, independent, political communities and as such, qualified to exercise
> powers of self-government, not by virtue of any delegation of powers from the
> Federal government, but rather by reason of their original Tribal sovereignty.  Thus
> treaties and statutes of Congress have been looked to by the Courts as limitations
> upon original tribal powers, or, at most, evidences of recognition of such powers
> rather than as the direct source of tribal powers.

S. Rep. No. 93-682, at 12 (quoting Cohen's Handbook of Federal Indian Law)(internal citations

and quotation marks removed).  The Senate Committee declared that the extent to which the semi-

independent Tribes are able to function depends on the degree to which Congress exercises its

derived plenary power.  See S. Rep. No. 93-682, at 12.  The Senate Committee noted what it saw

as a trend in both statutory and case law over the previous forty years to put greater emphasis on

Native American sovereignty and greater limitations on federal oversight of Native Americans.

See S. Rep. No. 93-682, at 12-13 (referencing the Indian Reorganization Act of June 18, 1934, 48

Stat. 984; the Indian Bill of Rights of 1968, 82 Stat. 77; and Begay v. Miller, 70 Ariz. 380, 222

P.2d 624, 627 (1950)).

The ISDEAA, the Senate Committee indicated, would be the next stage in this progression,

being "in essence an effort to provide tribes with the means to implement tribal self-governing

power by providing finances and procedures to achieve progressive development of tribal

resources and institutions."  S. Rep. No. 93-682, at 13.  Lest the bill's purpose not yet be clear

enough, the Senate Committee continued, "The purpose of S. 1017 [the ISDEAA] is to implement

a policy of self-determination whereby Indian tribes are given a greater measure of control over

the programs and services provided to them by the Federal government." S. Rep. No. 93-862, at 13.[16]

Having discussed the ISDEAA's purpose, the Senate Committee then turned to discussing the need for the bill.  See S. Rep. No. 93-682, at 13.  In the recent past, the Senate Committee said, federal Indian policy had experienced a dramatic shift with respect to the delivery of programs and services that the Bureau of Indian Affairs and the IHS formerly had administered.  See S. Rep. No. 93-682, at 13 (citing four different statutes).  The Senate Committee noted, however, that the policy changes had been made on very shaky authority, through a "mixture of broad interpretation and unrelated statutes . . . ."  S. Rep. No. 93-682, at 13.  Such policy potpourri, the Senate Committee said, had created "numerous administrative and management problems," such as "the inability of the Federal government to exempt tribal contracts from Federal Procurement Regulations and to authorize payments in advance of tribal performance on such contracts."  S. Rep. No. 93-682, at 13, 14.  The ISDEAA, according to the Senate Committee, was designed to alleviate such problems by providing direct statutory authority for Native Americans' federal contracting.  See S. Rep. No. 93-682, at 14.

### c.      House Report No. 93-1600.

The House Committee on Interior and Insular Affairs ("1974 House Committee") reported S. 1017 to the House floor on December 16, 1974.  H.R. Rep. No. 93-1600 (1974).  In the preamble to its report, the 1974 House Committee indicated that one of the bill's goals was to "provide for the full participation of Indian tribes in programs and services conducted by the Federal

---

[16]The Senate Committee listed another purpose related to Native American education, a subject that dominated the ISDEA -- at least in terms of column-inches -- but that is not directly relevant to this case.  See S. Rep. No 93-682, at 13.

Government for Indians . . . ."  1974 U.S.C.C.A.N. 7775.  The bill, according to the 1974 House Committee, therefore "authorizes and directs the Secretary of the Interior and the Secretary of Health, Education, and Welfare to contract with Indian tribes or tribal organizations for the operation of programs provided by the Bureau of Indian Affairs and the Indian Health Service under guidelines and criteria established by the bill . . . ." 1974 U.S.C.C.A.N. 7775.

Providing fellow House members with a quick rationale to support the bill, the 1974 House Committee indicated that S. 1017 provides "flexible authority to efficiently and realistically permit contracting of Bureau of Indian Affairs and Indian Health Service programs to the Indian tribes while maintaining the integrity of the programs and services funded by Federal appropriations." 1974 U.S.C.C.A.N. 7782.  According to the 1974 House Committee, S. 1017 simultaneously would expand the Interior Secretary's authority and the HEW Secretary's authority to enter into negotiated contracts with Indian Tribes and Tribal organizations under clear guidelines and contract requirements.  See 1974 U.S.C.C.A.N. 7782.

The 1974 House Committee also explained, mostly at the Interior Department's and the General Accounting Office's recommendation, that it had adopted several major amendments to S. 1017 which the Senate passed.  See 1974 U.S.C.C.A.N. 7782.  First, the 1974 House Committee adopted three new sections in S. 1017's preliminary provisions  that it meant to tighten up the ISDEAA's contract requirements in the areas of auditing and reporting, criminal penalties for the misuse of contract funds, applicability of the Davis-Bacon Act, 46 Stat. 1494, to contracts under the ISDEAA, and preferences for Indians and Indian subcontractors.  See 1974 U.S.C.C.A.N. 7782.  Second, the 1974 House Committee expanded the grant provisions in section 104 to facilitate contracting by Tribes and Tribal organizations under the ISDEAA's terms.  See 1974 U.S.C.C.A.N. 7782-83.  Third, the 1974 House Committee adopted amendments which would:

> (1) permit tribes and tribal contractors to be eligible for grants from the Civil Service Commission under the Intergovernmental Personnel Act to strengthen personnel administration of the contractors; (2) permit Federal employees transferring to tribal employment under such contracts to retain various fringe benefits of Federal employment; and (3) exempt such transferring employees from the conflict-of-interest provisions of section 205 and 207 of title 18 U.S.C., which would be inappropriate to the circumstances of such contracts.

1974 U.S.C.C.A.N. 7783.  Just as important, the 1974 House Committee indicated that it had deleted four parts of the Senate bill authorizing new programs, based on the Interior Department's advice, because the Interior Department believed that such programs would be duplicative of existing programs.  See 1974 U.S.C.C.A.N. 7783.

Something that the House Committee did not explicitly mention is something central to this case.  The Senate ISDEAA bill had made no explicit mention in section 106 whether the HEW Secretary could reduce the amount of funding a Tribe or Tribal organization received if the Tribe or Tribal organization took control of administration of a program.  The House Committee added subsection 106(h) that addressed this issue.  It provided that

> the amount of any funds provided to a contractor under a contract shall not be less than the amount the Secretary would have expended had the United States performed the service itself.  It also provides that savings, if any, realized by the tribal contractor would be available for additional services and benefits.

1974 U.S.C.C.A.N. 7779.  This subsection that made it into the enacted ISDEAA retained the sense but neither the House Committee version's sentence structure nor wording, reading as follows:

> The amount of funds provided under the terms of contracts entered into pursuant to sections 102 nad [sic] 103 shall not be less than the appropriate Secretary would have otherwise provided for his direct operation of the programs or portions thereof for the period covered by the contract: Provided, that any savings in operation under such contracts shall be utilized to provide additional services or benefits under the contract.

88 Stat 2204.

d.       **President Ford's Signing Statement**.

Nixon resigned the Presidency approximately four months before Congress passed the ISDEAA.  See Richard Nixon, Letter to Henry Kissinger Resigning the Office of President of the United States, 246 Public Papers of the Presidents of the United States (John Woolley & Gerhard Peters eds. 2005), available at http://www.presidency.ucsb.edu/ws/index.php?pid=4326&st =resignation&st1= (last visited Oct. 26, 2016).  Gerald Ford succeeded Nixon as President on August 9, 1974.  See Gerald Ford, Remarks on Taking the Oath of Office, 1 Public Papers of the Presidents of the United States, available at http://www.presidency.ucsb.edu/ws/index.php?pid =4409&st=resignation&st1= (last visited Oct. 26, 2016).  On January 4, 1975, Ford signed the ISDEAA.  See 10 Public Papers of the Presidents of the United States, available at http://www .presidency.ucsb.edu/ws/index.php?pid=4739 (last visited Oct. 26, 2016)("1975 Signing Statement").

In his signing statement, Ford indicated that his Administration "is committed to furthering the self-determination of Indian communities without terminating the special relationships between the Federal government and the Indian people.  The Congress is to be congratulated for its passage of the legislation.  It will enhance our efforts to implement the policy of Indian self-determination."  1975 Signing Statement.  Ford continued

> Title I of this act gives the permanence and stature of law to the objective of my Administration of allowing -- indeed encouraging -- Indian tribes to operate programs serving them under contract to the Federal Government.  Furthermore, with the passage of this act Indian communities and their leaders now share with the Federal Government the responsibility for the full realization of this objective.  It will be through the initiatives of Indian communities that the authorities provided in this act will be implemented.  I urge these communities to make the fullest possible use of them and pledge the support of this Administration.

1975 Signing Statement.  Ford concluded his discussion of Native American self-determination on a practical note: "In addition to making this kind of contracting a right, the act does much to make it feasible and practical. . . . The granting authority in this act can also be used to strengthen tribal governments and tribally-funded programs."  1975 Signing Statement.

      2.      **1988 Amendments.**

ISDEAA implementation did not go completely smoothly in the years after 1975.  See S. Rep. No 100-274, at 6-7 (1988).   As evident in the 1974 Senate Committee and House Committee Reports, Congress had aimed to encourage Tribes to contract for the administration of programs that IHS and the Bureau of Indian Affairs ("BIA") previously had administered.  See supra at 69-74.  In the years after ISDEAA enactment, however, Tribes encountered many problems in their contracts with the federal agencies.   See, e.g., 1987 Senate Committee Hearing, 156-58 (prepared statement on behalf of Standing Rock Sioux Tribes, North and South Dakota et al.)("Standing Rock").   Tribes complained that federal contracting requirements and bureaucratic regulations were too rigid and too burdensome, preventing the Tribes from being able to implement their own priorities and agenda for Tribal self-determination.  See, e.g., Second 1987 Senate Hearing at 24 (statement of Suzan Shown Harjo, Executive Director, National Congress of Native Americans). Moreover, many Tribes contended that they were paying a financial penalty for the right to contract for the administration of federal programs, as federal agencies did not cover many costs associated with the performance of the contracts, and these costs therefore had to come out of Tribes' coffers. See, e.g., 1987 Senate Committee Hearing at 93-97 (prepared statement of Edward Loke Fight).

Federal agencies such as IHS recognized that many of these "contract support costs" -- first defined in the 1988 amendments and including costs associated with audits, insurance, legal fees, and accounting fees --  were ones that the agencies would not have incurred themselves had they

still been administering the same programs.  See S. Rep. No. 100-393 (1987), at 4.  In an effort to

cover such costs for the Tribes, the BIA started to use a special line item in its Congressional

Budget Requests that called for such CSC.  See S. Rep. No. 100-393 (1987), at 4.  The House and

Senate Appropriation Committees, however, requested BIA to merge CSC with other program

funds. See H.R. Rep. No. 99-761 (1986), at 4.  Starting in 1985, BIA decided to cover CSC in

another way, grandfathering the costs on a one time basis in one lump sum in existing contracts at

one hundred percent of the level of need in the previous year.  See H.R. Rep. No. 99-761 (1986),

at 4-5.  BIA, however, never requested the additional CSC funding from Congress and never

received sufficient funds to fully cover CSC that Tribes were incurring.  See S. Rep. No. 100-393

(1987), at 4.  Because many Tribes lacked sufficient resources to continue operating programs

without CSC, many threatened to invoke their right to retrocede contracts to federal agencies under

the ISDEAA.  See H.R. Rep. No. 99-761 (1986), at 5.  Wishing to prevent a mass termination of

Tribal contracts, the House of Representatives began to consider ISDEAA amendments in

February 1987 that would (i) guarantee Tribes an adequate level of funding for CSC; and (ii) give

Tribes a stronger voice in determining policies affecting the various federal programs they were

contracting.  See S. Rep. No. 100-393 (1987), at 4.

### a.        House Report No. 103-653.

On October 26, 1987, the House Committee on Interior and Insular Affairs reported

proposed ISDEAA amendments out to the floor.  See H.R. Rep. No. 100-393 (1987).   The House

Committee found:

> The Indian Self-Determination and Education Assistance Act . . . has furthered the
> development of local self-government and education opportunities for Indian tribes,
> but its goal and progress have been impeded by lack of clarity and direction on the
> part of Federal agencies regarding their role in implementing the Federal policy of
> Indian self-determination.

H.R. Rep. No. 100-393, at 1 (1987). The House Committee further found that the "Federal responsibility for the welfare of Indian tribes demands effective self-government by Indian tribal communities," and that "additional legislation is necessary to assure that Indian tribes have an effective voice in the planning and implementation of programs for the benefit of Indians." H.R. Rep. No. 100-393, at 1 (1987).

The House Committee therefore proposed multiple ISDEAA amendments pertinent to this case. H.R. Rep. No. 100-393, at 2-3. It recommended amending ISDEAA § 4 to define "contract support costs" as

> the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which --
>
> > (1) normally are not carried on by the respective Secretary in his direct operation of the program; or
> >
> > (2) are provided by the Secretary in support of the contracted program from resources other than those under contract

H.R. Rep. No. 100-393, at 2 (1987). The House Committee then tackled the issue of CSC funding levels, proposing that the ISDEAA § 106(h) be amended to read as follows:

> (1) The amount of funds provided under the terms of contracts entered into pursuant to this Act shall be no less than the appropriate Secretary would have otherwise provided for his operation of the programs or portion thereof for the period covered by the contract.
>
> (2) To the amount available under subsection (h)(1) of this section shall be added the negotiated contract support costs.
>
> . . . .
>
> (4) Costs incurred by the contracting agency in monitoring contracts shall not be subtracted from the amount of funds provided under subsection (h)(1).

(5) Contract support costs shall be awarded for all programs for which a tribal organization has contracted pursuant to sections 102 and 103 of this Act.

(6) Except for general assistance grants, once contract and grant obligations are negotiated, the contract or grant amount may be decreased only with the consent of the contractor or grantee or to reflect a reduction in congressional appropriations from the previous fiscal year as reflected in the appropriation line item from which the contract or grant funds are derived.

(7) Any savings realized by the contractor or grantee in the operation or administration of such contract or grant shall be used to provide additional services or benefits under the contract or grant and shall be carried over to the succeeding fiscal years without any reduction in the funding to which the contractor or grantee is otherwise entitled.

(8) The appropriate Secretary shall provide supplemental reports to the Congress on or before March 15 of each year identifying any deficiency of funds needed to provide required contract support costs and indirect costs to all contractors for that fiscal year.

(9) The appropriate Secretary shall advise the Congress in annual budget requests of the amount of funds which should have been appropriated in the preceding fiscal year in order to have funded at the full amount the indirect costs and contract support costs negotiated by tribal organizations pursuant to this Act.   The appropriate Secretary shall also provide the Congress with an estimate of the indirect costs and contract support costs that will be needed for new contracts in the fiscal year covered by the budget request.

(10) At the request of any Indian tribe, the appropriate Secretary shall disclose to such tribe the current amount of funds allocated, obligated, and expended for any program, or portion thereof, administered for the benefit of such tribe.

H.R. Rep. No. 100-393, at 2-3 (1987).   The House Committee recommended more than just amendments to existing ISDEAA sections; it also proposed that entirely new sections be added to the ISDEAA.   See H.R. Rep. No. 100-393, at 3 (1987).   A new ISDEAA § 112 would read as follows:

(a) Whenever an indirect cost rate is negotiated annually between a tribe or tribal organization and the cognizant federal agency, that rate shall be applicable to all contracts and grants made with such tribe or tribal organization pursuant to Sections 102, 103, and 104 of this Act.

(b) Where a contractor's allowable indirect cost recoveries are below the level of indirect costs that the contractor should have received for any given year pursuant to its approved indirect cost rate, and such shortfall is the result of lack of full indirect cost funding by any Federal, state, or other agency, such shortfall shall not form the basis for any theoretical under or over-recovery or other adverse adjustment to any future years' indirect cost rate or amount for such contractor, nor shall any agency seek to collect such short fall from the contractor.

(c) Indian tribal governments shall not be held liable for amounts of indebtedness attributable to theoretical or actual under-recoveries or over-recoveries of indirect costs, as defined in Office of Management and Budget Circular A-87, incurred for fiscal years prior to fiscal year 1988.

H.R. Rep. No. 100-393, at 3 (1987).

### b.    Senate Report No. 100-274.

On April 22, 1987, in response to multiple complaints from Native American tribes about problems associated with ISDEAA implementation, the Senate Indian Affairs Committee conducted an oversight hearing.  See First Session on Recommendations for Strengthening the Indian Self-Determination Act: Hearing Before the S. Comm. on Indian Affairs, 100th Cong. (1987)("1987 Senate Committee Hearing").  At that hearing, Tribal witnesses described the ISDEAA as a constructive public policy that had, among other things, resulted in Native Americans using healthcare facilities more frequently.  E.g., 1987 Senate Committee Hearing at 30 (statement of Ron Allen, Chairman, Jamestown Klallam Tribe, Sequim, Washington).  At the same time, Tribal witnesses told the Senate Committee that inappropriate application of labyrinthine federal procurement law and federal acquisition regulations to self-determination contracts had resulted in excessive paperwork and unduly burdensome reporting requirements. See 1987 Senate Committee Hearing, 156-58 (prepared statement on behalf of Standing Rock Sioux Tribes, North and South Dakota et al.)("Standing Rock").

Perhaps the single most serious problem with ISDEAA implementation, however, according to the Tribal witnesses at the hearing, was BIA's and IHS' failure to provide full funding for the indirect costs associated with self-determination contracts.  See, e.g., 1987 Senate Committee Hearing 172 (prepared statement of United South & Eastern Tribes, Inc.)("It is very difficult not to believe that the BIA has been playing the budget cutting game largely at the expense of tribes.  For a number of years in its [budget] justification the Bureau under-estimated . . . tribal administrative needs . . . and funded tribes for only a percentage of the indirect costs that were due them.").  The Tribal witnesses said that the agencies' consistent failure to fully fund Tribal indirect costs had resulted in financial management problems for Tribes as they struggled to pay for federally mandated annual single-agency audits, liability insurance, financial management systems, personnel systems, property management and procurement systems, and other administrative requirements.  See, e.g., 1987 Senate Committee Hearing at 93-97 (prepared statement of Edward Loke Fight)(showing indirect CSC calculations and incomplete federal reimbursement for them).  Tribal witnesses indicated that their Tribes had diverted trust resources needed for community and economic development to cover these CSC.  See Standing Rock at 150.

The Senate Committee took note of these Tribal concerns and held another hearing featuring Native American tribal leaders on September 21, 1987 -- this one to discuss proposed ISDEAA amendments. See First Session on S. 1703 to Amend the Indian Self-Determination and Education Act: Hearing Before the S. Select Comm. on Indian Affairs, 100th Cong. (1987)("Second 1987 Senate Hearing").[17]  After eight months of working together with Tribal

---

[17]The Senate Committee held four hearings from April 22, 1987, to February 18, 1988, confusingly giving the title of "First Session" to the first three of them.  See First Session on Recommendations for Strengthening the Indian Self-Determination Act: Hearing Before the S.

leaders, according to Committee Chairman Daniel K. Inouye, United States Senator from Hawaii, the Committee produced a draft bill meant to address many Tribal concerns, including:

> the need for the Bureau of Indian Affairs and the Indian Health Service to fully fund tribal indirect costs for self-determination contracts; the need for year-to-year stability of contract funding levels in order to improve planning and management of programs; clarifying that Federal acquisition regulations do not apply to self-determination contracts; . . . reducing the paperwork and reporting requirements for mature contracts; alleviating problems associated with over-recovery and under-recovery of indirect costs from Federal agencies other than the BIA and IHS . . . .

Second 1987 Hearing at 1-2 (1987)(statement of Hon. Daniel K. Inouye).  Senator Daniel Evans of Washington, the Vice Chairman of the Senate Committee, further shared with witnesses:

> It is certainly my hope -- and I know that of the chairman and the members of the committee -- to attempt to move strongly in this field during this congress to try to open up new opportunities to finally fulfill, as closely as we can, the real concepts of self-determination that have been the goal of so many years.

Second 1987 Hearing at 2 (statement of Hon. Daniel Evans).  Tribal leaders, for the most part, praised the Senate Committee for the progress it had made to address these concerns over the previous few months, but still insisted there were structural problems with the ISDEAA's approach to CSC that needed to be remedied.  See, e.g., Second 1987 Senate Hearing at 24 (statement of Suzan Shown Harjo, Executive Director, National Congress of American Indians). Most particularly, the Tribal leaders indicated that they preferred the language of the House bill amending the ISDEAA as it related to CSC recovery:

> The second recommended change to accomplish is full recovery of costs and funding allocations.  The House bill language amending the P.L. 93-638 [the ISDEAA], defining contract support costs and requiring full allocation of contract support costs, provides a more complete description of what contract funding allocations should be based upon.  We would like to see that language given full consideration. . . . By including this proposed language, Tribes would receive a fair allocation of funds, irrespective of their indirect cost rates.

---

Comm. on Indian Affairs, 100th Cong. (1987).  The Court modifies this naming convention in the short forms to help the reader distinguish the three hearings from each other.

Second 1987 Senate Hearing at 78 (statement of Joseph B. DeLaCruz, President, Affiliated Tribes of Northwest Indians).  Unless Tribes could rely on such strong statutory protection for recovery of full CSC, Tribal leaders maintained, BIA and IHS would continue to fail to provide sufficient funds to cover CSC.  See Second 1987 Senate Hearing at 83 (statement of Clarence W. Skye, United Sioux Tribes of South Dakota Development Cooperation).

Taking such critiques to heart, the Senate Committee went to work on the amendments, and scheduled a third hearing on them for the following month.  See First Session on S. 1703 to Amend the Indian Self-Determination and Education Assistance Act: Hearing Before the S. Select Comm. On Indian Affairs, 100th Cong. (1987)("Third 1987 Senate Hearing").  The third hearing, unlike the first two, provided BIA and IHS witnesses with significant time to present their view of the amendments.  See Third 1987 Senate Hearing 25-52.  The Vice Chairman of the Senate Committee grilled the Assistant Secretary for Indian Affairs, with the latter noting that the agency had veered very far from Nixon's clear intent in his July 8, 1970 Message, and had gotten "bound up in conflicting and probably unnecessary regulations[.]"  Third 1987 Senate Hearing at 34 (statement of Hon. Daniel Evans).  Responding to a question about CSC from Senator John McCain, the Assistant Secretary indicated that Tribes which found themselves short of CSC to cover overhead could simply dip into their program costs to pay for it.  See Third 1987 Senate Hearing at 37 (statement of Ross Swimmer, Assistant Secretary for Indian Affairs, U.S. Dep't of the Interior).  Responding to a question from Senator Evans, the IHS Director indicated that inadequate appropriations for CSC at the overall agency level meant that there was a chronic CSC shortfall spread around at the Tribal contractor level as well, but that there was no better solution, because funding excess CSC for one tribe from a finite pot of money meant that IHS would need

to shortchange other Tribes by the equivalent amount.  <u>See</u> Third 1987 Senate Hearing 47-48 (statement of Everett Rhoades, Director, Indian Health Services).

Tribal leaders at the hearing took issue with the Assistant Secretary's and the IHS Director's statements about CSC.  <u>See</u> Third 1978 Senate Hearing 53-61.  They rejected the suggestion that excess CSC should be funded out of the Secretarial amount.  <u>See</u>, <u>e.g.</u>, Third 1978 Senate Hearing 53-54 (statement of William Ron Allen, Chairman, Jamestown Klallam Tribe, Sequim, Washington).  Tribes also rejected any proposal that CSC should be funded using a flat fee or some other simplified approach, arguing that "any kind of approach of a flat rate is just not workable within the system of addressing the true costs of the recovery of those costs by the tribes administering BIA/IHS contracts and grants."  Third 1978 Senate Hearing 54 (statement of William Ron Allen, Chairman, Jamestown Klallam Tribe, Sequim, Washington).

After a little more than two months following the Third 1978 Senate Hearing, the Senate Committee had considered and marked up CSC amendments, reporting them to the full Senate on December 22, 1987.  <u>See</u> S. Rep. No. 100-274, at 1 (1987).  The Senate Committee called for a "comprehensive reexamination" of the ISDEAA "to increase tribal participation in the management of Federal Indian programs," and to "remove many of the administrative and practical barriers that seem to persist" under the ISDEAA.  S. Rep. No. 100-274, at 2.

The Senate Committee also commended ISDEAA's enactment twelve years earlier as the "the major reason for assumption by Indian tribes of responsibility for Federal Indian programs." S. Rep. No. 100-274, at 2-3.  The transfer of responsibility had been a boon to Native Americans, the Senate Committee said:

> In addition to operating health services, human services, and basic governmental services such as law enforcement, water systems and community fire protection, tribes have developed the expertise to manage natural resources and to engage in

sophisticated economic and community development.  All of these achievements have taken place during a time when tribes have also developed sophisticated systems to manage and account for financial, personnel and physical resources. . . . Compared to state, county and municipal governments of similar demographic and geographic characteristics, the level of development attained by tribal governments over the past twelve years is remarkable.

S. Rep. No. 100-274, at 4.  The Senate Committee further found:

Improvements in tribal financial, personnel, property, and procurement systems have enabled tribes to manage increasingly complex matters.  In response to both federal and tribal demands for accountability, most Indian tribes that operate programs now have annual single-agency audits of tribal finances.  The Department of Interior Office of Inspector General has reported an increase in tribal assumption of responsibility for tribal financial management.

S. Rep. No. 100-274, at 4.  The Senate Committee noted many more of the improvements that the

ISDEAA had induced in Native American communities, including custodial care placements for

children, outreach to isolated Native American families through community health workers,

increased health facility utilization, and the construction of safe water and sanitation systems.  See

S. Rep. No. 100-274, at 5.  The common thread among all these successes, according to the Senate

Committee, was that the ISDEAA had given Tribal communities an opportunity to "plan and

deliver services appropriate to their diverse demographic, geographic, economic, and institutional

needs" -- whether in the Navajo Nation, the largest Tribe in the United States, or on isolated

rancherias in California with a few dozen residents. [18]  S. Rep. No. 100-274, at 5.

---

[18]It is unclear from the Senate Committee Report text how the Senate Committee came to identify the Navajo Nation as the largest Tribe in the United States, as the Court's search of United States Census Bureau archives finds only a population count of population by reservation in the 1980 Census, i.e., no summed totals by Tribal affiliation.  See 1 United States Bureau of the Census, 1980 Census of Population, Social Characteristics for American Indian Persons on Reservations and Alaska Native Villages: 1980 tbl.251 at 451-56, available at http://www2 .census.gov/prod2/decennial/documents/1980a_usC.zip (PDF document 1980a_usC-07 in the zip file)(last visited Oct. 19, 2016)("1980 Census").  According to the 1980 Census, however, the Navajo Reservation had by far the largest population of any reservation or Alaskan native village in the United States, with 110,606 persons.  See 1980 Census tbl.251 at 452.  It appears that the

The Senate Committee also found that IHS' actions attempting to implement the ISDEAA largely had been praiseworthy.  See S. Rep. No. 100-274, at 6.  As of 1987, the Senate Committee said, IHS directly operated forty-five hospitals, seventy-one health centers, and several hundred smaller health stations and satellite clinics.  See S. Rep. No. 100-274, at 6 (citing Indian Health Service, Fiscal Year 1988 Budget Request).  Nevertheless, the Senate Committee noted with concern that many Tribes had reported that IHS had refused to negotiate for the transfer of central office funds and had exhibited an overall resistance to Tribal efforts to redesign programs, and to reallocate resources and personnel in support of Tribal self-determination.  See S. Rep. No 100-274, at 6.  The Senate Committee therefore provided:

> [T]he [HHS] Secretary shall negotiate annual funding agreements with each Indian tribe.  These agreements authorize the tribe to plan, conduct, consolidate, and administer programs, services, functions, and activities to Indian tribes or Indians.  Pursuant to the terms of the agreement and at the request of the tribe, the Secretary shall provide funds to carry out the agreement in a [sic] amount equal to the amount that the Indian tribe would have been eligible for under Self-Determination Act contracts and grants.  The bill also provides that the Secretary shall interpret each Federal low [sic] in a manner that will facilitate inclusion of programs or activities under the agreement.

---

reference to the California rancherias with a few dozen residents refers to reservations such as Bridgeport Colony, California (population 48) and Middletown Rancheria, California (population 37).  See 1980 Census tbl.251 at 451-52.  Other California rancherias had as few as six residents.  See 1980 Census tbl.251 at 451 (Cedarville Rancheria, California).

As of the 2010 Census, the largest Tribe in the United States is either the Navajo or the Cherokee, depending on whether one counts individuals who identify as multiracial or as members of more than one Tribe.  Among those who identify exclusively as a member of a single Tribe, the Navajo are slightly more populous than the Cherokee -- 286,731 Navajo compared to 284,247 Cherokee.  See United States Census Bureau, The American Indian and Alaska Native Population: 2010 tbl.7, at 17 (2012), available at http://www.census.gov/prod /cen2010/briefs/c2010br-10.pdf (last visited Oct. 27, 2016)("2010 Census").  Including those who identify as multiracial or as members of more than one Tribe, Cherokees are almost three times as populous as any other Tribe in the country -- 819,105 Cherokee compared to 332,129 Navajo.  See 2010 Census at 17.

S. Rep. No. 100-274, at 8.  The Senate Committee then adopted an amendment in the nature of a substitute that made several modifications to language in H.R 3508 as introduced.  See S. Rep. No. 100-274, at 8-13.  Touching for the first time on the duplication issue that forms the pith of Sage Hospital's second MSJ, the Senate Committee stated that it was concerned that "if an Indian tribe is participating as part of a consortium that tribe should not be able to contract for any of the programs or activities which are already part of the consortium's self-governance agreement."  S. Rep. No. 100-274, at 8.  The Senate Committee noted further that the amendments that it proposed would "prevent this type of duplication of services and programs.  The Senate Committee also adopted language which instructed the HHS Secretary to "interpret each Federal law and regulation in a manner that will facilitate the inclusion of programs and services and the implementation of agreements . . . ."  S. Rep. No. 100-274 at 15.

A more noticeable change to the ISDEAA that the Senate Committee proposed, however, was to add a sixth title to the statute focused squarely on Tribal self-governance.  See S. Rep. No 100-274 at 14, 17-21.  Section 403(g)(3) within that proposed sixth title stated that, subject to exclusions for community colleges, public primary and secondary schools, the Flathead Agency Irrigation Division, and the Flathead Agency Power Division,

> the HHS Secretary shall provide funds to the tribe for one or more programs, services, functions, or activities in an amount equal to the amount that the tribe would have been eligible to receive under contracts and grants under this Act, including amounts for direct programs and contract support costs and amounts for those activities that are specifically or functionally related, but not part of the service delivery program, without regard to the organizational level within the Department where such functions are carried out.

S. Rep. No. 100-274 at 20.  Furthermore, the Senate Committee clarified in a proposed Section 406(a): "Nothing in this title shall be construed to limit or reduce in any way the services, contracts,

or funds that any other Indian tribe or tribal organization is eligible to receive under section 102 or any other applicable Federal law."  S. Rep. No. 100-274 at 21.

For the purposes of this case, however, the most important change to the ISDEAA that the Senate Committee proposed was to add Section 106 to clarify provisions for funding self-determination contracts, including direct costs.  See S. Rep. No. 100-274 at 30.  The Senate Committee walked slowly through each subsection to explain its import.  See S. Rep. No. 100-274 at 30-34.  Starting off with its proposed Subsection 106(a), the Senate Committee said:

> It is apparent from the wording of the new section 106(a) that the Committee is strongly committed to the principle of assisting tribes to succeed in their efforts to plan, manage and operate programs and services under self-determination contracts. . . . The intent of these amendments is to protect and stabilize tribal programs from inappropriate administrative reduction by Federal agencies.

S. Rep. No. 100-274 at 30.  The Senate Committee alleged that the BIA had made many such reductions over the years in direct contravention of Tribal funding priorities, see S, Rep. No. 100-274 at 30-31, and threw up Subsection 106(a)(5) as a barricade to prevent any such chicanery in the future:

> Section 106(a)(5) would prevent the [HHS] Secretary from reducing funds for a self-determination contract, except in response to a reduction in appropriations enacted by the Congress.  Such a reduction should be a proportional, across-the-board reduction. . . . These amendments are intended to prevent Federal agencies from passing on the entire amount, or a disproportionate amount, of a reduction in Congressional appropriations, to tribal contracts in order to protect the base for Federally-operated functions.

S. Rep. No. 100-274 at 31.  The Senate Committee accused the BIA of cutting Tribal self-determination budgets to free up money for pay increases for BIA personnel, of financial mismanagement, and of over-aggressively reducing Tribal programmatic budgets under the guise of congressional-imposed sequestrations, see S. Rep. No. 100-274 at 31-32, adding with

- 84 -

comparative sangfroid that "the intent of these amendments is to prevent such administrative reductions of tribal contract funds,"  S. Rep. No. 100-274 at 31.

The Senate Committee briefly discussed its proposed Subsections 106(b)-(f), which are not directly relevant to this case, before turning to its proposed Subsection 106(g).  See S. Rep. No. 100-274 at 33.  That Subsection, according to the Senate Committee, would "require the [HHS] Secretary to add indirect costs to the amount of funds provided for direct program costs associated with self-determination contracts for the initial year of tribal program operation, upon the request of the tribal contractor."  S. Rep. No. 100-274 at 33.  The intent behind this provision, according to the Senate Committee, is

> to require the [HHS] Secretary to provide indirect costs for each contract year in addition to the program funding which would have been available to the Secretary to operate a contracted program and to prohibit the practice which requires tribal contractors to absorb all or part of such indirect costs within the program level of funding, thus reducing the amount available to provide services to Indians as a direct consequence of contracting.

S. Rep. No. 100-274 at 33.  The Senate Committee then added:

> The combined amount of direct and indirect costs shall then be available for each subsequent year that the program remains continuously under contract.  While the Committee has concerns about the changes to the methods of budgeting for and allocating indirect costs funds, whether those methods be the so-called "grandfather" approach,[19] the single line-item indirect cost fund, or some other

---

[19]On November 3, 1983, the DOI Inspector General wrote a letter to the Office of Management and Budget in which he reported the BIA's decision to "grandfather" indirect cost dollars into a Tribe's recurring Secretarial amount, so that, after the first year of a self-determination contract, indirect costs would be paid off of the top of the total contract amount. S. Bobo Dean & Joseph H. Webster, Contract Support Funding and the Federal Policy of Indian Tribal Self-Determination, 36 Tulsa L.J. 349, 356 (quoting Letter from Richard Mulberry, DOI Inspector General, to Deputy Director, OMB (Nov. 3, 1983)("1983 OMB Letter")).   The DOI Inspector General expected that this "grandfather" approach would encourage Tribes to develop more efficient administrative systems, but he also indicated that there was a risk that the heavy and inconsistent requirements of the federal bureaucracy were jeopardizing Tribes' ability to handle federal programs. S. Bobo Dean & Joseph H. Webster, Contract Support Funding and the Federal Policy of Indian Tribal Self-Determination at 356 (quoting 1983 OMB Letter).

method, the Committee does not believe that it should determine the method of distribution.  The "grandfather" approach and the "single fund" approach both have advantages and disadvantages from the perspective of Federal agency budgets and from the perspective of individual tribal contracts.  It is the Committee's hope that the Department of the Interior Office of Inspector General, the Bureau of Indian Affairs, and the Indian Health Service will coordinate their efforts with the tribes to develop the most effective method of distributing indirect cost funds.  The Committee amendment will insure that, whatever method is used, the tribal contractor will realize the full amount of direct program costs and indirect costs to which the contractor is entitled.

S. Rep. No. 100-274 at 33-34.  The Senate Committee then turned to its proposed Subsection 106(h), a Subsection that Sage Hospital and the United States also contest in this case.  See S. Rep. No. 100-274 at 34.  The Senate Committee's commentary on the Subsection is not germane to the case, however, as the Senate Committee specifically addressed only construction contracts in the discussion.  See S. Rep. No. 100-274 at 34.

### c.      **President Reagan's Signing Statement**.

In his first Statement on Indian Policy, issued January 24, 1983, Reagan extended his general philosophical preference for programmatic decentralization to Native American Tribes.  See Ronald Reagan, Statement on Indian Policy, 40 Public Papers of the Presidents of the United States, available at http://www.presidency.ucsb.edu/ws/index.php?pid=41665&st=&st1= (last visited Oct. 26, 2016)("Reagan Statement on Indian Policy").[20]  Reagan praised Nixon's policy of Tribal self-determination from Nixon's 1970 Message and noted how the 1975 ISDEAA had captured Nixon's vision.  See Reagan Statement on Indian Policy at 1.  Reagan believed, however,

_____

[20]Reagan's published diary entry from September 20, 1982, indicates that he already held a Cabinet meeting on this topic on that day.  See Ronald Reagan, 1 The Reagan Diaries 155 (Douglas Brinkley ed. 2009)("A Cabinet meeting -- main subject our relations with Am. Indians. We are going to put our relationship with tribes on a govt. to govt. basis.").  These early discussions notwithstanding, Reagan did not issue any public presidential statement about Native Americans before his January 24, 1983 Statement on Indian Policy.

that the ISDEAA had not gone far enough, having been "more rhetoric than action." Reagan Statement on Indian Policy at 796. Instead of fostering and encouraging Tribal self-government, Reagan said, "Federal policies have by and large inhibited the political and economic development of the tribes. Excessive regulation and self-perpetuating bureaucracy have stifled local decision-making, thwarted, Indian control of Indian resources, and promoted dependency rather than self-sufficiency." Reagan Statement on Indian Policy at 796. Reagan established that his Administration intended to

> reverse this trend by removing the obstacles to self-government and by creating a more favorable environment for the development of healthy reservation economies. Tribal governments, the Federal Government, and the private sector will all have a role. This administration will take a flexible approach which recognizes the diversity among tribes and the right of each tribe to set its own priorities and goals.

Reagan Statement on Indian Policy at 796-97. Reagan acknowledged that "[c]hange will not happen overnight," but he was determined to "honor the commitment this nation made in 1970 and 1975 to strengthen tribal governments and lessen Federal control over tribal governmental affairs." Reagan Statement on Indian Policy at 797. Delving into specifics, Reagan noted:

> Tribal governments, like State and local governments, are more aware of the needs and desires of their citizens than is the Federal Government and should, therefore, have the primary responsibility for meeting those needs. The only effective way for Indian reservations to develop is through tribal governments which are responsive and accountable to their members.

Reagan State on Indian Policy at 797. For generations, according to Reagan, federal employees had performed functions on Native Americans' behalf. See Reagan State on Indian Policy at 797-98. Despite ISDEAA passage, Reagan continued, "major tribal government functions -- enforcing tribal laws, developing and managing tribal resources, providing health and social services, educating children -- are frequently still carried on by Federal employees." Reagan State on Indian Policy at 797.

Reagan asked Tribes to reduce their dependence on Federal funds by providing a greater percentage of the cost of their self-government, and pledged to "assist tribes in strengthening their governments by removing the Federal impediments to tribal self-government and tribal resource development." Reagan State on Indian Policy at 797. At the same time, Reagan would not simply make Tribes fly before they were fully fledged, ensuring that "[n]ecessary Federal funds" would remain available for all Tribes, and developing a Small Tribes Initiative to provide financial support smaller Tribes needed to develop basic Tribal administrative and management capabilities. Reagan State on Indian Policy at 797.

Speaking directly to the issue of Native American healthcare services the following year, Reagan pocket vetoed the Indian Health Care Amendments of 1984 on October 22, 1984.[21] See United States Senate, S. 2166 - Indian Health Care Amendments of 1984, https://www.congress .gov/bill/98th-congress/senate-bill/2166/all-actions (last visited Oct. 26, 2016)(listing all actions, including the pocket veto, taken on the bill). His reasoning behind the veto, Reagan said in an accompanying memorandum, was that he believed the bill to be seriously deficient in fulfilling the goals of the Indian Health Care Improvement Act, Pub. L. 94-437 (1976)("IHCIA"). See Ronald Reagan, Memorandum Returning Without Approval the Indian Health Care Amendments of 1984, 40 Public Papers of the Presidents of the United States 1584 (1984), available at http://www.presidency.ucsb.edu/ws/index.php?pid=39292&st=&st1= (last visited Oct. 26, 2016)

---

[21]Under Article 1, Section 7 of the United States Constitution, "[i]f any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law." U.S. Const. art. 1, § 7, cl. 2. A "pocket veto" refers to the situation when a congressional adjournment prevents the President from returning the bill. See generally Wright v. United States, 302 U.S. 583, 594-98 (1938) (discussing what constitutes an adjournment for pocket veto purposes).

("1984 Reagan Memorandum").  What Reagan identified as especially troublesome in the bill was a provision that would reduce access to health services for Native Americans.  See 1984 Reagan Memorandum at 1584.   The provision in question, Reagan said, "would set a precedent for potentially changing the fundamental relationship of the Indian Health Service to State and local entities, as well as depriving eligible Indians of benefits that should be due them by virtue of their citizenship in the State." 1984 Reagan Memorandum at 1584.  "As a matter of both principle and precedent," Reagan asserted, "I cannot accept this provision."   1984 Reagan Memorandum at 1584.

Reagan's interest in Native American issues seemed to wane during his second term, being expressed only in a trio of ceremonial proclamations in the three years leading up to the ISDEAA amendment of 1988.[22]  In Reagan's 1986 and 1988 proclamations marking National American Indian Heritage Week, however, Reagan revisited his theme of increased Tribal self-sufficiency. See Ronald Reagan, Proclamation 5577 -- American Indian Week, 1986, 101 Stat. 2041 (1986); Ronald Reagan, Proclamation 5868 -- National American Indian Heritage Week, 1988, 102 Stat. 5068 (1988).  In the 1986 proclamation, Reagan noted:

> Indians make contributions in every area of endeavor and American life, and our literature and all our arts draw upon Indian themes and wisdom. . . . We look to the future with the expectation of even stronger tribal governments and lessened Federal control over tribal government affairs.  We look to a future of development of economic independence and self-sufficiency, and an enhanced government-to-government relationship that will allow greater Indian control of Indian resources.

101 Stat. 2041.  Two years later and just one week before Congress sent him the ISDEAA amendments of 1988, Reagan repeated this self-determination theme in his 1988 proclamation:

---

[22]Native American issues did not make a single appearance in Reagan's personal diary during the period of time that Congress was considering the 1988 ISDEA amendments.  See Ronald Reagan, 1 The Reagan Diaries 692-819 (Douglas Brinkley ed. 2009)

> Despite past periods of conflict and changes in Indian affairs policies, the government-to-government relationship between the United States and Indian tribes has endured. The Constitution, treaties, laws, and court decisions have consistently recognized a unique political relationship between tribal elected governments and the United States. We look to a future of increasing economic independence and self-sufficiency on Indian reservations, and we support efforts to foster greater Indian control of Indian resources.

102 Stat. 5068. Read in light of Reagan's refrain about Tribal self-sufficiency over the five years preceding the ISDEAA amendments of 1988, it is difficult to miss the same tones in his signing statement to the bill on October 5, 1988. See Ronald Reagan, Statement on Signing the Indian Self-Determination and Education Assistance Act Amendments of 1988, 40 Public Papers of the Presidents of the United States 1284, available at http://www.presidency.ucsb.edu/ws/index.php?pid=34969&st=&st1= (last visited Oct. 26, 2016)("Reagan Signing Statement").

Reagan started the signing statement on a general note: "This Act will assist in furthering Administration efforts to transfer the development and operation of programs from the Federal Government to Indian tribes. Tribal self-governance allows tribes more freedom to design programs to serve the specific needs of their members." Reagan Signing Statement at 1284. He immediately thereafter turned, however, to a rejection of one of the provisions in the bill added to the proposed new ISDEAA § 106. See Reagan Signing Statement at 1284. Reagan wrote: "A provision in section 205 of the Act stated that the Secretaries of the Interior and Health and Human Services shall reduce funding to Indian tribes if so directed by a statement from a Member of Congress that accompanies a conference report." Reagan Signing Statement at 1284.[23] Reagan

---

[23]The object of the rejection is not entirely clear from the signing statement's text. Subsection (a)'s relevant portion reads as follows: "The amount of funds provided under the terms of self-determination contracts entered into pursuant to this Act shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract." 102 Stat. 2292. Subsection (a)'s relevant portion

asserted that the provision purported to authorize a process altering Executive branch officials' legal duties without both Congressional houses and the President's participation, thus violating the requirements for presentment and bicameralism that the Supreme Court five years earlier had enunciated in Immigration and Naturalization Service v. Chadha, 462 U.S. 919 (1983).  Aside from this objection and two others focused on reporting requirements, Reagan did not voice any objections to any provisions in the 1988 ISDEAA amendments.  See Reagan Signing Statement at 1284.

3. **1994 Amendments**.

Under the 1988 ISDEAA amendments' terms, HHS and DOI were supposed to work with Tribes to reach agreement on draft regulations to cover self-determination contracts within ten months of bill enactment.  Pub. L. 100-472 § 207(b)(3)-(4).[24]  Approximately two years after the statutory deadline -- and without first consulting Tribes -- IHS developed new policy guidelines governing the award of CSC.  See Indian Self-Determination Memorandum No 92-2 (Feb. 27, 1992)("1994 IHS Memorandum").  The new guidelines provided for the use of CSC to pay for all negotiated indirect costs, and IHS distributed available funds to contractors based on an annually

---

reads as follows: "The amount of funds provided under the terms of self-determination contracts entered into pursuant to this Act shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract."  102 Stat. 2292.

[24]Congress split this requirement across two statutory Subsections.  The first Subsection read as follows: "Within seven months from the date of enactment of the Indian Self-Determination and Education Assistance Act Amendments of 1988, the Secretary shall publish proposed regulations in the Federal Register for the purpose of receiving comments from tribes and other interested parties." Pub. L. 100-472 § 207(b)(3).  The second Subsection read as follows: "Within ten months from the date of enactment of the Indian Self-Determination and Education Assistance Act Amendments of 1988, the Secretary shall promulgate regulations to implement the provisions of such Act."  Pub. L. 100-472 § 207(b)(4).

negotiated rate.  1994 IHS Memorandum at 1.  The guidelines, however, also authorized IHS to use CSC to pay for direct costs under ISDEAA § 106(a)(2).  See 1994 IHS Memorandum at 1.

Oftentimes such payments never materialized, at least not in full.  See United States General Accounting Office, Indian Self Determination Act: Shortfalls in Indian Contract Support Costs Need to be Addressed, GAORCED 99-150 at 6 (June 1999), available at http://www.gao.gov/assets/230/227485.pdf)(last visited Oct. 26, 2016)("GAO Report").  Although CSC funding had been incommensurate with Tribal needs since the ISDEAA's enactment in 1975, the shortfalls started to become acute at the end of the 1980s and the beginning of the 1990s, because of Congress' failure to anticipate the increased Tribal demand for self-determination contracts that arose after the 1988 ISDEAA amendments.  See GAO Report at 25-28.  From 1989 to 1994, these CSC shortfalls ranged from seventy million dollars to over one hundred million dollars per year.  See GAO Report at 32 fig.2.5.

Nearly five years after the statutory deadline and still without having meaningfully consulted with Tribes, the DOI and HHS published eighty pages of proposed regulations conforming to the 1988 ISDEAA amendments in the Federal Register.[25]  See Indian Self-Determination and Education Act Amendments; Proposed Rule, 59 Fed. Reg. 3166 (January 20, 1994)(codified at 25 CFR pt. 900).  Tribal reaction to the proposed regulations was

---

[25]The DOI and HHS admitted in the notice of proposed rulemaking:

[A] major area of concern for the current Administration relates to the adequacy of outreach to, and participation in the drafting process by, tribes and tribal organizations during the post-August 1990 period.  The DOI's concern is heightened by the fact that the September 1990 draft (which did reflect tribal input) was significantly modified during the more than two-year period in which the two Departments worked on the draft without tribal participation.

59 Fed. Reg. 3166.

overwhelmingly negative, because of both their content and their length.  See First Session on Oversight Hearing to Establish a Detailed Timeframe for the Swift Development of New Implementing Regulations with Close Tribal Participation: Hearing Before the S. Comm. on Indian Affairs, 103d Cong., at 1-2 (1993)("1993 Senate Hearing")(statement of Hon. Daniel K. Inouye, Chairman).  In response, HHS and DOI began to hold regional meetings with Tribal leaders in a de facto inversion of usual notice and comment rulemaking.[26]  See 1993 Senate Hearing at 34 (statement of Eddie F. Brown, Assistant Secretary, Indian Affairs, Department of the Interior).

a.   **House Report 103-653.**

On August 3, 1994, the House Committee on Natural Resources reported to the full House on another set of ISDEAA amendments.  See H.R. Rep. No. 103-653 (1994).  In its report's preamble, the House Committee indicated that the bill's purpose was "to amend the Indian Self-Determination and Education Assistance [A]ct to permanently establish Tribal Self-Governance in the Department of the Interior."  H.R. Rep. No. 103-653 at 5.  The House Committee commended IHS for having entered into self-determination contracts with fourteen Native

---

[26]In notice and comment rulemaking, also known as "informal rulemaking," the Administrative Procedure Act, 5 U.S.C. § 551-84, generally requires that agencies publish a notice of proposed rulemaking in the Federal Register. Maeve P. Carey, Congressional Research Service, The Federal Rulemaking Process: An Overview 5-6 (June 17, 2013)("Federal Rulemaking Process").  The notice must contain (i) a statement of the public rulemaking proceedings' time, place, and nature; (ii) reference to the legal authority under which the rule is proposed; and (iii) either the proposed rule's terms or substance, or a description of the subjects and of the issues involved.  See Federal Rulemaking Process at 6.  After considering public comments, the agency may then publish the final rule, incorporating a general statement of its basis and purpose.  See Federal Rulemaking Process at 6.  Agencies commonly allow at least thirty days for public comment.  See Federal Rulemaking Process at 6.

American tribes during the previous two-and-a-half years, see H.R. Rep. No. 103-653 at 6, but it also revealed that it was

> very concerned about reports from many of the Self-Governance tribes that officials of the Indian Health Service have refused to negotiate for the transfer of central office funds and have exhibited an overall resistance to tribal efforts to redesign programs and reallocate resources and personnel under the authority of Tribal Self-Governance.

H.R. Rep. No. 103-653 at 6. The House Committee diagnosed the cause of such resistance within IHS to be "a misapprehension that Tribal Self-Governance is a temporary project." H.R. Rep. No. 103-653 at 6. To the contrary, the House Committee said, Tribal self-determination was to be a permanent policy, and IHS must take steps to "begin to plan for and implement changes that will result in reductions in the Federal bureaucracy which correspond to the transfer of program funds, resources, and responsibilities to Self-Governance tribes." H.R. Rep. No. 103-653 at 6.

Although the House Committee proposed adding an entire ISDEAA section dedicated exclusively to AFAs, the House Committee had surprisingly little to say about issues directly relevant to the Allocation MSJ or the Duplication MSJ. In one Subsection, however, it packed a punch far above its weight, instructing HHS to interpret not just the ISDEAA, but rather "each Federal law and regulation," except where otherwise provided by law, in a manner that would facilitate "the inclusion of programs, service, functions, and activities in the agreements entered into under" Tribal self-determination contracts. H.R. Rep. No. 103-653 at 20.

### b.     Senate Committee Report.

On April 20, 1994, Senators McCain and Inouye introduced a Senate version of the 1994 ISDEAA amendments, and the bill was referred to the Senate Committee on Indian Affairs. See S. Rep. No. 103-374 at 4 (1994). On August 10, 1994, the Senate Committee reported the bill to the full Senate. See S. Rep. No 103-374 at 1. According to the Senate Committee, the major

impetus for the bill was HHS and DOI's incorrigibility; Congress mandated in 1988 to quickly promulgate simple regulations to govern Tribal self-determination contracts, but the agencies had done the opposite for six years.[27]   See S. Rep. No. 103-374 at 14.   The Senate Committee keelhauled the agencies:

> This action is a direct result of the failure of the Secretaries to respond promptly and appropriately to the comprehensive amendments developed by this Committee six years ago.  The recently promulgated proposed regulations severely undercut Congress' intent in the original Act and those [1988] amendments to liberalize the contracting process and to put these programs firmly in the hands of the tribes.  The proposed regulations erect a myriad of new barriers and restrictions upon contractors rather than simplifying the contracting process and freeing tribes from the yoke of excessive federal oversight and control.

S. Rep. No. 103-374 at 14.   The Senate Committee explained that, because of the agencies' recalcitrance, its proposed 1994 ISDEAA amendments would cabin their rulemaking authority even more than the original ISDEAA and the 1988 ISDEAA amendments had.  See S. Rep. No. 103-374 at 14:

> Section 5(1) delegates to the Secretary the authority only to promulgate implementing regulations in certain limited subject matter areas. . . .  A second key limitation on the delegation of rulemaking authority is provided in the twelve month limitation on the Secretaries' authority to promulgate the regulations.  This limit is necessary to prevent another regulation drafting process that goes on for years without satisfactory or final resolution.

---

[27]Such caustic congressional condemnation of the BIA was common during the 1980s and early 1990s.  See George Pierre Castile, Taking Charge: Native American Self-Determination and Federal Indian Policy, 1975-1993, at 49-110 (2006).  The Senate Special Committee on Investigations found massive failure of the BIA to serve Native Americans in 1989 and noted "at least 42 congressional investigations have recommended federal reorganization, restructuring, retinkering.  And in one nine year period alone, the BIA was actually reorganized ten times." United States Senate, A Report of the Special Committee on Investigations of the Select Committee on Indian Affairs 15, 101st Cong., 1st Sess. (Nov. 20, 1989).

S. Rep. No. 103-374 at 14.  Because of the agencies' obduracy in refusing to follow congressional instructions to consult Tribes before proposing regulations,[28] the Senate Committee explained, its proposed 1994 ISDEAA amendments also would require HHS and DOI to employ the negotiated rulemaking process, publishing a proposed rule within six months of the amendments' enactment. See S. Rep. No. 103-374 at 14.

Having ground its ax, the Senate Committee also delved deeply into amendments that it proposed for ISDEAA § 106, which Congress had added to the ISDEAA in 1988.  See S. Rep. No. 103-374 at 8-14.  The Senate Committee proposed to amend Sections 106(a)(2) and (3) to more fully define the meaning of the term "contract support costs" to "include both funds required for administrative and other overhead expenses and 'direct' type expenses of program operation."  S. Rep. No. 103-374 at 8-9.  The Senate Committee said that, in the event that the Secretarial amount for a particular function proves to be insufficient in light of a contractor's needs for prudent management, "contract support costs are to be available to supplement such sums."  S. Rep. No. 103-374 at 9.  The Senate Committee proposed retaining the ISDEAA's process for negotiations between the agencies and Tribes for indirect cost agreements, see S. Rep. No. 103-374 at 9, but

---

[28]It appears that the Senate Committee may have been somewhat hyperbolic when haranguing HHS and DOI for completely "disregarding" Native American input.  S. Rep. No. 103-374 at 14.  On at least one occasion, on September 29, 1990, President George Bush's Interior Secretary, Michael Lujan, met with nearly seven hundred Tribal leaders.  See Seth Mydans, Old Angers Still Fresh As Indians Meet Lujan, N.Y. Times, Sept. 30, 1990, available at http://www.nytimes.com/1990/09/30/us/old-angers-still-fresh-as-indians-meet-lujan.html (last visited Oct. 21, 2016)("Old Angers").  Even at this meeting, however, DOI effectively presented the Tribal leaders with a regulatory fait accompli, eliciting strong resentment from the Tribal leaders present. Old Angers at 1 (quoting, among others, Wayne Ducheneaux, president of the National Congress of American Indians, as challenging Lujan: "You say you want consultation with the Indian tribes, but I don't think you truly want it.").

still smarting from the agencies' impenitent disregard for its earlier instructions, the Senate Committee drew a line in the sand even on these negotiations:

> Throughout this section the Committee's objective has been to assure that there is no diminution in program resources when programs, services, functions or activities are transferred to tribal operation. . . .  [If] a tribe would be compelled to divert program funds to prudently manage the contract, [it is] a result Congress has consistently sought to avoid.

S. Rep. No. 103-374 at 9.  The Senate Committee micromanaged even further, sidestepping HHS and DOI and directing the Office of Management and Budget ("OMB") to develop new cost principles unique to Tribal organizations for HHS and DOI to apply to self-determination contracts.  See S. Rep. No. 103-374 at 10.

The Senate Committee also proposed two new ISDEAA subsections that would codify existing practice and policy, and two new subsections that would reverse existing practice.  See S. Rep. No. 103-374 at 10-12.  The first new subsection would codify "the current policy and practice regarding program income earned by a tribal organization during the course of administering a contract (such as third party income paid by insurance companies insuring persons served by a tribal organization's health program)."  S. Rep. No. 103-374 at 10.  The second new subsection would

> incorporate[] the longstanding canon of statutory interpretation that laws enacted for the benefit of Indians are to be liberally construed in their favor, and further to clarify that all functions, services, activities or programs or portions thereof, as well as all administrative functions, are contractible, as clearly provided in the Act.

S. Rep. No. 103-374 at 11.  The third new subsection would make it clear that Tribal contractors operating under self-determination contracts are "not subject to [HHS or DOI] manuals, guidelines, regulations or unpublished requirements unless expressly authorized under the [ISDEAA] or agreed to by the Contractor."  S. Rep. No. 103-374 at 12.  The fourth new subsection

would permit "a unilateral modification of [a self-determination] contract when that modification only adds supplemental funding for programs or other functions that are already included in the annual funding agreement." S. Rep. No. 103-374 at 13.

      **c.**     **President Clinton's Native American Policy.**

President William J. Clinton issued more than fifty percent more signing statements than any other President in history. See Congressional Research Service, Presidential Signing Statements: Constitutional and Institutional Implications 5-7 (Jan. 4, 2012), available at http://fas.org/sgp/crs/natsec/RL33667.pdf (last visited Oct. 26, 2016). His choice not to issue one on the ISDEAA amendments is therefore as notable as a dog that does not bark,[29] especially given that he wrote four other signing statements on other bills the same day that he signed the ISDEAA amendments of 1994. See Presidential Signing Statements -- 1994, http://www.presidency.ucsb.edu/signingstatements.php?year=1994&Submit=DISPLAY (providing a chronological listing of every presidential signing statement from 1994).

Clinton had not been silent about Native American self-determination, however, during the months when the 1994 ISDEAA amendments were coursing through Congress; six months before the ISDEAA amendments reached his desk, Clinton had summoned the leaders of all 547 federally recognized Tribes to the meeting on the White House lawn. See Douglas Jehl, Clinton Meets

---

[29]The "dog didn't bark" canon derives from a short story from Sir Arthur Conan Doyle, in which Sherlock Holmes deduces the identity of the villain after realizing that the dog of the house did not bark when the individual came to the house. See Sir Arthur Conan Doyle, The Adventure of Silver Blaze, The Complete Sherlock Holmes 347 (A.C. Doyle Memorial ed. 1960). The Supreme Court repeatedly has invoked this unofficial canon of statutory construction. See, e.g., Zuni Pub. Sch. Dist. No. 89 v. Dep't of Ed., 550 U.S. 81, 88 (2007); Scheidler v. National Organization of Women, 547 U.S. 9, 20 (2006).

Indians, Citing a New Respect, N.Y. Times, Apr. 30, 1994.  In his welcoming remarks to the Tribal

leaders, Clinton said:

> All governments must work better.  We must simply be more responsive to the people we serve and to each other.  It's the only way we'll be able to do good things with the resources we have.  I know that you agree with that.  More and more of you are moving to assume fuller control of your governments.  Many are moving to take responsibility for operating your own programs.  Each year the Bureau of Indian Affairs is providing more technical services and fewer direct services.
>
> One avenue for greater tribal control is through self-governance contracts.  There are about 30 self-compacting tribes today.  We're working with Congress to raise that number by 20 tribes every year.  We'd like self-governance to become a permanent program.  But we must ensure services will still be provided to the smaller tribes that do not choose to participate.

William J. Clinton, Remarks to Native American and Native Alaskan Tribal Leaders, 42 Public

Papers of the Presidents of the United States PP (Apr. 29, 1994), available at http://www

.presidency.ucsb.edu/ws/index.php?pid=50070&st=&st1= (last visited Oct. 26, 2016).   In the

memorandum that Clinton ceremoniously signed immediately after his welcoming remarks,

Clinton went further: "Each executive department and agency shall take appropriate steps to

remove any procedural impediments to working directly and effectively with tribal governments

on activities that affect the trust property and/or governmental rights of the tribes."  William J.

Clinton, Memorandum on Government-to-Government Relations With Native American Tribal

Governments, 42 Public Papers of the Presidents of the United States PP (Apr. 29, 1994), available

at  http://www.presidency.ucsb.edu/ws/index.php?pid=50064&st=&st1= (last visited Oct. 26,

2016).

At Clinton's instruction, the Departments of Justice, Interior, and Housing and Urban

Development followed up on the White House meeting with a joint "National American Indian

Listening Conference" in Albuquerque.  Louis Sahagun, Tribal Leaders Meet, Voice Sovereignty

Concerns, Los Angeles Times, at 12 (May 6, 1994)("Tribal Leaders Meet").  At that meeting, ninety federal officials, including Attorney General Janet Reno and Secretaries Bruce Babbitt and Henry Cisneros, fielded questions from more than 200 Tribal leaders to discuss how Tribes could develop their economies and social services free of the interference of federal agencies.  See Tribal Leaders Meet at 12.  Reno indicated that the goal of the conference was to make a first "step toward doing away with the old, closed way of doing business."  See Tribal Leaders Meet at 12.

## ANALYSIS

Fort Defiance asserts two basis for injunctive relief: (i) a permanent injunction under the ISDEAA; and (ii) a PI pursuant to rule 65 of the Federal Rules of Civil Procedure.  See Motion at 1.  The Court will grant the Motion in part and deny it in part.  The Court will not order, at this stage of the case, a permanent injunction under the ISDEAA, 25 U.S.C. § 5331(a).  The Court, however, will order a PI under rule 65 that requires the United States through IHS to fund Fort Defiance according to the FY 2022 contract renewal proposal and accompanying AFA.  Because the United States through IHS already is funding Fort Defiance according to the bulk of the terms of the FY 2022 contract renewal proposal and accompanying AFA, the only aspect of Fort Defiance's ISDEAA contract that the PI impacts is Fort Defiance's requested contract supports costs.  Accordingly, the Court will order IHS to award Fort Defiance a total of $18,515,007.00 in contract support costs for FY 2022, which is $16,627,268.00 more than IHS already has given Fort Defiance.  The Court will order that IHS make prorated monthly payments until this litigation is resolved.

## I.   FORT DEFIANCE IS NOT ENTITLED TO INJUNCTIVE RELIEF UNDER THE ISDEAA.

Fort Defiance is not, at this stage of the case, entitled to permanent injunctive relief under the ISDEAA.  Under the ISDEAA, a federal district court may order permanent injunctive relief in "an action brought under this chapter" to

> compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this chapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 5321(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

25 U.S.C.A. § 5331.  A district court, therefore, may award "immediate injunctive relief without proceeding to summary judgment or to trial" if the United States violates the ISDEAA.  Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 100 F. Supp. 3d 1166.

As explained below, Fort Defiance likely will succeed in showing that IHS' partial declination violates the ISDEAA.  See Analysis § II(A) infra, at 106-16.  IHS' partial declination likely violates 25 C.F.R. § 900.33 and 25 U.S.C. § 5325(b).  See Analysis § II(A) infra, at 106-16. Nevertheless, a permanent injunction under ISDEAA is not appropriate at this time, because a PI can address Fort Defiance's concerns while the factual and legal issues that Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, creates can be resolved.  First, although IHS' partial declination violates 25 C.F.R. § 900.33 and 25 U.S.C. § 5325(b), the D.C. Circuit's decision in Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, raises two issues that the Court needs to explore more thoroughly.  In Cook Inlet Tribal Council, Inc. v. Dotomain, the D.C. Circuit concludes that the ISDEAA "does not require the government to pay contract support costs for expenses Indian Health Service normally pays when it runs a health program" and that "[t]hose expense are eligible for reimbursement only under the secretarial amount."  Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 894. 25 C.F.R. § 900.33 prohibits IHS from declining a renewal contract that does not propose a "material and substantial change to the scope or funding

of a program, functions, services, or activities." 25 C.F.R. § 900.33.  25 U.S.C. § 5325(b) prohibits IHS from reducing "funds required by" 25 U.S.C. § 5325(a) except for in five enumerated circumstances; the parties do not argue that this case fits into any of the enumerated circumstances, and the Court does not, at this stage, see an exception that applies.  25 U.S.C. § 5325(b).

Although the interpretation of 25 U.S.C. § 5325 in Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, does not require IHS' partial declination, the existing record does not demonstrate unequivocally that none of Fort Defiance's disputed contract support costs are to cover expenses that IHS "normally" would incur.  25 U.S.C. § 5325.  While the Court does not agree with the United States' overbroad reading of Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, see Analysis § II(A) infra, at 106-16, an implication of the D.C. Circuit's conclusion is to ask courts -- rather than IHS or Tribes -- to scrutinize more closely the itemized list of funds that IHS supplies under an ISDEAA contract.  Relatedly, in Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, the D.C. Circuit does not consider the implications that its decision has for existing ISDEAA contracts like Fort Defiance's.  If Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, is correct and 25 U.S.C. § 5325 does not permit IHS to structure a Tribe's self-determination contract as it has, then there is an unavoidable conflict between 25 U.S.C. § 5325 and other parts of the ISDEAA.  If IHS must restructure a self-determination contract or AFA to comply with the D.C. Circuit's 25 U.S.C. § 5325 interpretation, see Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, then, to restructure the contract, the IHS must violate 25 U.S.C. § 5325(b) and 25 C.F.R. § 900.33.  This result is the product of the D.C. Circuit's attempt at faithful textualism.  The D.C. Circuit concludes that, under 25 U.S.C. § 5325(a)(2), "no expense is a contract support cost if it -- like facility costs -- is 'normally' paid by the agency that would otherwise administer the program directly."  Cook Inlet Tribal Council, Inc. v. Dotomain,

20 F.4th at 896.  The D.C. Circuit cites FDA v. Brown & Williamson Tobacco Corp., 529 U.S.

120, 133 (2000), to support its reasoning, quoting approvingly the Supreme Court of the United

States of America's statement that "[a] court must . . . interpret the statute as a symmetrical and

coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." FDA v.

Brown & Williamson Tobacco Corp., 529 U.S. at 133.  See Cook Inlet Tribal Council, Inc. v.

Dotomain, 20 F.4th at 896.  By not considering the conflict between 25 U.S.C. § 5325(a)(2) and

25 U.S.C. § 5325(b) and 25 C.F.R. § 900.33 for existing self-determination contracts, however,

the D.C. Circuit does not follow the Supreme Court's instruction and falls into the trap of reading

a single piece of text in isolation and ignoring other pieces of equally important text.  See 25 U.S.C.

§ 5321(g)("[E]ach provision of this chapter and each provision of a contract or funding agreement

shall be liberally construed for the benefit of the Indian Tribe participating in self-determination,

and any ambiguity shall be resolved in favor of the Indian Tribe.").  See also Victoria Nourse,

Picking and Choosing Text: Lessons for Statutory Interpretation From the Philosophy of

Language, 69 Fla. L. Rev. 1409, 1412 (2017)("Choosing one piece of text over another can amount

to assuming that which one is trying to prove."); Brett M. Kavanaugh, Keynote Address: Two

Challenges for the Judges as Umpire: Statutory Ambiguity and Constitutional Exceptions, 92

Notre Dame L. Rev. 1907, 1910 (2017)("The simple and troubling truth is that there is no definitive

guide for determine whether statutory language is clear or ambiguous."). Cf. Cary Franklin, Living

Textualism, 2020 Sup. Ct. Rev. 119, 125-30 (2020).  Faithful textualism requires precision.  See

Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 220 F. Supp. 3d at 1227 ("If possible,

the Court interprets statutes according to the statutory text's plain meaning and structure");

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 20

(2012)(noting that textualists "routinely take purpose into account, but in its concrete

manifestations as deduced from close reading of the text").  Consequently, <u>Cook Inlet Tribal</u> <u>Council, Inc. v. Dotomain</u>, 20 F.4th at 892, creates both factual and legal issues that must be resolved before the Court can order an injunction under the ISDEAA.

Second, an ISDEAA injunction "is unnecessary at this stage of the case." <u>Navajo Health</u> <u>Found. -- Sage Mem'l Hosp. Inc. v. Burwell</u>, 100 F. Supp. 3d at 1168.  Like the Court concludes in <u>Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell</u>, 100 F. Supp. 3d at 1168, a PI "can address the large majority of [the Tribe's] concerns." <u>Navajo Health Found. -- Sage Mem'l Hosp.</u> <u>Inc. v. Burwell</u>, 100 F. Supp. 3d at 1168.  A PI can remedy Fort Defiance's pressing concerns about funding important healthcare costs but still will permit IHS to "add evidence to the record to support their decision" to decline partially Fort Defiance's FY 2022 contract renewal proposal. <u>Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell</u>, 100 F. Supp. 3d at 1168.  If Fort Defiance "succeeds on the merits of its claims -- at either the summary judgment stage or at trial -- the Court will order any necessary and appropriate permanent injunctive relief at that point." <u>Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell</u>, 100 F. Supp. 3d at 1168.  Moreover, the Court agrees with its earlier analysis: although 25 U.S.C.A. § 5331 permits a court to order immediate, permanent injunctive relief, "courts should take whatever time it may require to develop a full factual record rather than rushing to judgment based on a few affidavits," especially "in a case like this one where millions of dollars in federal funds are at stake." <u>Navajo Health</u> <u>Found. -- Sage Mem'l Hosp. Inc. v. Burwell</u>, 100 F. Supp. 3d at 1168.  A "more cautious approach ensures that the Court will not miss anything in the process." <u>Navajo Health Found. -- Sage Mem'l</u> <u>Hosp. Inc. v. Burwell</u>, 100 F. Supp. 3d at 1168.  Relatedly, although Fort Defiance argues that this case does not present factual issues, <u>see</u> Tr. at 36:20-21 (Miller), <u>Cook Inlet Tribal Council, Inc.</u> <u>v. Dotomain</u>, 20 F.4th at 892, creates factual issues that must be resolved, namely, whether any of

the funds that IHS declined are for costs that IHS normally would incur if it ran the healthcare program that Fort Defiance runs.

## II.     **FORT DEFIANCE IS ENTITLED TO A PI.**

Although Fort Defiance is not entitled to a permanent injunction under the ISDEAA, it is entitled to a PI, because: (i) there is a substantial likelihood that IHS' partial declination violates the ISDEAA; (ii) denying a PI would irreparably harm Fort Defiance's ability to provide healthcare services to the Navajo Nation; (iii) and any harm that the United States would suffer by honoring the proposed FY 2022 self-determination contract and accompanying AFA is minimal. To obtain a PI, a movant must show: (i) a substantial likelihood of success on the merits; (ii) irreparable harm to the movant if the injunction is denied; (iii) that the threatened injury outweighs the harms that the PI may cause the opposing party; and (iv) that the injunction, if issued, will not adversely affect the public interest.  See Aposhian v. Barr, 958 F.3d 969, 978 (10th Cir. 2020).  When the government is the opposing party, the "third and fourth factors 'merge.'" Aposhian v. Barr, 958 F.3d 978 (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)).  A movant's entitlement to a PI must be "clear and unequivocal," because a PI is an "extraordinary remedy." Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1261 (10th Cir. 2004).

The requested PI is not a disfavored injunction.  There are three PIs that are "specifically disfavored"; (i) PIs that alter the status quo; (ii) mandatory PIs; and (iii) PIs that awards the movant all the relief that it could recover at the conclusion of a full trial on the merits.  Schrier v. Univ. of Colo., 427 F.3d at 1259.  First, although the requested PI alters the status quo that has existed since IHS' partial declination, the requested PI would restore the pre-declination status quo that has existed for approximately a decade.  Were the requested injunction a disfavored injunction, then courts would need to "more closely scrutinize" any request for a PI that asks to restore a recently

disrupted status quo.  Schrier v. Univ. of Colo., 427 F.3d at 1259.  That standard would shoulder improperly an additional burden on litigants trying, like Fort Defiance is here, to restore a status quo while trying to deal with the possibility of the status quo changing after a full trial on the merits.  Second, there is no indication or suggestion -- from the parties or otherwise -- that the requested PI is a mandatory PI.  Third, although the requested PI requires the United States to honor the FY 2022 proposed renewal contract and accompanying AFA, which is what Fort Defiance seeks through a full trial on the merits, that PI does not prohibit the possibility that Fort Defiance may have to return money to the United States if a full trial on the merits reveals that Fort Defiance is not entitled to the money that it seeks.  Money is fungible, and a PI, of course, is not a permanent injunction.  In the Complaint, Fort Defiance asks for an injunction under ISDEAA, 25 U.S.C. § 5331(a).  See Complaint ¶¶ 65-75, at 17-18.  The requested PI, therefore, does not award Fort Defiance all the relief that it may recover after a full trial on the merits.

### A.    FORT DEFIANCE LIKELY WILL SUCCEED ON THE MERITS.

There is a substantial likelihood that Fort Defiance will succeed on the merits, because it is substantially likely that IHS' partial declination violates the ISDEAA.  IHS is not permitted to "review the renewal of a term contract for declination issues where no material and substantial change to the scope or funding of a program, function, services, or activities has been proposed by the Indian tribe or tribal organization."  25 C.F.R. § 900.33.  Moreover, IHS may not reduce the secretarial amount or the contract support costs -- the funds "required by" 25 U.S.C. § 5325(a) -- in years subsequent to the initial contract term except pursuant to: (i) "a reduction in appropriations from the previous fiscal year for the program or function to be contracted"; (ii) "a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution"; (iii) a Tribal authorization; (iv) "a change in the amount of pass-through funds needed

under a contract"; or (v) "completion of a contracted project, activity, or program."  25 U.S.C.

§ 5325(b)(2).  In addition, within ninety days of a Tribe's renewal proposal, the IHS must "approve

the proposal and award the contract unless the Secretary" notifies the Tribe of a "specific finding

that clearly demonstrates" or "is supported by a controlling legal authority that":

(A)     the service to be rendered to the Indian beneficiaries of the particular
        program or function to be contracted will not be satisfactory;

(B)     adequate protection of trust resources is not assured;

(C)     the proposed project or function to be contracted for cannot be properly
        completed or maintained by the proposed contract;

(D)     the amount of funds proposed under the contract is in excess of the
        applicable funding level for the contract, as determined under section 450j-
        1(a) of this title; or

(E)     the program, function, service, or activity (or portion thereof) that is the
        subject of the proposal is beyond the scope of programs, functions, services,
        or activities, . . . because the proposal includes activities that cannot lawfully
        be carried out by the contractor.

25 U.S.C. § 5321(a)(2).

Here, Fort Defiance argues that it likely is to succeed on the merits.  IHS' partial declination

likely violates the ISDEAA, because Fort Defiance does not propose a "material and substantial,"

25 C.F.R. § 900.33, change to its contract, and because IHS does not rely on any of the 25 U.S.C.

§ 5325(b)(2) criteria in partially declining the contract, see Motion at 4-8.  In response, the United

States asserts that Fort Defiance is not likely to succeed on the merits, for two reasons.   See

Response at 8-16.  First, the United States contends that IHS does not need to rely on one of the

25 U.S.C. § 5325(b)(2) criteria, because § 5325(b)(2) applies only to funding that § 5325(a)

requires, and because § 5325(a) does not require the IHS to give Fort Defiance the funding that

Fort Defiance requests in its proposed contract renewal proposal.  See Response at 5-7.  Second,

the United States argues that 25 C.F.R. § 900.33 does not prohibit IHS' partial declination, because Fort Defiance's requested increase in contract support costs and requested extension of the contract term from three to fifteen years are material and substantial changes to the contract, and, even if they are not material and substantial changes, that 25 C.F.R. § 900.33 conflicts with the ISDEAA and is unlawful.  See Response at 7-8.

First, 25 C.F.R. § 900.33 likely prohibits IHS' partial declination.[30]  The two changes at issue are the FY 2022 AFA's $18,515,007.00 in contract support costs and the proposal to increase the contract term from three to fifteen years.  See Response at 4-8; Declination Letter at 267-68. The FY 2022 amount of contract support costs that IHS calculated, $18,515,007.00, is an increase from the $18,279,615.00 -- the twelve-month proration from the $15,250,622 in contract support costs that Fort Defiance received -- for FY 2021, an increase of $235,392.00, or approximately 1.29%.  See Complaint ¶ 35, at 9. Complaint ¶ 70, at 16; Adkins Decl. ¶13, at 4.  This increase is not for any new programs, services, functions, or activities, nor does Fort Defiance seek to use this money to cover any new costs or staff.  See Complaint ¶ 38, at 10.  Moreover, the methodology used to reach the $18,515,007.00 number is the same that Fort Defiance used in the past for earlier contract renewal proposals and AFAs.  See Complaint ¶¶ 41, 42 at 10-11.  This increase, therefore, likely is not a material and substantial change, and 25 C.F.R. § 900.33 likely prohibits IHS' decision to decline to fund the FY 2022 AFA's $18,515,007.00 in contract support costs.

---

[30]25 C.F.R. § 900.33, not 25 C.F.R. § 900.32, applies to the IHS' partial declination, because 25 C.F.R. § 900.33 "pertains only to the agency's authority to decline renewal contracts," whereas 25 C.F.R. § 900.32 pertains to "successor AFAs."  Navajo Nation v. United States Dep't of Interior, No. CIV 16-0011-TSC, 2022 WL 834143, at *9 n.6 (D.D.C. March 21, 2022)(Chutkan, J.)).

Next, Fort Defiance's proposal to extend the contract term to fifteen years does not amount to a material and substantial change under 25 C.F.R. § 900.33.  25 C.F.R. § 900.33 pertains to changes "to the scope or funding of a program, functions, services, or activities [that have] . . . been proposed by the Indian tribe or tribal organization."  25 C.F.R. § 900.33.  Changing a contract's term does not affect a contract's "scope or funding"; it extends the time during which the contract will be in effect.  25 C.F.R. § 900.33.  A renewal contract that "offers no modifications" to the contract's provisions "that speak to the scope and funding" of the Tribe's self-determination contract is not a material and substantial change under 25 C.F.R. § 900.33.  Navajo Health Found. -- Sage Mem'l Hosp. , Inc. v. Burwell, 256 F. Supp. 3d at 1235.  Moreover, 25 U.S.C. § 5321(a)(2) does not list an extension of a contract's term as one of the permitted declination criteria.  See 25 U.S.C. § 5321(a)(2).  Importantly, 25 U.S.C. § 5324(c)(1) states that a self-determination contract shall be:

(A)   For a term not to exceed three years in the case of other than a mature contract, unless the appropriate Secretary and the tribe agree that a longer term would be advisable, and

(B)   For a definite or an indefinite term, as requested by the tribe (or, to the extent not limited by tribal resolution, by the tribal organization), the case of a mature contract.

25 U.S.C. § 5324(c)(1).  A "mature contract" is

a self-determination contract that has been continuously operated by a tribal organization for three or more years, and for which there are no significant and material audit exceptions in the annual financial audit of the tribal organization: Provided, That upon the request of a tribal organization or the tribal organization's Indian tribe for purposes of section 5321(a) of this title, a contract of the tribal organization which meets this definition shall be considered to be a mature contract;

25 U.S.C. § 5304(h).

Although Fort Defiance's self-determination contract has existed for more than three years, there is no indication that it is a mature contract under 25 U.S.C. § 5304(h).  Under IHS policy, a Tribe must request mature contract status.  <u>See</u> Internal Agency Procedures Handbook for Non-Construction Contracting Under Title I or the Indian Self-Determination and Education Assistance Act, ch. 22, at 145, available at https://www.ihs.gov/sites/ihm/themes/responsive2017/display_obj ects/documents/pc/IAP_Handbook_Under_Title%20I_ISDEAA.pdf.  There is no indication that Fort Defiance has requested mature contract status.  <u>See</u> Declination Letter at 266.  Consequently, Fort Defiance's contract may not be for a term of more than three years unless IHS and Fort Defiance "agree that a longer term would be advisable."  25 U.S.C. § 5324(c)(1).  The ISDEAA does not require IHS to enter into a fifteen-year contract; IHS retains discretion to decline to extend the contract term for more than three years at a time.  <u>See</u> 25 U.S.C. § 5324(c)(1).  The United States misinterprets the ISDEAA.  In the Declination Letter, IHS states that it does not agree to a fifteen-year term, because Fort Defiance "has not made a written request for mature contract status."  Declination Letter at 267.  The ISDEAA does not, however, state that only mature contracts can have terms longer than three years.  Rather, the ISDEAA permits non-mature contracts to have terms greater than three years if IHS and the Tribe agree to a longer term.  <u>See</u> 25 U.S.C. § 5324(c)(1)(A).  While IHS may decide that a fifteen-year term is not "advisable," it may not use the mature-contract provision to justify its declination decision, because 25 U.S.C. § 5324(c)(1) permits non-mature contracts to have terms longer than three years.  25 U.S.C. § 5324(c)(1)(A).  IHS must, therefore, rely on alternative justifications to support its decision to decline to extend the contract's term to fifteen years.  <u>See</u> 25 U.S.C. § 5324(c)(1).  Accordingly, 25 U.S.C. § 5324(c)(1) does not support IHS' partial declination, and Fort Defiance's proposed

extension of the contract from a three-year term to a fifteen-year term is not a material and substantial change under 25 C.F.R. § 900.33.

Second, 25 U.S.C. § 5325(b) likely prohibits IHS' partial declination. The United States does not argue that IHS relies on one of § 5325(b)(2)'s five enumerated reduction criteria. In fact, IHS, in the Declination Letter, states that it declines $16,627,268.00 in Fort Defiance's proposed contract support costs, because that money is "for various activities, which are normally carried out by the IHS and already covered in the Secretarial amount," and, therefore, may not be paid as contract support costs. Declination Letter at 267 (citing Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892). Similarly, the United States argues that 25 U.S.C. § 5325(b) does not prohibit IHS' partial declination, because § 5325(b) applies only to funds that § 5325(a) requires, but the "funding in dispute here was not required by" § 5325(a), "nor was it authorized [contract support costs] under subsection (a)(2)-(3)." Response at 5-6. Further, the United States asserts that Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, prohibits the IHS from giving Fort Defiance the full amount of its requested contract support costs. See Response at 6. At the hearing, the United States contended that the Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, decision is "in conflict" with the Court's opinion in Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 100 F. Supp. 3d 1122. Tr. at 45:14 (Bell). The United States suggests that, if the Court agrees with its Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 100 F. Supp. 3d 1122, opinion, then "the Government may not succeed here," but that, if the Court agrees with the D.C. Circuit's decision in Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, the United States should succeed. Tr. at 49:19 (Bell).

The Court's decision is not to pick between its earlier conclusions in Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 100 F. Supp. 3d at 1122, Navajo Health Found. -- Sage

Mem'l Hosp. Inc. v. Burwell, 263 F. Supp. 3d at 1178, and the D.C. Circuit's conclusion in Cook

Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892.  In Navajo Health Found. -- Sage Mem'l

Hosp. Inc. v. Burwell, the Court concludes that 25 C.F.R. § 900.33 "does not allow" IHS "to

consider information beyond a contract renewal proposal's four corners in determining whether to

apply" § 5321(a)(2)'s declination criteria.  Navajo Health Found. -- Sage Mem'l Hosp. Inc. v.

Burwell, 100 F. Supp. 3d at 1183.  In Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell,

263 F. Supp. 3d at 1162, the Court concludes that the ISDEAA does not prohibit IHS from funding,

as a contract support cost, an amount that "hypothetically could have been paid under the

Secretarial amount."  Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 263 F. Supp. 3d

at 1162.  In Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, the D.C. Circuit

concludes that the ISDEAA "does not require the government to pay contract support costs for

expenses" that IHS "normally pays when it runs a health program" and that "those expenses are

eligible for reimbursement only under the secretarial amount."  Cook Inlet Tribal Council, Inc. v.

Dotomain, 20 F.4th at 894.  According to the United States, asking whether the ISDEAA permits

contract support costs in light of Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, is a

consideration beyond the contract's four corners, meaning that 25 C.F.R. § 900.33 prohibits IHS

from considering that Fort Defiance's proposed contract support costs violate ISDEAA and,

therefore, that 25 C.F.R. § 900.33 is unlawful.  See Response at 4-9.  Moreover, in Navajo Health

Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 263 F. Supp. 3d at 1178, the Court ordered IHS to

reimburse the Tribe for all contract support costs that are "reasonable costs for activities" that the

Tribe "must carry on as a contractor to ensure compliance with" the contract "and prudent

management without applying a duplication offset for any individual activity unless IHS already

paid for that specific, individuated activity under the secretarial amount."  Navajo Health Found.

-- Sage Mem'l Hosp. Inc. v. Burwell, 263 F. Supp. 3d at 1178.  Both Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 263 F. Supp. 3d at 1178, and Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, therefore, reinforce the proposition that one line item cannot be duplicated across the secretarial and contract support costs amounts, whether or not IHS "normally" would incur that cost.  25 U.S.C. § 5325(a).[31]

The United States and IHS, in its Declination Letter, adopt an assumption that does not stand up to scrutiny.  According to the United States and IHS, in its Declination Letter, Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, prohibits $16,627,268.00 in Fort Defiance's requested contract support costs, because those funds are for activities that IHS "normally" would conduct were IHS, and not a Tribe, running the healthcare facility.  25 U.S.C. § 5325(a)(2).  See Response at 5.  Alternatively, the United States and IHS assert that the $16,627,268.00 duplicates funds that IHS reimburses in the secretarial amount.  See Response at 5-6; Declination Letter at 267-68.  The United States and IHS misunderstand the ISDEAA's purpose and conflate duplicated costs with contract support costs.  It is not the case that IHS reimbursing a Tribe for a cost through

_____

[31]The Court recognizes the tension between Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 263 F. Supp. 3d at 1178, whose holding does not categorically bar IHS from reimbursing, as a contract support cost, an amount that IHS normally would incur, and Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, whose holding categorically bars IHS from reimbursing, as a contract support cost, an amount that IHS normally would incur.  Nevertheless, the Court's task here is not to pick between them, because it is not clear which of the disputed costs are permissible under the ISDEAA and which are not.  On the extant record, it is not clear: (i) which of the disputed contract support costs are for expenses that IHS "normally" would incur and are duplicated in the secretarial amount; (ii) which contract support costs are for expenses that IHS "normally" would incur and are not duplicated in the secretarial amount, and, therefore, are properly reimbursed only under the secretarial amount; and; (iii) which contract support costs are for expenses that IHS does not "normally" incur and are properly reimbursed as contract support costs.  25 U.S.C. § 5325(a)(2).  See Declination Letter at 267-68.  As the Court explains above, Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 892, makes sorting out which expenses are permissible more fact intensive.  See Analysis § I, supra at 100-05.

the secretarial amount prohibits IHS from reimbursing -- as a contract support cost -- the Tribe an additional amount for the same activity or service merely because the IHS determines that it would "normally" pay for that service were it running the program.  25 U.S.C. § 5325(a)(2).  Contract support costs' purpose is to provide Tribes an additional amount to run a program through a self-determination program so that the Tribe can "ensure compliance with the terms of the contract and prudent management." 25 U.S.C. § 5325(a)(2).  As the D.C. Circuit in Cook Inlet Tribal Council, Inc. v. Dotomain, notes, ISDEAA contract support costs do not extend so far as to cover costs that IHS normally would incur, because those must be in the secretarial amount.  See Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 894.  Nevertheless, Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 894, does not stand for the proposition that IHS may never award a Tribe contract support costs for expenses that a Tribe incurs in excess of what the IHS or the Secretary would incur if the Tribe needs more funds to cover the same activity or service "to ensure compliance with the terms of the contract and prudent management."  25 U.S.C. § 5325(a)(2).[32] That interpretation cannot be correct, because it would risk reading 25 U.S.C. § 5325(a)(2) out of ISDEAA entirely and would ignore the potential that a Tribe might have higher operating costs than the United States.  If the United States' and IHS' interpretation is correct, then, if the United

---

[32]The D.C. Circuit is correct that, if a Tribe's "secretarial amount does not cover the same facility costs 'normally' incurred by the agency, the [T]ribe's recourse is simple: Sue for a larger secretarial amount."  Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 896.  For example, if the IHS normally would pay $1,000,000.00 in facility costs but the existing secretarial amount is for $8,000,000.00 in facility costs and the Tribe needs $1,000,000.00 or even more, the Tribe may sue for a larger secretarial amount to make up the short fall.  The D.C. Circuit's conclusion, however, does not prohibit IHS from paying $1,100,000.00 in facility costs under the secretarial amount or from paying $1,000,000.00 in facility costs under the secretarial amount and $100,000.00 in itemized additions for costs that IHS normally would not pay, but that the Tribe must pay "to ensure compliance with the terms of the contract and prudent management."  25 U.S.C. § 5325(a)(2), even if those costs -- heating, cooling, or maintenance, for example -- look like they may be facility costs.

States normally would pay $1,000,000.00 in facility costs, then it cannot pay the Tribe any more than $1,000,000.00 in facility costs, even if the Tribe's building is more expensive, has higher operating costs, greater energy needs, or any of myriad other differences.  If the United States' and IHS' interpretation is correct, giving a Tribe $1,000,000.00 for facility costs under the secretarial amount and $20,000.00 in heating costs as a contract support cost to cover the cost of the Tribe's less-well-insulated building -- that the Tribe needs to "ensure compliance with the terms of the contract and prudent management" of the program -- violates 25 U.S.C. § 5325(a)(2), because it either duplicates $20,000.00 in facility costs or is an impermissible cost, because the IHS "normally" would pay for heating.  25 U.S.C. § 5325(a)(2).

This interpretation of the ISDEAA cannot be correct, because it assumes that all costs that the Tribe might incur will be the same costs that IHS would incur.  In other words, it presumes that all of the same basic items or services that both the Tribe and IHS need to run a program must be the same, except for the discrete items or services that the Tribe needs that the IHS "normally" does not.  25 U.S.C. § 5325(a)(2).  In other words, it reduces the cost to run a program to a list of items -- facility, staff, information services -- rather than a Tribe's distinct, actual needs and whether they might be different from IHS' needs.  For example, if information services are more expensive to a Tribe, whether because of higher overhead, greater travel, and/or the state of existing infrastructure, than they would be to IHS, because of lower prices, existing staff, and/or existing contracts that permit IHS to obtain equipment more quickly, the ISDEAA does not require IHS to decline to reimburse a Tribe for its information services costs above the IHS' equivalent estimate.  Rather, the ISDEAA, as Cook Inlet Tribal Council, Inc. v. Dotomain, 20 F.4th at 89, concludes, does not permit IHS to reimburse a Tribe, as contract support costs, for the same expenses that it normally would incur.  For example, the ISDEAA does not permit IHS to

reimburse, as a contract support cost, a Tribe for the money that IHS normally would have spent on information services, because that cost must be covered in the secretarial amount. <u>Cook Inlet Tribal Council, Inc. v. Dotomain</u>, 20 F.4th at 894, reinforces the proposition that, if a Tribe incurs higher costs than IHS "normally" would have to administer a service, those costs are not considered "normal[]," 25 U.S.C. § 5325(a)(2), and thus may be reimbursed as contract support costs, even if those costs represent categories already included in the secretarial amount, provided that the "specific, individuated" expense is not" already included, <u>Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell</u>, 263 F. Supp. 3d at 1178. <u>Cook Inlet Tribal Council, Inc. v. Dotomain</u>, 20 F.4th at 89, does not prohibit IHS from reimbursing a Tribe, as a contract support cost, an amount of money for the same activity or service if the difference between the expenses that the IHS normally would incur and the Tribe's expenses for the same "activities" is to "ensure compliance with the terms of the contract and prudent management." 25 U.S.C. § 5325(a)(2). The ISDEAA is concerned with money, not labels. Just because an "activit[y] which must be carried on by a tribal organization" costs a Tribe more does not prohibit the IHS from covering the difference. 25 U.S.C. § 5351(a)(2). Indeed, that risk is what Congress designed the ISDEAA to prevent. <u>See</u> <u>Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell</u>, 220 F. Supp. 3d 1190, 1227-56 (D.N.M. 2016)(Browning, J.)). Consequently, 25 C.F.R. § 900.33 likely prohibits IHS' partial declination, and, even if it does not, then the D.C. Circuit's decision in <u>Cook Inlet Tribal Council, Inc. v. Dotomain</u>, 20 F.4th at 89, does not require IHS' partial declination, because § 5325(a) requires the funds at issue. Accordingly, it is substantially likely that Fort Defiance will succeed on the merits.

### B.     FORT DEFIANCE WILL SUFFER IRREPABLE HARM WITHOUT A PI.

Because the money that Fort Defiance seeks will help it to provide critical healthcare, it will suffer irreparable harm absent a PI.  "To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'"  Heideman v. S. Salt Lake City, 348 F.3d at 1189 (quoting Wis. Gas Co. v. Fed. Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Irreparable harm is "not harm that is 'merely serious or substantial.'"  Heideman v. S. Salt Lake City, 348 F.3d at 1189 (quoting Prairie Band of Patowatomi Indians v. Pierce, 253 F.3d 1234, 1250 (10th Cir. 2001)).  A movant suffers irreparable injury "'when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain.'"  Planned Parenthood Ass'n of Utah v. Herbert, 828 F.3d 1245, 1263 (10th Cir. 2016)(quoting Awad v. Ziriax, 670 F.3d 1111, 1131 (10th Cir. 2012)).

Fort Defiance argues that it will suffer irreparable harm absent a PI, because Fort Defiance "and the Navajo people who depend" on its services "face irreparable harm due to the interruption in continuity of care and decreased access to vital health care services, all because of IHS' improper decision to severely reduce" Fort Defiance's funding "in the middle of a pandemic." Motion at 15-16.  In response, the United States counters that Fort Defiance "faces no irreparable injury when it possesses substantial assets and can recover damages, if warranted, at the conclusion of this action."  Response at 4.  According to the United States, Fort Defiance's alleged injury is no more than a temporary loss of income, and Fort Defiance does not support its contention that it will need to cut services and reduce hospital staff.  See Response at 3.

Without a PI to ensure Fort Defiance's funding level continues until this case is fully litigated, Fort Defiance will be in a "precarious financial situation."  Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 100 F. Supp. 3d at 1171.  IHS' decision to decline partially Fort

Defiance's proposed FY 2022 contract and accompanying AFA has had a detrimental effect on Fort Defiance's ability to "provide essential health services to its patients and community members, especially in the midst of the COVID-19 pandemic."  Complaint ¶ 55, at 13.  Because the funding that IHS gives to Fort Defiance through its ISDEAA contract covers the salaries of Fort Defiance's permanent staff members, Fort Defiance will need to reduce the number of contract nurses it hires to fill otherwise vacant positions.  See Complaint ¶ 56, at 13; Adkins Decl. ¶ 15, at 5.  Fort Defiance needs contract nurses so that it has enough staff to cover for staff who are ill and to help assist departments that are overloaded as a result of the COVID-19 pandemic. See Complaint ¶ 57, at 14; Adkins Decl. ¶ 15, at 5.  Overall, contract staff cost approximately forty percent more than permanent employees, and this cost has increased dramatically since COVID-19 began.  See Complaint ¶ 56, at 13; Adkins Decl. ¶ 14, at 4.  Because reducing the number of contract nurses will harm Fort Defiance's ability to manage the "extremely high number of COVID-19 patients seeking care" at Fort Defiance's facilities, reducing the funds needed to pay these contract nurses "will make it impossible to provide the necessary level of care to the Navajo Nation community and to the sickest patients throughout the COVID-19 pandemic."  Complaint ¶ 58, at 14.  See Adkins Decl. ¶ 15, at 5.   Moreover, reducing the number of available nurses and other employees already has impacted negatively Fort Defiance's ability to conduct contact-tracing and gather necessary information to prevent COVID-19's spread.  See Complaint ¶ 60, at 14; Adkins Decl. ¶ 16, at 5.  Diminishing Fort Defiance's capacity to provide adequate healthcare increases the burden on other hospitals and increases the financial and human costs incurred in transporting patients to other hospitals.  See Complaint ¶ 59, at 14; Adkins Decl. ¶ 15, at 5.

The United States does not dispute that Fort Defiance benefits from the money it receives through its ISDEAA contract and that reducing that money could impact its ability to provide

healthcare.  Rather, the United States contends that Fort Defiance has enough money to make up the shortfall that IHS' partial declination causes by drawing on its own funds.  See Response at 3-4.  The United States notes that, as of September 30, 2020, Fort Defiance has $227,781,909.00 in assets and a net position of $199,665,784.00.  See Response at 4; Yazzie Aff. ¶ 3, at 2.  The United States asserts that a temporary loss of income is not an irreparable injury.  See Response at 3.  While the United States is correct that monetary loss typically does not constitute irreparable injury, see Prairie Band of Patowatomi Indians v. Pierce, 253 F.3d 1250, it is not the case that monetary loss, even if temporary, can never cause irreparable harm, see Kan. Health Care Ass'n, Inc. v. Kan. Dept. of Soc. and Rehab. Servs., 41 F.3d 1536, 1544 (10th Cir. 1994).  A party seeking a PI does not need to assert that they are "on the verge of going out of business in order to establish that they are suffering imminent and irreparable harm."  Kan. Health Care Ass'n, Inc. v. Kan. Dept. of Soc. and Rehab. Servs., 41 F.3d at 1544.  As the Tenth Circuit notes, a PI seeker's wealth does not demolish his or her ability to prove irreparable harm -- even someone who has the resources to subsidize a monetary loss may still suffer irreparable harm from a monetary injury.  See Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Soc. and Rehab. Servs., 41 F.3d at 1544 n.15.  Although Fort Defiance has other funds available, at least some of those funds already are slated for another purpose: Fort Defiance plans to use these funds to cover "lapsed appropriations, government shutdowns, incremental and often delayed payments by IHS, or other potential catastrophic events."  Reply at 9.  See Second Declaration of Dr. Sandra Adkins ¶ 10 at 4-5, filed April 22, 2022 (Doc. 42)("Second Adkins Decl.").  As the Tenth Circuit notes, a "threat to trade or business viability may constitute irreparable harm" to justify a PI.  Tri-State Gen. & Transmission Ass'n, Inc. v. Shoshone River Power, Inc., 805 F.2d 351, 356 (10th Cir. 1986).  In addition, even if Fort Defiance "is not technically insolvent before this case goes to trial, its patients, employees, and

creditors may see the writing on the wall and begin jumping ship well before then," but it is "particularly important" that Fort Defiance "not begin to lose its professionals -- both doctors and nurses -- for fear that the facility is becoming insolvent."  Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 100 F. Supp. 3d at 1172.  As a result, Fort Defiance's "losses before trial will be difficult to calculate with certainty," which "cuts in favor of finding irreparable harm." Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 100 F. Supp. 3d at 1172.

Moreover, concluding that Fort Defiance's existing assets abrogate an irreparable injury finding would create an incentive for Fort Defiance to decrease its assets or put itself in a more precarious financial position before engaging in ISDEAA contract negotiations.  Fort Defiance would have an incentive to prevent a court from doing what the United States asks here in the event that IHS declines Fort Defiance's contract renewal or renewed AFA.  Because that conclusion does not comport with the ISDEAA's purposes, Fort Defiance's assets do not undercut an irreparable injury finding.  See Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1230 (10th Cir. 1997)("The court's discretion [to find irreparable injury] is to be exercised in light of the purposes of the statute on which the plaintiff's suit is based.").

Next, the United States argues that Fort Defiance does not "explain[] its delay in seeking preliminary relief, which 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'"  Response at 4 (quoting GTE Corp. v. Williams, 731 F.2d 676, 678 (10th Cir. 1984)).  IHS issued its Declination Letter on December 1, 2021.  See Declination Letter at 262.  Fort Defiance filed its Initial TRO Motion on March 13, 2022, see Initial TRO Motion at 1, and its Motion seeking a PI on April 1, 2022, see Motion at 1.  This four-month delay does not undercut Fort Defiance's irreparable injury assertion. First, although delay may undercut a party's irreparable injury claims, a party may suffer

irreparable injury even if its request that the irreparable injury be remedied is sluggish; someone injured in a car accident does not become less likely to suffer long term damage if they wait before calling for an ambulance.  See Fish v. Kobach, 840 F.2d 710, 753 (10th Cir. 2016).  Second, and more directly, a four month delay is not fatal to Fort Defiance's claims.  See Kan. Health Care Ass'n, Inc. v. Kan. Dept. of Soc. and Rehab. Servs., 41 F.3d at 1544 (concluding that a three-month delay does not destroy a party's claim of irreparable injury).  There is no "categorical rule that delay bars the issuance of an injunction."  Fish v. Kobach, 840 F.2d at 753.  "The question instead is whether the delay was unreasonable, was not a decision by the party to 'sit on its rights,' and did not prejudice the opposing party."  Fish v. Kobach, 840 F.2d at 753 (quoting RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1211-12 (10th Cir. 2009)).  Litigation takes time.  Although Fort Defiance may have been able to seek an injunction with more haste, four months is not unreasonable.

As of January 27, 2022, IHS has provided $1,887,739.00 in "reimbursable indirect costs for FY 2022," which is $16,627,268.00 less than Fort Defiance proposed.  Complaint ¶ 54, at 13. See Adkins Decl. ¶ 13, at 4.  In non-COVID-19 years, IHS is responsible for approximately forty-five percent of Fort Defiance's budget.  See Tr. at 6:11-16 (Miller).  It is now May.  Although further litigation may reveal that Fort Defiance is not entitled to the money it seeks, the dramatic reduction in indirect contract support costs that results from IHS' partial declination is causing irreparable injury to Fort Defiance.

### C.   THE HARM THAT FORT DEFIANCE WILL SUFFER ABSENT A PI OUTWEIGHS ANY INJURY TO THE UNITED STATES, AND A PI IS IN THE PUBLIC INTEREST.

A party seeking a PI must show that the threatened injury outweighs whatever harm the proposed PI may cause the opposing party and that the injunction, if issued, will not adversely

affect the public interest.  See Aposhian v. Barr, 958 F.3d at 978.  The harm-to-the-opposing-party factor and public-interest factor "merge" when the opposing party is the federal government.  Nken v. Holder, 556 U.S. at 435.  See Aposhian v. Barr, 958 F.3d at 978.  When balancing the equities of issuing a PI in the healthcare context, courts have found that the increased risk of further spread of COVID-19 is worth considering and cannot be minimized as "speculative."  Valdez v. Grisham, 559 F. Supp. 3d 1161 (D.N.M. 2021)(Vasquez, J.)(finding a strong public interest in preventing further spread of COVID-19).  While IHS and other federal agencies have a valid interest, which the public shares, in ensuring that taxpayer dollars allotted to contractors are being put to scrupulous and efficient use, this consideration must be weighed against the substantial public interest in ensuring that access to healthcare for Native American populations is not interrupted unduly.  See Navajo Health Found.-Sage Mem'l Hosp., Inc. v. Burwell, 100 F. Supp. 3d  at 1189-91.

Here, Fort Defiance contends that, in contrast to its own irreparable harm, IHS "will not be harmed" by issuance of an injunction.  Motion at 16.  Instead, according to Fort Defiance, the injunction merely will provide for the continuation of the status-quo -- a "decades-long relationship" between Fort Defiance and IHS -- at least until trial -- and will require only "relatively minimal" funding in the interim, compared, presumably, to the annual federal budget.  Motion at 16.  Finally, Fort Defiance adds that IHS has separate recourse under the Contract Disputes Act, 41 U.S.C. §§ 7101-7109, if it finds any payments required by the injunction turn out to be "improper."  Motion at 16.

In its Response, the United States argues that a PI will harm it insofar as "it would contravene the public interest to require IHS to award funding that Congress specifically prohibited in 25 U.S.C. § 5325(a)(2)-(3)."  Response at 8.  Fort Defiance, meanwhile, argues that denying the

injunction would be adverse to the public interest, because, absent full IHS funding, Fort Defiance will be less able to "provide care to patients impacted by the [COVID-19] pandemic at its facilities[,]" requiring Fort Defiance to turn away and transfer patients to "other hospitals throughout the Western United States."  Motion at 17.  Fort Defiance contends that denying the injunction -- and thereby hamstringing Fort Defiance's care and patient capacity -- is especially adverse to the public interest at a time when the COVID-19 pandemic has disproportionately affected the Navajo Nation and placed higher demands on Fort Defiance.  See Motion at 17-18.

The equities weigh in favor of granting the PI, because Fort Defiance will suffer more harm without a PI than the United States will suffer with a PI, and issuing the injunction is in the public's interest.  Absent a PI, Fort Defiance will be forced to hire fewer contract nurses and staff who have been "critical" to the hospital's COVID-19 response.  Adkins Decl. ¶ 15, at 4-5.  Reducing staff will make it "impossible to provide the necessary level of care" to its patients, Adkins Decl. ¶ 15, at 5, who are predominately from the Navajo Nation and experience disproportionate harm from the COVID-19 pandemic.  Motion at 17.  The Navajo Nation already is "underserved[,]" and further compromising Fort Defiance's care capacity may force patients to seek care elsewhere, burdening other health care systems in the region and hampering the region's COVID-19 responsiveness.  Adkins Decl. ¶ 15, at 5.  Such outcomes constitute substantial harm to Fort Defiance's reputation and capacity as a healthcare provider, to Navajo and other regional constituents' interest in proximate, accessible healthcare, and to the public's general interest in a robust and responsive health care system, especially amid the lingering COVID-19 pandemic.

On the other hand, there is no indication that providing funds at a level that is nearly equivalent to earlier self-determination contracts between the parties will harm the United States. See Tom Decl. ¶ 9, at 3.  Such funding would be required only in the short term, until a full trial

on the merits can be held.  Any monetary harm that the United States experiences in the interim can be restored after trial.  The United States' sole argument in its defense is that it would harm the public interest to "require IHS to award funding that Congress specifically prohibited in 25 U.S.C. § 5325(a)(2)-(3)."  Response at 8.  As the Court explains in Analysis § II(A), supra at 106-16, the ISDEAA likely does not prohibit the contract supports costs that IHS declined. Accordingly, the United States has not alleged any harm or public interest that would outweigh the harms that Fort Defiance will experience absent a PI.

## III.    FORT DEFIANCE DOES NOT NEED TO SECURE A BOND.

Fort Defiance argues that, if the Court grants its PI request, the Court should not impose a bond.  See Motion at 18.  Under rule 65(c), the Court may issue a PI "only if the movant gives security in an amount that the court considers proper to pay the costs and damages by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The United States, and its officers and agencies, are exempt from this requirement.  See Fed. R. Civ. P. 65(c).  The Court must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable").  See also Flood v. ClearOne Comm'ns, 618 F.3d 1110, 1126 n.4 (10th Cir. 2010). Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security'" and may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).  When determining whether to impose a bond, a court "'should consider the possible loss to the enjoined party together with the hardships that a bond requirement would impose on the applicant.'"  Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 100

F. Supp. 3d 1191 (quoting Crowley v. Local No. 82, Furniture & Piano, 679 F.2d 978 (1st Cir. 1982), rev'd on other grounds, 467 U.S. 526 (1984)).

The Court will not require Fort Defiance to post a bond. Here, a bond only would exacerbate the problem that Fort Defiance hopes a PI will remedy -- the financial troubles that IHS' partial declination caused. That $16,627,268.00 is a substantial amount for IHS to provide Fort Defiance to comply with the PI reinforces this point. If the Court requires Fort Defiance to post a bond of the same amount -- or even a prorated amount to cover the PI until trial -- it would "risk defeating [the] preliminary injunction's purpose: keeping [Fort Defiance] afloat until this case's resolution." Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 100 F. Supp. 3d at 1192. The Court here reaches a similar conclusion that it reached in Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 100 F. Supp. 3d at 1192: it is inclined to award a permanent injunction under 25 U.S.C. § 5331, but chooses to award a PI instead "only to preserve the status quo and to give the Defendants an opportunity to develop their arguments on the remaining factual issues." Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 100 F. Supp. 3d at 1192. Because the money that Fort Defiance will get from the United States for the PI will be used to make up for a temporary budget shortfall that the IHS' partial declination causes, and because the United States "can recoup any funds that [Fort Defiance] expends for an impermissible purpose" later in the litigation, "ordering a bond at this stage would be inappropriate," and either would exacerbate or undercut the solution that the PI attempts to provide. Navajo Health Found. -- Sage Mem'l Hosp. Inc. v. Burwell, 100 F. Supp. 3d at 1192.

**IT IS ORDERED** that: (i) the request in Fort Defiance Indian Hospital Board, Inc.'s Motion for Immediate Injunctive Relief or in the Alternative a Preliminary Injunction with Supporting Memorandum, filed April 1, 2022 (Doc. 29), for an injunction under 25 U.S.C. § 5331

is denied; (ii) the request in Fort Defiance Indian Hospital Board, Inc.'s Motion for Immediate Injunctive Relief or in the Alternative a Preliminary Injunction with Supporting Memorandum, filed April 1, 2022 (Doc. 29), for a preliminary injunction is granted; and (iii) IHS must comply with Fort Defiance's proposed FY 2022 self-determination renewal contract and its accompanying AFA by reimbursing Fort Defiance an additional $16,627,268.00, prorated monthly, for contract support costs for all of FY 2022, and, if necessary, $18,515,007.00, prorated monthly, for FY 2023 and beyond, until this case can be resolved on the merits.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Mielke
Sonosky, Chambers, Sachse, Miller & Brownell, LLP
Albuquerque, New Mexico

-- and --

Lloyd B. Miller
Rebecca Ann Patterson
Sonosky, Chambers, Sachse, Miller & Monkman, LLP
Anchorage, Alaska

-- and --

Steven C. Boos
Law Office of Steven Boos, LLC
Bayfield, Colorado

      *Attorneys for the Plaintiff*

Fred J. Federici
   United States Attorney
Kimberly N. Bell
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Defendants*